

Neesa Sethi (CA Bar No. 263955)
nsethi@wmclaw.com
Stephen A. Weisbrod (pro hac vice to be filed)
August J. Matteis, Jr. (pro hac vice to be filed)
Kathleen M. S. Hale (pro hac vice to be filed)
Joshua N. Katz (pro hac vice to be filed)
Weisbrod Matteis & Copley PLLC
1900 M Street, NW
Suite 850
Washington, DC  20036
Telephone:  (202) 499-7900
Facsimile:  (202) 478-1795

*Attorneys for Plaintiffs William Jeffrey Burnett
and Joe H. Camp*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

ED CV 12 - 01715 VAP SPx

| | |
|---|---|
| William Jeffrey Burnett and Joe H. Camp, | ) |
| Plaintiffs, | ) Case No.: |
| v. | ) **COMPLAINT** |
| Conseco Life Insurance Company, CNO Financial Group, Inc., CDOC, Inc., and CNO Services, LLC, | ) |
| Defendants. | ) |

Complaint                                                                 C.A. No.

## I.    SUMMARY OF THE ACTION

1.    Plaintiffs William Jeffrey Burnett and Joe H. Camp (together, the "Plaintiffs") are former owners of "LifeTrend III" and "LifeTrend IV" life insurance policies (the "Policies"). The Policies were issued by corporate predecessors to Conseco Life Insurance Company ("Conseco Life") and currently are administered by (1) Conseco Life; (2) Conseco Life's indirect corporate parent, CNO Financial Group, Inc. ("CNO," formerly known as "Conseco, Inc."); (3) Conseco Life's direct corporate parent CDOC, Inc. ("CDOC"); and (4) another affiliate of CNO called CNO Services, LLC ("CNO Services," formerly known as "Conseco Services, LLC") (collectively, the "Conseco Defendants").

2.    The LifeTrend Policies were sold in the 1980s and 1990s. By 2008, the Conseco Defendants had become very concerned about losses in the LifeTrend program. LifeTrend policyholders were becoming quite elderly and starting to die in increasing numbers, with the result that the Conseco Defendants were having to pay death benefits in increasing numbers. But revenue from premiums on the Policies was low because the Policies were so-called "vanishing premium" policies, and very few policyholders were paying new premiums for their life insurance coverage.

3.    In October 2008, to make up for past losses and to stave off future losses, the Conseco Defendants announced massive increases in premiums, cost-of-insurance deductions, and expense charges that LifeTrend policyholders would be required to pay if they wanted to maintain their coverage going forward. The announced increases violated several express and unambiguous terms of the insurance contracts.

4.    The increases announced in October 2008 were designed to save the Conseco Defendants money in two ways: (1) they would generate more revenue from the policyholders who kept their coverage, and (2), more significantly, they would induce thousands of policyholders to give up their insurance before they died

1

Complaint                                                                    C.A. No.

1   – and before the Conseco Defendants had to pay out death benefits to the

2   policyholders' survivors.

3        5.     The Conseco Defendants knew when they announced the improper

4   increases in premiums, cost-of-insurance deductions and expense charges that

5   thousands of people would respond to the shock of the massive increases by

6   surrendering their Policies or having them lapse.  Indeed, producing widespread

7   "shock lapse" was one of the main purposes of the increases – the Conseco

8   Defendants cynically anticipated that they would save tens of millions of dollars on

9   a money-losing product line if they could induce a few thousand policyholders to

10  give up their Policies before the policyholders died.

11       6.     Because of the increases in premiums, cost-of-insurance deductions,

12  and expense charges, Mr. Burnett and Dr. Camp concluded that continuing to

13  maintain their Policies was impractical.  They surrendered their Policies, as did

14  thousands of other policyholders, with each of those policyholders forfeiting tens or

15  hundreds of thousands of dollars' worth of life insurance coverage.

16       7.     From October 6, 2010 until December 20, 2011, Mr. Burnett and Dr.

17  Camp were members of the nationwide class certified under Federal Rule of Civil

18  Procedure 23(b)(2) in the multidistrict litigation captioned *In re Conseco Life*

19  *Insurance Company Life Trend Insurance Marketing and Sales Practices*

20  *Litigation*, Case No. 3:10-md-02124-SI (N.D. Cal.) (the "LifeTrend MDL").  On

21  December 20, 2011, however, the court presiding over the LifeTrend MDL (the

22  "MDL Court") determined that, in light of the United States Supreme Court's

23  ruling *Wal-Mart v. Dukes*, 131 S. Ct. 2541 (2011), former policyholders no longer

24  could be included in the certified class, as their claims raised damage calculation

25  issues not present in the breach-of-contract claims asserted by current

26  policyholders.

27       8.     After the MDL Court ruled that former policyholders could not be

28  included in a class certified under Rule 23(b)(2), representatives of the current

- 2 -

Complaint                                                                              C.A. No.

1    LifeTrend policyholders continued to litigate.  On July 17, 2012, the MDL Court

2    granted in part the current policyholder representatives' motion for preliminary

3    injunction against Conseco Life.  Finding that the policyholders' contractual

4    arguments were likely correct, the MDL Court enjoined Conseco Life from

5    imposing cost-of-insurance charges on approximately 100 policyholders whose

6    accumulation account values have been or will be exhausted by the end of 2013 due

7    to the increased charges.

8         9.    Thus, while current LifeTrend policyholders are represented in and

9    receiving protection as a result of the LifeTrend MDL, former LifeTrend

10   policyholders are not represented by the class representatives and are receiving little

11   if any benefit from that litigation.  That is so even though the former policyholders

12   are the policyholders who actually lost their life insurance and suffered the greatest

13   harm as a result of the Conseco Defendants' contract breaches.

14        10.   Despite their exclusion from the class certified by the MDL Court

15   under Rule 23(b)(2), Mr. Burnett and Dr. Camp continue to believe that the claims

16   of former LifeTrend policyholders are best pursued as a class action.  Pursuing

17   claims independently is not a viable option for many individual policyholders, even

18   though their claims are valuable.  Accordingly, Mr. Burnett and Dr. Camp intend to

19   seek certification of a second nationwide class under Rule 23(b)(3) and,

20   alternatively, Rule 23(c)(4), that would include all former LifeTrend policyholders

21   who, after the increases in premiums, cost-of-insurance deductions, and expense

22   charges were announced in October 2008, surrendered their Policies or had them

23   lapse.

24        11.   In this complaint, on behalf of all members of the proposed class of

25   former LifeTrend policyholders, Plaintiffs seek (a) declarations that the Conseco

26   Defendants breached the Policies and (b) money damages for the value of the life

27   insurance that the Class Members lost as a result of the Conseco Defendants'

28   cynical shock lapse strategy.

- 3 -

12.     Plaintiffs seek this relief and breach-of-contract damages not only from Conseco Life but also from the other Conseco Defendants, which are alter egos of Conseco Life.

13.     While the Conseco Defendants from time to time observe some corporate formalities, they have a history of blurring lines between the various affiliated companies.  The payment of dividends up from Conseco Life, the infusion of cash down from Conseco Life's parents, and the terms of contracts between Conseco Life and its corporate affiliates have followed patterns wholly inconsistent with business dealings by companies engaged in arms' length transactions.

14.     Conseco Life paid dividends when it could not afford to pay them.  Cash infusions have been made to Conseco Life by its affiliates when they had no contractual obligation to pay anything to Conseco Life.  Prices charged by Conseco Life's affiliates for services provided to the company were set based on the company's ability to pay rather than the value of the services received.  And because Conseco Life had no employees of its own, all major decisions made on behalf of the company were made by employees of other Conseco Defendants.

15.     Accordingly, Plaintiffs bring this complaint against all of the Conseco Defendants.

## II.     PARTIES

16.     Plaintiff William Jeff Burnett, age 69, was a citizen and resident of California from 1953 until 2007.  At the time he purchased his Policies, Mr. Burnett lived in Twentynine Palms, California.  In 2007, after retiring from his job as a secondary school teacher, Mr. Burnett and his wife moved to Jefferson City, Missouri.  Mr. Burnett currently is a citizen of Missouri.  He purchased three LifeTrend III Policies and has surrendered all of them.

17.     Plaintiff Joseph Camp, age 63, is a citizen and resident of North Carolina.  He lived in North Carolina when he purchased his LifeTrend Policy.  Dr. Camp purchased a LifeTrend IV Policy that he has surrendered.

Complaint                                                                C.A. No.

18.    Defendant Conseco Life is a corporation duly organized and existing under the laws of Indiana.  The Policies were issued by Massachusetts General Life Insurance Company ("Massachusetts Life") and Philadelphia Life Insurance Company ("Philadelphia Life"), which, through a series of transactions occurring in the 1990s, merged and became Conseco Life.  Conseco Life has transacted and continues to transact business in the State of California within the Central Judicial District, by, among other things, selling and administering life insurance policies.

19.    CDOC, Inc. is the direct corporate parent and owner of 100% of the stock of Conseco Life.  CDOC is a corporation duly organized and existing under the laws of Delaware.  Through CDOC's ownership of and control over Conseco Life, it transacts business in the State of California and within the Central District, primarily by selling and administering life insurance policies and other financial products.

20.    CNO Financial Group is the direct corporate parent and owner of 100% of the stock of CDOC, Inc.  CNO is a corporation duly organized and existing under the laws of Delaware.  CNO was incorporated in 1979, began operations in 1982, and became a public company under the name Conseco, Inc. in 1985.  In 2010, the company changed its name to "CNO Financial Group."  CNO is a holding company for a number of insurance companies, including Conseco Life.  Through CNO's ownership of and control over Conseco Life and other Conseco Defendants, CNO transacts business in the State of California and within the Central District, primarily by selling and administering life insurance policies and other financial products.

21.    CNO Services, LLC (formerly known as "Conseco Services, LLC") is a limited liability company incorporated under the laws of Indiana.  CNO and CDOC are co-owners of CNO Services.  CNO Services actually performs most of the day-to-day operations and actions of Conseco Life.  Through CNO Services' ownership of and control over Conseco Life and other Conseco Defendants, CNO

- 5 -

1   Services transacts business in the State of California and within the Central District,

2   primarily by administering life insurance policies and other financial products.

3   **III.    JURISDICTION AND VENUE.**

4       22.    Pursuant to 28 U.S.C. § 1332(a), this Court has subject matter

5   jurisdiction over this matter because the amount in controversy exceeds $75,000

6   and Mr. Burnett and Dr. Camp, on the one hand, and the Conseco Defendants, on

7   the other, are citizens of different states.

8       23.    Pursuant to 28 U.S.C. § 1332(d)(2), this Court also has subject matter

9   jurisdiction over this matter as a purported class action because the amount in

10  controversy for the entire class exceeds $5,000,000 and at least one member of the

11  purported class and at least one Conseco Defendant are citizens of different states.

12      24.    This Court has personal jurisdiction over each of the Conseco

13  Defendants because each marketed and/or sold and/or administered insurance

14  policies or other financial products in this State and in this District.

15      25.    This Court also has personal jurisdiction over CNO, CDOC and CNO

16  Services because they are alter egos of Conseco Life, which sold and administered

17  insurance policies (including Mr. Burnett's Policy) in this State and in this District.

18      26.    Venue is proper in this District under 28 U.S.C. § 1391(a) because Mr.

19  Burnett lived in this District when he purchased his Policies and received

20  communications about his Policies from the Conseco Defendants while living in

21  Twentyninepalms, California, which is located in this District.

22      27.    Similarly, assignment of this action to the Eastern Division is

23  appropriate because Mr. Burnett lived in Twentyninepalms, California when he

24  purchased his Policies and subsequently received communications from the

25  Conseco Defendants about his Policies while living there.  Twentyninepalms,

26  California is located in the Eastern Division.

27

28

Complaint                                                       C.A. No.

IV.    **FACTUAL ALLEGATIONS**

    A.    **The Conseco Defendants' Shock Lapse Strategy**

       28.    Massachusetts Life Insurance Company and Philadelphia Life Insurance Company began selling LifeTrend life insurance Policies in the late 1980s.  Upon information and belief, over 12,000 LifeTrend III and IV Policies were issued.

       29.    Upon information and belief, in approximately 1998, after they had stopped selling the Policies, Massachusetts Life and Philadelphia Life merged. They then were acquired by a subsidiary of CNO (then known as Conseco Inc.) and became Conseco Life.

       30.    Within a few years of the acquisition, the Conseco Defendants realized that acquiring Massachusetts Life and Philadelphia Life had been a major mistake. The Conseco Defendants were losing money on several lines of life insurance policies issued by Conseco Life, including the LifeTrend Policies.

       31.    The Conseco Defendants were losing money on the LifeTrend Policies for several reasons.  To begin, relatively few LifeTrend policyholders were paying premiums.  The Policies were "vanishing premium" Policies.  Under the relevant contract terms, most policyholders could cease paying premiums five years after purchasing the Policies.

       32.    In addition, the Conseco Defendants' returns on their investments were lower than previously projected.  The Conseco Defendants had no readily available revenue stream to replace the vanished premiums.

       33.    While LifeTrend-related revenues were lower than projected, LifeTrend-related liabilities were higher.  Fewer LifeTrend policyholders than previously projected were surrendering their Policies or having them lapse, with the result that the Conseco Defendants were having to pay high-dollar death benefit claims more frequently than previously projected.

Complaint                                                                                                C.A. No.

34.    In 2008, the Conseco Defendants attempted to stop the financial bleeding caused by the LifeTrend Policies.  In October 2008, years after Class Members paid very substantial initial premiums to purchase their Policies, and years after most Class Members had elected to put their Policies on "vanishing premium" status, the Conseco Defendants sent a form letter (the "October 2008 Letter") to nearly all LifeTrend policyholders.

35.    In the October 2008 Letter, the Conseco Defendants announced several changes in the way the Policies would be administered going forward.

36.    The most shocking news in the October 2008 Letter was that the company was going to start demanding so-called "shortfall payments" equal to several years' worth of annual premiums.  According to the Conseco Defendants, those annual premiums should have been paid by policyholders in prior years but had not been charged previously due to an alleged "administrative error."  For many policyholders, the shortfall payments demanded were in the tens of thousands of dollars.

37.    The Conseco Defendants also disclosed other significant changes in the October 2008 Letter, including a new method for calculating premium payment obligations, increased deductions for cost of insurance, and increased expense charges.

38.    The October 2008 Letter was not signed by a particular individual and directed questions about the Letter to the policyholder services department.

39.    In the October 2008 Letter, the Conseco Defendants assured policyholders that they all were being treated in precisely the same manner:

> **You are not being singled out.  This change will be applied to all policies in the same age, gender and underwriting classification with like benefits and provisions as your policy.**

40.    As the Conseco Defendants well knew, implementation of the changes announced in the October 2008 Letter would render the Policies unaffordable for thousands of policyholders.  Indeed, rendering the Policies unaffordable was one of the main purposes of the announced changes.

41.    "Shock lapse" is a well-known phenomenon in the life insurance industry.  The phenomenon occurs when an insurance company imposes large increases in premiums or charges that "shock" policyholders into surrendering the policies or having them lapse.  *Cf.* Defs.' Resp. to Class Pls.' Statement of Controverting Facts & Conclusions of Law in Opp'n to Defs.' Mot. for Sum. J. on Issue of Full Policy Surrender & Release, & in Supp. of Class Pls.' Cross-Mot. at 4:12-27, *In re Conseco Life Ins. Co. Cost of Ins. Litig.* (C.D. Cal. May 2, 2006) (No. 04-1610), 2006 WL 4585406 (quoting Dep. of Keith Turner) (Conseco actuary stating similar definition of "shock lapse").

42.    The administrative changes announced in October 2008 were devised for the specific purpose of shocking policyholders into giving up their Policies.  Thousands of policyholders, including Mr. Burnett and Dr. Camp, did just that.

**B.    The Structure of the Policies**

**i.    The Policies' Accumulation Accounts and Death Benefits**

43.    Under the terms of the LifeTrend Policies, each Policy provided investment income to the insured during his or her lifetime as well as a death benefit to be paid upon the death of the insured.

44.    Each Policy was tied to an investment account, also known as an "accumulation account."  Each accumulation account accrued interest at a minimum guaranteed rate of 4.5 percent.

**ii.    The Optional Premium Payment Provision**

45.    Policyholders initially funded their accumulation accounts by making annual premium payments.  Each Policy required the policyholder to pay a stated annual premium, with an option to cease paying premiums after five years pursuant

Complaint                                                                        C.A. No.

1  to the Policy's Optional Premium Payment Provision (the "OPP Provision").  The

2  OPP Provision was (and continues to be) widely described by employees of the

3  Conseco Defendants, independent brokers and policyholders as the "vanishing

4  premium" provision.

5       46.    The annual premiums paid by LifeTrend policyholders typically were

6  very large.  For example, Dr. Camp's annual premium on his Policy was $18,870.

7            **iii.**    **Monthly Cost-of-Insurance Deductions and Expense**

8                 **Charges**

9       47.    The Policies gave Conseco Life the right to impose monthly cost-of-

10  insurance deductions and expense charges, subject to certain limitations stated in

11  the Policies.

12       48.    The Policies did not define "cost of insurance" but did provide that the

13  monthly deduction would be calculated using a cost-of-insurance "rate."  The

14  Policies included tables listing the maximum cost-of-insurance rates that could be

15  charged.  The Policies identified the table of rates as the "Guaranteed Maximum

16  Monthly Mortality Charge: Table of (Monthly) Cost of Insurance Rates."  The

17  Policies stated that the rates listed in the table were "based upon the

18  Commissioner's 1980 Standard Ordinary Mortality Table."  Generally speaking, a

19  mortality table reflects calculations of the likelihood that people of certain ages and

20  genders will die in given time frames.

21       49.    Thus, according to the plain meaning of the Policies, the cost-of-

22  insurance deductions were to be determined by a formula based on mortality rates.

23       50.    Conseco Life could pass along as "expense charges" expenses related

24  to the costs of administering the Policies.  Unlike cost-of-insurance deductions,

25  which could exceed hundreds or even thousands of dollars per month, expense

26  charges were $2.50 per month at the Policy inception.  On the Policy anniversary,

27  Conseco Life had the right to raise the expense charges, but no higher than $5.00

28  per month.

Complaint                           C.A. No.

iv.    **Loans against Accumulation Account Balances**

51.    Policyholders were permitted to take out loans against the balances of their accumulation accounts. Conseco Life was permitted to charge interest on those loans. The Policies referred to any amount borrowed plus the interest accrued on that amount as "indebtedness."

v.    **Changes in Accumulation Account Balances**

52.    Generally speaking, the accumulation accounts grew when policyholders paid premiums into them and when the Conseco Defendants paid interest on amounts held in the accounts, and the accumulation accounts shrank when policyholders borrowed money from them or when the Conseco Defendants took money out of the accounts in the form of cost-of-insurance deductions or expense charges.

vi.    **The Right to Surrender a Policy**

53.    A policyholder could choose at any time to surrender the Policy and receive the balance of the accumulation account, minus a "surrender charge" and any indebtedness.

54.    Each Policy listed potentially applicable "surrender charges," which depended on the number of years in which the Policy was in force. For most Policies, the surrender charge became $0 by the twentieth year.

vii.    **Guaranteed Cash Value**

55.    Each Policy contained a "Guaranteed Cash Value" table (the "GCV Table") that listed minimum amounts that Conseco Life promised to pay the policyholder upon surrender of the Policy. The amounts listed in the GCV Table depended on the number of years in which the Policy was in force.

56.    The GCV Table stated, "[t]his table presumes that the insured pays the full annual premium shown on the preceding page each year." In other words, once a policyholder had taken advantage of the OPP Provision and stopped paying premiums, the values set forth in the GCV Table no longer applied, and the GCV

- 11 -

1  was $0.

2          **viii.    The OPP Eligibility Formula**

3       57.    Each Policy's OPP Provision allowed the policyholder to stop paying

4  annual premiums after five years as long as the amount of money in the Policy's

5  accumulation account exceeded the sum of the "Guaranteed Cash Value" ("GCV")

6  of the Policy plus the applicable surrender charge and any indebtedness.  If a Policy

7  became "underfunded," meaning that the account balance fell below that threshold,

8  then Conseco Life properly could resume charging premiums.  By contrast, if a

9  Policy was not underfunded, meaning that the account balance exceeded that

10  threshold, then Conseco Life was not authorized to resume charging premiums.

11          **ix.    Death Benefits**

12       58.    The size of a Policy's death benefit depended on, among other things,

13  the "Sum Insured" and the amount of money in the accumulation account at the

14  time of the policyholder's death.  A policyholder's beneficiary was entitled to the

15  "Proceeds" of the Policy, calculated as the greater of the (1) Sum Insured (as stated

16  in a Policy schedule) or (2) the amount in the accumulation account multiplied by a

17  factor that was supposed to correspond to the insured's age at death, less any

18  indebtedness and unpaid premiums.

19          **x.    The Non-Participating Provision**

20       59.    Conseco Life is a stock insurance company, not a mutual insurance

21  company.  Accordingly, it is entitled to keep the profits it makes and must absorb

22  the losses it incurs.  Although Conseco Life is permitted to pass along cost-of-

23  insurance and expense charges, it is prohibited from passing along to policyholders

24  the company's losses or profits.  The Policies express this limitation in the "Non-

25  Participating Provision," which states that the Policies "will not share in any of the

26  company's profits or surplus."

27       60.    Pursuant to the Non-Participating Provision, Conseco Life was barred

28  from imposing premiums or deducting expense or cost-of-insurance charges to

- 12 -

1    make up for past losses.  The language used in the Non-Participating Provision in

2    most of the Policies stated that "[a]ny premium or factor changes are determined

3    and redetermined prospectively," and that Conseco Life "will not recoup prior

4    losses, if any, by means of premium or factor changes."

5          **C.**    **Improper Demands for "Shortfall Payments" and Premiums**

6          61.    In the October 2008 Letter, the Conseco Defendants announced

7    dramatic changes in the manner in which they calculated OPP eligibility under the

8    Policies.  As a result, the Conseco Defendants sent notices to thousands of

9    policyholders improperly stating that their Policies were underfunded and that the

10    policyholders owed and would continue to owe substantial premium amounts.

11          62.    The notifications of new premium obligations were based on a gross

12    miscalculation that hinged on the Conseco Defendants' use of a single incorrect

13    variable – the GCV – when making OPP eligibility determinations.

14          63.    As noted, after a policyholder entered the OPP program and stopped

15    paying premiums, the GCV Table no longer applied and the GCV was $0.  More

16    precisely, under the plain meaning of the Policies, the GCV Table applied to a

17    policyholder on OPP status only for the initial year in which a policyholder opted

18    for OPP status.  The GCV Table applied for that year but not subsequent years

19    because that was both the first and last year in which the policyholder (a) had paid

20    the annual premium "each year" but (b) the policyholder was not required to pay

21    future annual premiums.  By the second year of a policyholder's OPP status, the

22    policyholder had not paid the annual premium "each year" and therefore the GCV

23    was $0.

24          64.    Accordingly, by 2008, for a policyholder on OPP status, the GCV no

25    longer should have figured into the calculation of whether the Policy had become

26    underfunded such that premiums properly could be charged again.

27          65.    For many years prior to 2008, the Conseco Defendants respected the

28    plain meaning of the Policies when determining whether a policy was underfunded.

- 13 -

They correctly used $0 for the GCV element of the OPP eligibility formula (*i.e.*, accumulation account greater than the sum of the GCV, plus the surrender charge and indebtedness). Prior to 2008, the Conseco Defendants routinely sent notices to OPP participants correctly stating that the GCV of their Policies was $0, with no mention of any premium obligations.

66.    In October 2008, the Conseco Defendants acknowledged that they had sent such notices for many years, and had charged no premiums to the recipients of such notices, but according to the Conseco Defendants, those notices had been sent as a result of an "administrative error," which the Conseco Defendants stated they intended to "correct."

67.    The effect of quantifying the GCV as $0 was that most Policies satisfied the OPP eligibility requirements because the value of the accumulation account had to exceed only the surrender charge plus any indebtedness.

68.    By contrast, the effect of using the values from the GCV Table was that, according to the Conseco Defendants, most LifeTrend policyholders had underfunded accumulation accounts, owed enormous "shortfall amounts," and would have to pay substantial annual premiums going forward.

69.    Mr. Burnett, Dr. Camp and thousands of other LifeTrend policyholders were informed that if they did not make up the alleged shortfalls in their accumulation accounts, the Conseco Defendants would draw down on the accounts such that the policyholders would lose their investments and their insurance coverage.

**D.    Improper Cost-of-Insurance Deductions and Expense Charges.**

70.    The Policies permitted Conseco Life to impose cost-of-insurance deductions up to a certain specified levels. Such deductions were to be calculated according to a formula that is based on mortality rates.

71.    Although mortality had declined, in the October 2008 Letter, the Conseco Defendants announced substantial increases in cost-of-insurance

- 14 -

deductions.  The announced increases violated the Policies because the increases were based on factors other than mortality.

72.    For many policyholders, the new cost-of-insurance deductions totaled many thousands of dollars per year.

73.    The Conseco Defendants also announced that monthly expense charges would double, from $2.50 to $5.00 per month.  They did not claim, however, that administrative expenses had doubled.

74.    The announced increases in expense charges violated the Policies because they did not correspond to Conseco Life's actual expenses.

**E.    The Regulatory Settlement Agreement**

75.    The administrative changes announced in October 2008 drew the attention of state insurance regulators from California, Florida, Indiana, Iowa and Texas (the "Lead Regulators").  The Lead Regulators launched a joint investigation.

76.    As a result of the regulatory investigation, the Conseco Defendants informed policyholders in another form letter issued in November 2008 that the changes announced in the October 2008 Letter were suspended.

77.    On May 25, 2010, Conseco Life announced that it had entered into the Regulatory Settlement Agreement ("RSA") with the Lead Regulators and thirty-seven other state insurance regulators.  At least forty-five state insurance regulators ultimately signed the RSA.

78.    Under the RSA, Conseco Life and other Conseco Defendants agreed not to charge the huge one-time shortfall payments announced in the October 2008 Letter.  However, nothing in the RSA barred the Conseco Defendants from applying the OPP Provision in the manner announced in the October 2008 Letter. The Lead Regulators also agreed that they would not take action to stop the Conseco Defendants from imposing increases in cost-of-insurance deductions and expense charges that were substantially similar to those announced in the October

- 15 -

2008 Letter. The Lead Regulators also agreed to a new "per unit expense charge" that the Conseco Defendants elected to start imposing on policyholders.

79. The RSA described the allegations that regulators had investigated in regard to the LifeTrend Policies as "allegations related to the sale, administration and management of Conseco Life Insurance Company's LifeTrend life insurance policies" and the "processes" that Conseco Life "use[s] to identify, manage, and correct policy administration issues." Specifically,

> [t]he Lead Regulators' review of the LifeTrend policies
> included the following issues:
>
> a. Whether any marketing or advertising materials used by
>    Conseco Life or its predecessors for the LifeTrend policies
>    contained any false or misleading information;
>
> b. Whether Conseco Life or its predecessors engaged in sales
>    practices that misinterpreted the benefits, advantages, or
>    terms of the LifeTrend policies;
>
> c. Whether any communication by Conseco Life or its
>    predecessors was misleading to LifeTrend Policyowners;
>
> d. Whether the Company had failed to properly manage or
>    administer the LifeTrend policies; and
>
> e. Whether Conseco Life and its predecessors properly
>    determined NGE changes made to the LifeTrend policies.

RSA at 17-18 ¶ 26.

80. The Lead Regulators did not investigate whether the Conseco Defendants were properly applying the OPP eligibility formula when determining whether policyholders owed premiums.

81. The Lead Regulators never alleged that the Conseco Defendants improperly applied the OPP eligibility formula when announcing the new premium amounts.

Complaint                                                                C.A. No.

82.    The Lead Regulators did not investigate whether the Conseco Defendants were improperly including factors other than mortality in cost-of-insurance deductions.

83.    The Lead Regulators never alleged that the Conseco Defendants were calculating cost-of-insurance deductions improperly by including factors other than mortality in that calculation.

84.    The Lead Regulators did not investigate whether the Conseco Defendants were imposing expense charges in amounts exceeding actual expenses.

85.    The Lead Regulators never alleged that the Conseco Defendants imposed expense charges in excess of actual expenses in violation of the Policies.

86.    The Lead Regulators did not investigate whether the Conseco Defendants were fulfilling their interest payment obligations.

87.    The Lead Regulators never alleged that the Conseco Defendants failed to pay policyholders the guaranteed interest rate.

88.    The Lead Regulators did not investigate whether the Conseco Defendants were violating the Policies' Non-Participating Provision by attempting to make up for past losses through increased premiums, increased cost-of-insurance deductions and increased expense charges.

89.    The Lead Regulators never alleged that the Conseco Defendants improperly attempted to recoup past losses through increased premiums, increased cost-of-insurance deductions or increased expense charges.

- 17 -

1

### i.    The RSA's "Corrective Action Plan"

2    90.    The RSA allowed the Conseco Defendants to implement some, but not

3  all, of the administrative changes announced in the October 2008 Letter.  The

4  administrative changes permitted and the administrative changes prohibited under

5  the RSA were described in the RSA's "Corrective Action Plan" or "CAP."

6    91.    The CAP imposed certain obligations on the Conseco Defendants and

7  gave them certain rights, but for policyholders who chose to participate in the CAP,

8  it "neither impose[d] any obligations upon, nor [took] away any rights."

9    92.    The CAP made clear that "[e]xcept as explicitly provided herein,

10  nothing in this Agreement or any of its terms and conditions shall be interpreted to

11  alter in any way the contractual terms of any insurance policy issued or acquired by

12  Conseco Life or by the parties to such contract."  RSA at 51, ¶ 132.

13    93.    As for the alleged underfunding of policyholders' accumulation

14  accounts, the CAP gave policyholders various options.  If the Conseco Defendants

15  determined that the policyholder's account was underfunded and the policyholder

16  did not wish to make any more premium payments, then, under the CAP's

17  "Optional Additional Policy Benefits," the policyholder could elect a "Reduced

18  Paid-Up Policy." *Id.* at 21, ¶ 37(ii).  The policy's death benefit then would be

19  reduced to a level that the Conseco Defendants calculated as equivalent to the

20  funding level of the accumulation account.  If the Conseco Defendants determined

21  that the policyholder's account was underfunded and the policyholder was willing

22  to pay some additional premiums, then the Policy could receive a new, reduced face

23  value and a new annual premium amount. *Id.* at 21, ¶ 37(i).

24    94.    The CAP did not dictate the manner in which underfunding would be

25  determined, and thus the Conseco Defendants was permitted to apply the OPP

26  Provision in the manner that resulted in the outlandish "shortfall" calculations

27  described in the October 2008 Letter.

28

- 18 -

95.    The RSA also established a settlement pool in the amount of $10,000,000 for "eligible" LifeTrend policyholders.  The amount that each policyholder could receive from the settlement pool depended on the distribution scheme set forth in the RSA and the number of people who elected to collect from the pool.

### ii.    The RSA Release Form

96.    Before a policyholder could take advantage of most of the options available under the CAP, including participating the settlement pool, he or she had to sign a release form.  RSA Exhibits F.1 & F.2.

97.    The release form, which was found in the RSA, provided:

> In consideration of the Relief ("Relief") provided to
> (Name), (hereinafter "Claimant"), as described herein,
> Claimant, on behalf of himself or herself, and on behalf of
> his or her heirs, personal representatives, successors and
> assigns, does hereby release, acquit and forever discharge
> Conseco Life Insurance Company (hereinafter referred to
> as "Company") and its affiliates, subsidiaries, parents,
> agents, officers, directors, employees, insurers, successors
> and assigns (hereinafter referred to as "Released Parties"),
> from any and all claims of any kind whatsoever, whether
> known or unknown, which Claimant now has or which
> may hereafter accrue, arising out of or in any way related
> to any current and/or future litigation that Claimant could
> bring regarding the allegations in the Agreement, for
> Policy Number XXXX issued to Claimant by the
> Company (hereinafter the "Policy"), for the period
> covering the solicitation and eventual issue date of the

Complaint                                                                                    C.A. No.

1    Policy to the date hereof (hereinafter the "Released

2    Claims").

3  RSA at Ex. F.1.

4    98.    The RSA did not define the phrase "allegations in the Agreement"

5  found in the definition of "Released Claims."

6    99.    The CAP imposed restrictions on when the Conseco Defendants could

7  impose expense charges and deductions for cost of insurance but it did not preclude

8  the company from charging increased amounts. *Id.* at 27-30, ¶¶ 56-61.  The only

9  restriction on the imposition of such increased charges was that the Conseco

10  Defendants would have to stop applying them once it reached a "break-even" result.

11    100.   The Conseco Defendants also introduced through the RSA a new "per

12  unit" expense charge that was not mentioned in the October 2008 Letter and was

13  not mentioned in the Policies.

14    **F.    Breaches of the Policies**

15    101.   Many of the changes to the administration of the Policies announced in

16  the October 2008 Letter and many of the changes permitted under the RSA

17  constituted violations of the clear and unambiguous terms of the LifeTrend Policies.

18    102.   First, the Conseco Defendants improperly calculated eligibility for the

19  OPP Provision by using the values in the Table of Guaranteed Policy Values

20  instead of zero.   Based on those miscalculations, the Conseco Defendants charged

21  substantial premium amounts not actually owed by policyholders.

22    103.   Second, the Conseco Defendants calculated cost-of-insurance charges

23  in violation of the Policy terms by basing the charges on factors other than

24  mortality rates.  The Conseco Defendants assert that the increases in cost-of-

25  insurance deductions were permissible because, although mortality declined after

26  the Policies were issued, the cost to the Conseco Defendants of paying death

27  benefits proved to be higher than projected, as fewer policyholders than expected

28  had their Policies lapse.  However, policy lapse behavior is not mortality.  The

- 20 -

Complaint                                                                    C.A. No.

Policies did not permit increases in cost-of-insurance deductions based on factors other than increased mortality.

104.   Third, in calculating expense charges, the Conseco Defendants improperly included costs other than actual expenses and have added a new and unauthorized expense charge.

105.   Fourth, the cost-of-insurance deductions and expense charges not only violated the Policy terms but also caused the dilution of the Policies' guaranteed 4.5 percent interest rate.

106.   Finally, through increased premiums, cost-of-insurance deductions and expense charges, the Conseco Defendants breached the Policies' Non-Participating Provision by passing the company's losses onto policyholders.

107.   Despite the RSA, the Conseco Defendants were able to start collecting many thousands of dollars in premiums on each Policy (even though no premiums were due in most cases), start imposing thousands of dollars' worth of increases in cost-of-insurance deductions for each Policy (even though mortality had declined), start doubling monthly expense charges (even though the Conseco Defendants had made no showing that expenses incurred by the Conseco Defendants had doubled), and start implementing so-called "per unit" expense charges (even though such charges were not authorized under the Policies).

108.   The Conseco Defendants have reaped and will continue to reap significant financial benefits through their ongoing collection of new premiums, increased cost-of-insurance deductions and increased expense charges.  The most significant financial benefit to the Conseco Defendants from the administrative changes, however, was that, as a result of the enormous increases in the amounts that policyholders were told they would have to pay to maintain their Policies, thousands of policyholders were compelled to surrender their Policies or have them lapse.

Complaint                                                                                          C.A. No.

109.    This shock lapse was the intended consequence of the administrative changes.  It has generated or will generate millions of dollars in cost savings to the Conseco Defendants while causing Mr. Burnett and Dr. Camp, and thousands of other policyholders to suffer corresponding losses in the form of forfeited life insurance coverage.

**G.    Plaintiffs' Policy History with Conseco Life**

**i.    Dr. Camp**

110.    Dr. Camp is 63 years old.  He previously owned a LifeTrend IV Policy, numbered 1090095604, with an effective date of May 15, 1993.

111.    The Policy's face value was $500,000, and Dr. Camp paid initial premiums of $18,870.

112.    On May 5, 1998, Dr. Camp informed Conseco Life that he was electing the OPP Provision.  After electing the OPP Provision, Dr. Camp received annual statements and other accountings stating that the GCV of his Policy was $0. He also was not charged cost of insurance for several years.

113.    Dr. Camp received the October 2008 Letter.  In it he was told that Conseco Life now would be imposing cost-of-insurance deductions of $727.97 per month, and that his Policy was underfunded by $78,274.97.

114.    Dr. Camp was stunned by these increases, especially after years of not paying premiums or incurring cost-of-insurance deductions.

115.    In November 2008, he was further shocked when he received a shortfall notice demanding payment of $78,274.97.

116.    Conseco Life's shock lapse strategy worked as planned on Dr. Camp. On December 22, 2008, Dr. Camp notified the company that he was surrendering his Policy.

117.    On February 5, 2009, he formally elected to go forward with surrendering his Policy.  Conseco Life informed him that the value of his accumulation account was $99,005.57 and that after the surrender charge, he would

- 22 -

Complaint                                                                              C.A. No.

1    receive $89,585.57.  This amount is dramatically less than the $500,000 death

2    benefit that Dr. Camp had planned on having available for his family.

3                        **ii.    Mr. Burnett**

4          118.    Mr. Burnett is 69 years old.  He purchased three LifeTrend Policies.

5          119.    In 1990, he purchased policy number 10L1030370, which had a death

6    benefit of $50,000.  The initial annual premiums were approximately $1,128.

7          120.    Also in 1990, he purchased Policy number 10L1030380, which had a

8    death benefit of $64,000.   Mr. Burnett paid annual premiums of approximately

9    $1,440.

10         121.    In June 1997, Mr. Burnett elected the OPP Provision for these two

11   Policies.

12         122.    In 1993, Mr. Burnett purchased Policy number 1090083185, which

13   had a death benefit of $71,703.  Mr. Burnett paid initial annual premiums of

14   approximately $2,100.

15         123.    Mr. Burnett elected the OPP Provision for this Policy in February

16   1999.

17         124.    In October 2008, he received the form letter sent to LifeTrend

18   policyholders declaring the Policies underfunded and demanding additional

19   premiums.

20         125.    Although shocked by the demands, Mr. Burnett did not surrender his

21   Policies immediately.  He kept apprised of the status of his Policies through

22   correspondence he received from Conseco Life.  In the summer of 2010, Mr.

23   Burnett learned of the RSA.

24         126.    In September 2010, after the cash values of his Policies declined

25   precipitously, Mr. Burnett surrendered his Policies and elected to participate in the

26   CAP's settlement pool.  Mr. Burnett signed the RSA release forms on September

27   13, 2010.  The initial amounts deposited into his accumulation accounts upon

28   surrender of all three Policies totaled $2,688.69.

- 23 -

127.    In December 2010, he obtained the cash value of Policy number 10L1030370, which was $13,791.  This policy had a death benefit of $50,000, and Mr. Burnett had paid $9,029.91 in premiums over the life of the Policy.

128.    In February 2012, Mr. Burnett obtained the cash value of Policy number 10L1030380, which was $10,390.96 for a Policy with a $64,000 death benefit.   He had paid $7,033 in premiums over the life of the Policy.

129.    Also in February 2012, Mr. Burnett obtained the cash value of Policy number 1090083185, which was $11,304.74.  The death benefit for this Policy had been $71,703, and he had paid $15,105 in premiums over the life of the Policy.

130.    In September 2012, Mr. Burnett received an additional $1,748.71 under the RSA.

131.    Compared to the premiums paid for these Policies and the value Mr. Burnett expected his family to receive upon his death – a total of $185,703 –  he received very small amounts after signing the RSA.

**H.    Conseco Defendants' Failure to Observe Corporate Formalities**

132.    Mr. Burnett and Dr. Camp bring this complaint against Conseco Life and its direct corporate parent CDOC, CDOC's corporate parent CNO, and CNO Services because, through their ownership, operation, control and/or management of all aspects of Conseco Life's business, CNO, CDOC and CNO Services also are liable to plaintiffs and the class.

133.    Conseco Life exists only as a shell company for the benefit of CNO and CDOC.  CNO, CDOC and CNO Services own, operate, and/or control all aspects of Conseco Life's business.

134.    CNO and CDOC have the power to appoint officers and directors of Conseco Life.  Many of these persons who serve as officers and directors for Conseco Life also have served as employees of CNO, CDOC and/or CNO Services at the same time.  The following are examples of persons who overlapped in

- 24 -

employment between Conseco Life and the other Conseco Defendants and their affiliates:

- Thomas J. Killian (2001-2002)
  - President of Conseco Life
  - President of CNO
  - President and Chief Executive Officer of CNO Services
- William J. Shea (2003-2004)
  - President and a Director of Conseco Life
  - President, Chief Executive Officer, Chief Operating Officer, and Acting Chief Financial Officer of CNO
- William S. Kirsch (2005)
  - President of Conseco Life
  - President of Conseco Insurance Group (now the CNO subsidiary known as Washington National Insurance Company)
- Daniel R. Bardin (2008)
  - President of Conseco Life
  - President of Conseco Insurance Group
- Steven M. Stecher
  - Executive Vice President of Operations for CNO (2006-2007)
  - Executive Vice President and Chief Operations Officer for Conseco Life (2006-2008)
  - President of Conseco Insurance Group (2008-2010)
  - President and Director of Conseco Life (2009-2010)
- Matthew J. Zimpfer
  - General Counsel of CNO (1998-2008)
  - Vice President, Associate General Counsel and Assistant Secretary of Conseco Life (2003-2005)
  - Senior Vice President of Conseco Life (2006)

- 25 -

1  Vice President, Deputy General Counsel and Assistant Secretary

2  of Conseco Life (2007-2008)

3  Executive Vice President, General Counsel and Assistant

4  Secretary for Conseco Life (2008-2010)

5  Executive Vice President of CNO (2008-2010)

6  Mr. Zimpfer also served on the LifeTrend Steering Committee,

7  which was the committee that oversaw the changes in the

8  administration of the LifeTrend Policies.

9  • Christopher Nickele

10  Director of Conseco Life and the Executive Vice President of

11  Product Management for CNO (2007-2009)

12  • Russell M. Bostick

13  Executive Vice President of Technology and Operations for

14  Conseco Life (2008-2010)

15  Executive Vice President of Technology and Operations for

16  CNO Services (2008-2010)

17  • Edward J. Bonach

18  Director of Conseco Life (2008-2009)

19  Executive Vice President of CNO (2008-2009)

20  Chief Financial Officer of CNO (2008-2009)

21  • Mark  E. Alberts

22  Executive Vice President, Chief Actuary, and a Director of

23  Conseco Life (2008)

24  Executive Vice President and Chief Actuary of CNO (2008)

25

26

27

28

- 26 -

Complaint                                                    C.A. No.

- • Mark Billingsley

  Senior Vice President and Actuary of Conseco Life (2008-2009)

  Senior Vice President and Actuary of CNO Services (2008-2009)

135. CNO and CDOC used the officers and directors who overlapped among the CNO affiliated companies, including Conseco Life, to enrich CNO and CDOC at the expense of the affiliates such as Conseco Life. After appointing officers and directors to Conseco Life, CNO and CDOC instructed Conseco Life to pay dividends that depleted Conseco Life's capital.

136. CNO requires that Conseco Life contract with CNO affiliates, primarily CNO Services, to provide the personnel and infrastructure necessary to run the insurance company.

137. CNO and its affiliates set the prices and rates at which CNO Services and other affiliates provided services to Conseco Life without regard to the true market value for such services, instead charging for services based on Conseco Life's ability to pay.

138. CNO and CNO Services negotiated the terms of the RSA on behalf of the "Conseco Companies," which were defined in the RSA to include Conseco Life, Conseco Insurance Company, Conseco Health Insurance Company, Washington National Insurance Company and Bankers Life and Casualty Company.

139. As the above allegations demonstrate, Conseco Life merely is a shell through which CNO and CDOC carry out business. If CNO and CDOC can engage in non-arms' length transactions and ignore corporate formalities, and thereby profit from their undercapitalized alter ego shell company, then they also must be liable for the shell company's contractual breaches.

Complaint                                                                C.A. No.

## I.    The Pending Lifetrend Class Action

140.    In response to the October 2008 Letter and Conseco Life's breaches of the LifeTrend Policies, numerous policyholders filed lawsuits against the company.

141.    On December 24, 2008, Cedric Brady, Charles Hovden, Marion Hovden, Eugene Kreps, John McNamara, and Hisaji Sakai (collectively, the "Brady Plaintiffs") filed a class action lawsuit against Conseco Life and Conseco, Inc. (now known as CNO) in the Northern District of California.  The case was assigned to the Honorable Susan Illston.

142.    The Brady Plaintiffs were jointly represented by Gilbert LLP and Millstein & Associates.  Until October 2011, the lead attorneys for the Brady case at Gilbert LLP included undersigned counsel Stephen Weisbrod, August Matteis, and Kathleen Hale.  Mr. Weisbrod, Mr. Matteis, and Ms. Hale left Gilbert LLP in October 2011 and formed a new law firm, Weisbrod Matteis & Copley PLLC. They no longer represent the Brady Plaintiffs.

143.    The court granted Conseco, Inc.'s motion to dismiss the claims against it for lack of personal jurisdiction.  The Brady Plaintiffs had not alleged activity by Conseco, Inc. in California, nor had they alleged a veil-piercing claim against Conseco, Inc.  The court gave the Brady Plaintiffs leave to take discovery in order to amend the Plaintiffs' complaint to allege facts in support of jurisdiction (*i.e.*, to establish conduct by Conseco, Inc. in California) but the Brady Plaintiffs did not pursue such discovery and did not seek to amend their complaint at that time.  Their lawsuit proceeded solely against Conseco Life.

144.    In December 2009, Conseco Life requested that the Panel on Multidistrict Litigation (the "MDL Panel") establish an MDL proceeding with the Brady case and two other federal cases pending in Florida: *Muldrow v. Conseco*, No. 4:08-cv-552 (N.D. Fl.) and *McFarland v. Conseco*, No. 3:09-cv-598 (M.D. Fl.).

145.    The MDL Panel transferred all related cases to Judge Illston in the Northern District of California, where the cases proceeded as the LifeTrend MDL

Complaint                                                                C.A. No.

146.    In March 2010, the plaintiffs in the LifeTrend MDL, led by the Brady Plaintiffs, moved to certify a nationwide class and a California subclass under Rules 23(b)(2) and (3).

147.    On October 6, 2010, the MDL Court certified a nationwide class under Rule 23(b)(2) for the breach of contract and declaratory relief claims.  The MDL Court specifically found that certification of a class was appropriate despite the parallel investigation by the Lead Regulators and despite the availability of remedies under the RSA.

148.    The MDL Court defined the nationwide class as:

> All persons in the United States who (1) own or owned a
> Conseco LifeTrend 3 or LifeTrend 4 Policy, and (2) have
> received since October 2008, or in the future may receive,
> pursuant to a settlement with state insurance regulators or
> otherwise, any of the following: (a) notice that an annual
> premium is due, notwithstanding such person's prior
> invocation of the Policy's Optional Premium Payment
> Provision ("OPP Provision"); (b) notice of increased
> expense charges under the Policy; or (c) notice of
> increased cost-of-insurance deductions under the Policy.

149.    The court did not rule on the propriety of class certification under Rule 23(b)(3).

150.    The court subsequently appointed the Brady Plaintiffs as lead plaintiffs, and Gilbert LLP and Millstein & Associates as co-lead class counsel.

151.    After certification, Conseco Life informed the court that, as of October 2010, approximately 3,000 policyholders had signed the RSA release form in response to the initial solicitations sent pursuant to the RSA.

152.    In early October 2010, the Conseco Defendants began sending out a second round of solicitations in which they misleadingly told policyholders:

- 29 -

1    "YOUR RESPONSE IS NEEDED."  Although the Conseco Defendants wanted

2    policyholders to respond and accept remedies under the RSA (which, for many

3    policyholders, would result in reduced death benefits or complete loss of death

4    benefits), a response was not in fact required.

5         153.   After class certification, Conseco Life argued that individuals who

6    signed the release forms should be excluded from the class.  The Brady Plaintiffs

7    opposed Conseco Life's request by arguing, among other things, that the RSA

8    release form was ambiguous and/or did not address the breach-of-contract claims

9    asserted in the LifeTrend MDL.

10        154.   The MDL Court agreed with the Brady Plaintiffs that the language of

11   the release form was ambiguous.  The MDL Court denied (without prejudice)

12   Conseco Life's motion to exclude signers of the release form from the class.  The

13   court also *sua sponte* certified a subclass of policyholders who:

14                    (1) Meet the criteria for membership in the Class, (2)

15                    accepted optional benefits made available by Conseco

16                    pursuant to a settlement that Conseco entered into with

17                    state regulators in 2010 (the "Regulatory Settlement") and

18                    (3) signed the standard release form accompanying the

19                    Regulatory Settlement.

20        155.   On January 26, 2011, the Brady Plaintiffs distributed to 10,432

21   LifeTrend policyholders a class notice that had been approved by the Court.

22        156.   The parties to the LifeTrend MDL still were in discovery when, on

23   July 1, 2011, Conseco Life filed a motion to decertify the class based on the United

24   States Supreme Court's ruling in *Wal-Mart v. Dukes,* 131 S. Ct. 2541 (2011).

25        157.   The MDL Court granted the decertification motion in part,

26   decertifying the Rule 23(b)(2) class as to former policyholders.  For former

27   policyholders, the MDL Court found that "the monetary relief sought . . . is not

28

Complaint                                                                    C.A. No.

1    incidental to declaratory or injunctive relief," as required for class certification

2    under Rule 23(b)(2).

3       158.    The MDL Court did not address the propriety of former policyholders

4    being included in a Rule 23(b)(3) class, although the Brady Plaintiffs had raised

5    that issue in the briefing on Conseco Life's motion for decertification.

6       159.    The MDL Court denied Conseco Life's motion insofar as it sought to

7    decertify the class entirely.  The Court modified the class definition to include only

8    current LifeTrend III and IV policyholders, finding that a class limited in that

9    manner satisfied the prerequisites of Rule 23(b)(2).

10       160.    Because of the new premiums, cost-of-insurance deductions and

11    expense charges imposed by Conseco Life, many LifeTrend policyholders

12    continued to surrender their Policies or have them lapse.  As a result, on March 5,

13    2012, the Brady Plaintiffs filed a motion for preliminary injunction asking the court

14    to enjoin Conseco Life from imposing the cost-of-insurance charges on two groups

15    of policyholders who were particularly vulnerable to losing their Policies: (1)

16    policyholders who are sixty years old or older and have accumulation account

17    values that have been or will be exhausted by cost-of-insurance and expense

18    charges before the end of 2013; and (2) policyholders who are sixty years old or

19    older and are currently being charged monthly cost of insurance charges over

20    $400.00.

21       161.    At the time the motion for preliminary injunction was filed, the first

22    group consisted of approximately 100 policyholders and the second group consisted

23    of approximately 77 policyholders, with 20 policyholders belonging to both groups.

24       162.    On July 17, 2012, the MDL Court granted the preliminary injunction

25    Motion as to the first group of policyholders, those whose accumulation account

26    values will be exhausted by the end of 2013.  The Court found that the Brady

27    Plaintiffs had shown they were likely to succeed on the merits for all of the

28    policyholders, stating:

- 31 -

Complaint                                                                    C.A. No.

1       Conseco has vastly increased the COI rates – from $0 to

2       hundreds or even thousands per month – in the face of

3       declining mortality.  Because the Court finds that changes

4       to the COI rates are contractually bound to changes in

5       mortality rates, raising the rates represents a breach of

6       contract.

7       163.   The MDL Court further concluded that the first group of policyholders

8 would suffer irreparable harm without the preliminary injunction because they "will

9 lose their insurance without substantial payments."  As for the second group of

10 policyholders, the Court concluded that the Brady Plaintiffs had not met their

11 burden of showing a likelihood of irreparable harm because those policyholders

12 could choose to remain insured, even if doing so meant continuing to incur the cost-

13 of-insurance charges.

14       164.   Conseco Life appealed the ruling on the preliminary injunction motion

15 to the U.S. Court of Appeals for the Ninth Circuit.  *In re Conseco Life Insurance*

16 *Lifetrend Sales and Marketing Litigation*, No. 12-16706 (9th Cir.).  Conseco Life

17 has filed its opening brief, and the Brady Plaintiffs' response is due on October 11,

18 2012.

19       165.   The MDL Court was not the first federal court to take Conseco Life to

20 task for increasing cost-of-insurance deductions improperly.  In *Yue v. Conseco Life*

21 *Insurance Co.*, No. CV 08-1506, 2011 WL 210943, at 8-10 (C.D. Cal. Jan. 19,

22 2011), the court granted summary judgment in favor of a class of policyholders

23 who had Policies that said the cost of insurance would be based on "mortality."

24 But in calculating those costs, Conseco Life considered factors other than mortality,

25 particularly whether it was going to have to pay more in death benefits than

26 previously projected. *Id.* at 9-10.  The court found that Conseco Life's actions

27 violated the Policies' terms. *Id.*

28

Complaint                             C.A. No.

166.  Conseco Life also previously has been found to breach prohibitions against passing losses onto policyholders.  In *Rosenbaum v. Philadelphia Life*, 2:93-cv-00834 (March 3, 1994, C.D. Cal.), the court found that Conseco Life's predecessor had breached life insurance Policies by trying to pass along the cost of a new federal tax through increased expense charges.

## V.    CLASS ACTION ALLEGATIONS

167.  This action is brought by Mr. Burnett and Dr. Camp individually and on behalf of a class of people similarly situated to them pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

### A.    Class Definition

168.  Plaintiffs seek a nationwide class under Rule 23(b)(3) that is defined as follows:

> All persons in the United States who (1) have owned a Conseco LifeTrend III or IV Policy; (2) have received, since October 2008, any of the following: (a) notice that an annual premium or shortfall payment was due, notwithstanding such person's prior invocation of the Policy's Optional Premium Payment Provision; (b) notice of increased cost-of-insurance deductions; or (c) notice of increased expense charges; and (3) since October 2008, have surrendered their Policies or had them lapse.

169.  Plaintiffs also seek certification of a subclass of policyholders defined as follows:

> All persons who (1) meet the criteria for the class; (2) accepted optional benefits made available by Conseco Life under the Regulatory Settlement Agreement; and (3) signed the standard release form accompanying the Regulatory Settlement Agreement.

- 33 -

**B.     Class Certification is Appropriate Under Rule 23(a)**

Class certification under Rule 23(a) is appropriate because Plaintiffs satisfy the criteria set forth in the Rule.

**i.     Impracticability of Joinder under Rule 23(a)(1)**

170.   The proposed class will consist of thousands of people who previously were LifeTrend III and IV policyholders.  Joinder of thousands of former policyholders to this action is impracticable.  The resolution of Plaintiffs' and other Class Members' claims in a class action, rather than in one complaint or individual lawsuits, will promote the orderly and expeditious administration and adjudication of those claims and ensure uniform treatment of the claims.  Moreover, Plaintiffs and the Class Members share a common interest in resolution of the questions of law and fact alleged in this Complaint because they suffered similar harm from the Conseco Defendants' uniform conduct.

171.   Certifying a class action also will promote efficient use of time and resources of the parties and the judicial system.  Plaintiffs do not anticipate any difficulty in managing the adjudication of these claims as a class action.

172.   In addition, the proposed class is ascertainable.  For the purpose of disseminating notices in connection with the RSA and the LifeTrend MDL, Conseco Life identified persons who may fit the definition of the proposed class. The Conseco Defendants easily can access the Class Members' contact information.

**ii.     Commonality under Rule 23(a)(2)**

173.   Plaintiffs' claims against the Conseco Defendants arise from a common course of conduct by which the Conseco Defendants breached the terms of the LifeTrend Policies.  The conduct affected all Class Members similarly and thus gives rise to questions of law and fact that are common to the class.

174.   The common questions of law and fact include but are not limited to:

*First:* Did the Conseco Defendants breach the terms of the LifeTrend Policies by, among other things:

- 34 -

- • improperly calculating the premium amounts owed under the OPP Provision?
- • calculating cost-of-insurance deductions based on factors other than mortality?
- • calculating expense charges based on factors other than actual expenses?
- • charging a new "per unit" expense charge that was not authorized by the Policies?
- • diluting the 4.5% guaranteed interest rate by charging increased premiums, cost-of-insurance deductions and expense charges?
- • passing along financial losses to the policyholders through increased premiums, cost-of-insurance deductions and expense charges?

*Second:* Did the Conseco Defendants intentionally induce the Class Members to surrender their Policies or have them lapse by announcing increases in premiums, cost-of-insurance deductions and expense charges that were not authorized by the Policies?

*Third:* What is the fair measure of damages to the Class Members for the Conseco Defendants' contract breaches?  For example, can damages be measured by the difference between (a) the amount received by the policyholder when he or she surrendered the Policy or had it lapse, and (b) the present value of the Policy at that time, calculated based on (i) the face value of the Policy and the relevant policy terms and (ii) the life expectancy of an individual in the insured's gender and age classification?

175.   The resolution of these questions as to all Class Members involves the interpretation of Policies that all contain the same relevant contract terms.

176.   The Conseco Defendants acted the same way for each Class Member when administering the Policies.  As the Conseco Defendants said themselves in the October 2008 Letter:

- 35 -

Complaint                                                                                    C.A. No.

1               You are not being singled out.  This change will be

2               applied to all policies in the same age, gender and

3               underwriting classification with like benefits and

4               provisions as your policy.

5      177.   Questions common to the proposed subclass include all of the above,

6 as well as the following:

7               *First*, what claims were covered by the release in the RSA release form?

8               *Second*, was the RSA release form ambiguous?

9               *Third*, did the Subclass Members release their rights to bring the claims for

10               breach of contract alleged in this complaint where the Subclass Members

11               signed the release form accompanying the RSA?

12      178.   All of the RSA release forms contain the same relevant language.

13      179.   The Conseco Defendants also acted in the same manner toward all

14 policyholders who signed the RSA release form.

15              **iii.**     **Typicality under Rule 23(a)(3)**

16      180.   Dr. Camp meets the definition of the class set forth above, and his

17 claims are typical of the claims of Class Members who surrendered their Policies or

18 had them to lapse without signing a release.  Mr. Burnett meets the definition of the

19 class and the subclass and his claims are typical of Class Members who surrendered

20 their Policies or had them lapse and who also signed a release form.

21              **iv.**    **Fair and Adequate Representation under Rule 23(a)(4)**

22      181.   Dr. Camp and Mr. Burnett will represent and protect the interests of

23 the class fairly and adequately because they share claims that are common to all

24 former LifeTrend policyholders.  They do not have interests that are adverse to any

25 Class Members.

26      182.   Dr. Camp and Mr. Burnett intend to prosecute this action vigorously

27 and they have selected experienced and competent counsel at Weisbrod Matteis &

28 Copley PLLC to represent them.  Counsel at Weisbrod Matteis & Copley

Complaint                                                            C.A. No.

1   previously served as the lead lawyers for the certified class that included both

2   current and former policyholders in LifeTrend MDL.  Due to undersigned counsel's

3   experience representing the class for nearly three years, counsel are particularly

4   well-suited to represent the interests of the former policyholders.  In addition, the

5   attorneys at Weisbrod Matteis & Copley have significant experience in

6   policyholder-side insurance litigation and have handled other life insurance matters.

7   **C.    Class Certification is Appropriate Under Rule 23(b)(3)**

8       183.   Class certification is appropriate under Rule 23(b)(3) because common

9   questions of law and fact predominate over individual questions and a class action

10  is a superior method for addressing the Conseco Defendants' breaches of the

11  Policies' terms.

12          **i.      Predominance**

13      184.   Questions of law and fact that are common to the Plaintiffs and the

14  proposed class predominate over questions affecting only individual members of

15  the class because Plaintiffs' claims arise from the Conseco Defendants' uniform

16  changes to the administration of the Policies.

17      185.   The terms of the Policies are identical.

18      186.   The Conseco Defendants expressly acknowledged that they were not

19  singling out any one policyholder when they announced the changes to the Policies

20  or implemented changes after signing the RSA.

21      187.   The contract law governing the Conseco Defendants' breaches

22  essentially is the same in all fifty states on the issues that are relevant here, thereby

23  allowing for judicial efficiency to be achieved through the certification of a class

24  action.

25      188.   Additionally, the damages sustained by Plaintiffs and the proposed

26  class are a result of the Conseco Defendants' uniform conduct and can be calculated

27  in the same manner for each policyholder.

28

Complaint                                                                    C.A. No.

## ii.    Superiority

189.    For several reasons, a class action is the superior method for adjudicating the controversy at issue here compared to other available methods.

190.    First, joinder of all Class Members would create undue hardship and inconvenience for the affected policyholders who number in the thousands and reside across the country.

191.    Second, Plaintiffs are unaware of any class member who wants to control the prosecution of his or her individual cause of action against the Conseco Defendants instead of having those rights and remedies pursued through a class action.  A policyholder who prefers to prosecute his or her claim individually would be permitted to opt out of the class.

192.    Third, once the Conseco Defendants' liability is adjudicated, relief to all former policyholders who meet the class and subclass definitions can be administered efficiently.

193.    Fourth, there are no impediments to the manageability of this action as a class action.  Numerous class actions are and have been litigated against Conseco Life without difficulty.

194.    Thus, a class action will allow for the orderly and expeditious administration of the claims of Plaintiffs and other similarly situated former policyholders, promote efficient resolution of those claims, and provide uniform treatment for those subject to the Conseco Defendants' conduct.

195.    Finally, few individual policyholders can afford to prosecute independently these complicated claims against the Conseco Defendants.  If no class is certified, then the Conseco Defendants will receive a massive, multimillion dollar windfall at policyholders' expense and a terrible wrong perpetrated against a very vulnerable group of people will not be remedied.

Complaint                                                                                           C.A. No.

**D.    Alternative Request for Certification of Particular Issues Pursuant to Rule 23(c)(4).**

196.   To the extent that aspects of Plaintiffs' breach-of-contract claim are deemed inappropriate for class treatment, many of the particular issues raised by the claim plainly are common to all class members and still would be amenable to certification under Rule 23(c)(4).

197.   For example, the Court could certify all issues in the case relating to:

- the meaning of the Policies' OPP Provision and whether the Conseco Defendants breached it by demanding shortfall payments and additional premiums;
- the meaning of the Policies' GCV Table;
- the meaning of the Policies' cost-of-insurance provision and whether the Conseco Defendants breached it by improperly increasing cost-of-insurance deductions;
- the meaning of the Policies' expense charge provision and whether the Conseco Defendants breached it by improperly increasing expense charges;
- whether the Conseco Defendants breached the Policies by imposing unauthorized per-unit expense charges;
- whether the Conseco Defendants breached the Policies' guaranteed interest rate provision;
- whether the Conseco Defendants breached the Policies' Non-Participating Provision by attempting to recoup past losses;
- whether the Conseco Defendants employed a shock lapse strategy designed to induce thousands of policyholders to surrender their Policies and/or cause thousands of Policies to lapse;

- 39 -

Complaint                                                                                      C.A. No.

- the meaning of the RSA release forms and whether policyholders who executed them have waived the breach-of-contract claims at issue in this complaint;

- whether CNO, CDOC and CNO Services are alter egos of Conseco Life and whether the corporate veil should be pierced; and

- the appropriate measure of damages for a forfeited Policy.

198. Each of those issues is a complex issue that few if any individual policyholders could afford to litigate individually.

## VI.    CAUSES OF ACTION

### COUNT ONE

### BREACH OF CONTRACT

199. Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

200. Mr. Burnett and Dr. Camp each entered into contracts with Conseco Life when they purchased their LifeTrend life insurance Policies, as did thousands of other individuals across the country who meet the class definitions.

201. Mr. Burnett and Dr. Camp and all other proposed members of the class performed their obligations under the contracts by paying required premiums.

202. Under the terms of the Policies, the Conseco Defendants owed duties to Mr. Burnett, Dr. Camp and other members of the class. Those duties included administering the Policies in accordance with the Policies' terms, applying the OPP Provision as written in the Policy, charging cost-of-insurance amounts based solely on mortality, charging expense amounts based solely on actual expenses, and refraining from charging unauthorized expense charges. The Conseco Defendants also were obligated not to dilute the guaranteed interest rate in the Policies or to pass along losses to policyholders in violation of the Non-Participating Provision.

203.  The Conseco Defendants materially breached the terms of the LifeTrend III and IV Policies by:

- improperly calculating the premium amounts owed under the OPP Provision and then determining and seeking shortfall amounts and annual premium payments based on those calculations;

- charging cost-of-insurance charges that are not based on mortality rates;

- charging expenses that are not based solely on actual expenses;

- charging new "per unit" expense charges that are not authorized under the Policies;

- diluting the 4.5% guaranteed interest rate by charging increased cost-of-insurance deductions and expense charges; and

- violating the Non-Participating Provision by passing along financial losses to the policyholders through increased premiums, cost-of-insurance deductions, and expense charges.

204.  As a direct and proximate cause of the Conseco Defendants' breaches of the Policies, Plaintiffs and members of the proposed class have been damaged. The Conseco Defendants intended that the administrative changes to the Policies would induce shock lapse.  The Conseco Defendants succeeded.  Plaintiffs and thousands of Class Members surrendered their Policies or had their Policies lapse after October 2008 as a result of the Conseco Defendants improperly changing the administration of the Policies in ways that violated the Policies' terms.

205.  Plaintiffs and the Class Members are entitled to money damages.  One potential measure of such damages is the difference between the amount of money each policyholder received when he or she surrendered the Policy or had it lapse and the value of the Policy at the time it lapsed or was surrendered.

206.   These amounts, although different for each policyholder, can be determined with little difficulty based on standard formulas and Policy valuation methodologies commonly used in the life insurance industry

207.   Plaintiffs on behalf of themselves and similarly situated Class Members demand relief in accordance with the Request for Relief set forth below, which is incorporated herein by reference.

**COUNT TWO**

**DECLARATORY RELIEF**

208.   Plaintiffs incorporate by reference the allegations set forth in the prior paragraphs of this complaint.

209.   An actual controversy exists between Plaintiffs and members of the proposed class and the Conseco Defendants.  Plaintiffs further contend that the Conseco Defendants improperly applied the OPP Provision to determine that accumulation accounts were underfunded and that shortfall payments and additional premiums were owed.  Plaintiffs further contend that the Conseco Defendants were not permitted to calculate cost-of-insurance deductions or expense charges in the manner that they announced in October 2008 or that they used after the RSA was implemented.

210.   Plaintiffs on behalf of themselves and the Class Members seek a declaration of their rights under the Policies.  In particular, they seek a declaration that the Conseco Defendants' actions violated the terms of the Policies.

211.   Plaintiffs seek a declaration that policyholders who signed RSA release forms are not barred from asserting the breach of contract claims alleged herein.

212.   Plaintiffs seek a declaration that CNO, CDOC and CNO Services are alter egos of Conseco Life and therefore liable for the conduct of Conseco Life.

213.   Plaintiffs on behalf of themselves and similarly situated Class Members demand relief in accordance with the Request for Relief set forth below, which is incorporated herein by reference.

## JURY DEMAND

214.   Plaintiffs demand a jury trial.

## VII.   REQUEST FOR RELIEF

215.   WHEREFORE, Plaintiffs on behalf of themselves and all similarly situated individuals who satisfy the definitions of the proposed class and subclass demand judgment against the Conseco Defendants as follows:

- Certify the class and subclass as defined above.
- Enter a judgment in favor of Plaintiffs and the class on all counts.
- Award compensatory damages for the Conseco Defendants' breaches of the insurance Policies and create a common fund comprised of all damages to class.
- Award Plaintiffs and the class costs and disbursements and a reasonable allowance for the fees of counsel and experts.
- Award Plaintiffs and the class the costs of this lawsuit.
- Award Plaintiffs and the class such other and further relief the Court deems just and equitable.

Complaint                                                                    C.A. No.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  October 5, 2012

Respectfully submitted,

WEISBROD MATTEIS & COPLEY PLLC

Neesa Sethi (CA Bar No. 263955)
nsethi@wmclaw.com
Stephen A. Weisbrod (*pro hac vice* to be filed)
August J. Matteis, Jr. (*pro hac vice* to be filed)
Kathleen M. S. Hale (*pro hac vice* to be filed)
Joshua N. Katz (*pro hac vice* to be filed)
Weisbrod Matteis & Copley PLLC
1900 M Street, NW, Suite 850
Washington, DC  20036
Telephone:    (202) 499-7900
Facsimile:     (202) 478-1795

*Attorneys for Plaintiffs*

Complaint                                                        C.A. No.

Conseco Life Insurance Company
Registered Agent:
Corporation Service Company
251 E. Ohio Street, Suite 500
Indianapolis, IN 46204

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| William Jeff Burnett and Joe H. Camp | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | ED CV 12 - 01715 VAP SPx |
| v. | |
| Conseco Life Insurance Company, CNO Financial Group, Inc., CDOC, Inc., and CNO Services, LLC | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Neesa Sethi_____, whose address is _1900 M Street, NW, Suite 850, Washington, DC 20036_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

**TERRY NAFISI**

Clerk, U.S. District Court

Dated:   __OCT - 5 2012__          By: _____
                                                        Deputy Clerk

                                                   *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                          **SUMMONS**

Name & Address:
CNO Services, LLC
Registered Agent:
Corporation Service Company
251 E. Ohio Street, Suite 500
Indianapolis, IN 46204

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER |
|---|---|
| William Jeff Burnett and Joe H. Camp | |
| PLAINTIFF(S) | **ED CV 12 - 01715 VAP SPx** |
| v. | |
| Conseco Life Insurance Company, CNO Financial Group, Inc., CDOC, Inc., and CNO Services, LLC | **SUMMONS** |
| DEFENDANT(S). | |

TO:     DEFENDANT(S):

        A lawsuit has been filed against you.

        Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Neesa Sethi                           , whose address is 1900 M Street, NW, Suite 850, Washington, DC 20036                  . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                    TERRY NAFISI
                                    Clerk, U.S. District Court

Dated:  _____OCT - 5 2012_____          By: _____L. MORRAY_____
                                            Deputy Clerk

                                            (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                          **SUMMONS**

SUMMONS

Name & Address:
CDOC, Inc.
Registered Agent:
Corporation Service Company
2711 Centerville Rd., Suite 400
Wilmington, DE 19808

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

William Jeff Burnett and Joe H. Camp

CASE NUMBER

PLAINTIFF(S)

**ED CV 12 - 01715**

VAP SPX

v.

Conseco Life Insurance Company, CNO Financial
Group, Inc., CDOC, Inc., and CNO Services, LLC

**SUMMONS**

DEFENDANT(S).

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Neesa Sethi_____, whose address is _1900 M Street, NW, Suite 850, Washington, DC 20036_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

TERRY NAFISI

Clerk, U.S. District Court
L. MURRAY

Dated:  OCT - 5 2012 _____

By: _____

Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                          SUMMONS

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| William Jeff Burnett and Joe H. Camp | Conseco Life Insurance Company, CNO Financial Group, Inc., CDOC, Inc., and CNO Services, LLC |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Weisbrod Matteis & Copley PLLC<br>1900 M Street, NW, Suite 850, Washington, DC 20036<br>(202) 499-7900 | Neesa Sethi, Stephen A. Weisbrod, August J. Matteis, Jr., Kathleen M. S. Hale, Joshua N. Katz |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:    JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Plaintiffs file this Complaint pursuant to 28 U.S.C. Section 1332(d)(2) and bring a claim for breach of insurance contracts.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☒ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | IMMIGRATION | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:    Case Number:**    ED CV 12 - 01715    VAP  SPx

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

OCT - 5 2012