UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM JEFFREY BURNETT,       )
JOE H CAMP,                    )
                              )
              Plaintiffs,      )
                              )
        v.                     )      No. 1:18-cv-00200-JPH-DML
                              )
CONSECO LIFE INSURANCE COMPANY )
n/k/a Wilco Life Ins. Co,      )
CNO FINANCIAL GROUP, INC.,     )
CNO SERVICES LLC,              )
                              )
              Defendants.      )

**ORDER DENYING THE CNO DEFENDANTS' MOTION TO DISMISS**

Plaintiffs William Jeffrey Burnett and Joe H. Camp allege that

Defendants breached their "LifeTrend" life insurance policies by changing

policy premiums and expense charges that caused thousands of policyholders

to surrender their policies.  *See* dkt. 108-1 (First Amended Complaint ("FAC")).[1]

They seek declaratory relief and compensatory damages for breach of contract.

*See id.* at 70–73.  Defendants CNO Financial Group and CNO Services, LLC

(together, "CNO Defendants") have filed a motion to dismiss.  Dkt. [110].  For

the reasons that follow, that motion is **DENIED**.

---

[1] The FAC was filed in *In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*, No.
3:10-MD-02124 (N.D. Cal.), dkt. 636, and is the operative complaint.

1

# I.
## Facts and Background

Because the CNO Defendants have moved for dismissal under Rule
12(b)(6), the Court accepts and recites "the well-pleaded facts in the complaint
as true." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

### A.    The LifeTrend Policies

In the late 1980s, Massachusetts General Life Insurance Company and
Philadelphia Life Insurance Company sold LifeTrend life insurance policies.
Dkt. 108-1 at 13 ¶ 52.  Between 1996 and 1998, Conseco, Inc. acquired
Massachusetts Life, re-domesticated to Indiana, merged with Philadelphia Life,
and changed its name to Conseco Life Insurance Company ("Conseco Life").  *Id.*

Each LifeTrend policy provided investment income during the insured's
lifetime and a death benefit to be paid upon the insured's death.  *Id.* ¶ 55.  The
policyholder paid an annual premium that funded an investment
"accumulation account," which would accrue a minimum guaranteed interest
rate.  *Id.* at 14 ¶¶ 57, 58.  The policies permitted Conseco Life to deduct a
monthly "cost of insurance charge" and monthly "expense charges" from the
accumulation accounts.  *Id.* at 13, 14 ¶¶ 56, 60.  Policyholders could take out
loans against the balance of their accumulation accounts, *id.* at 15 ¶ 63, and
could surrender their policy at any time and receive the balance of the
accumulation account, minus a "surrender charge," *id.* ¶ 65.  Accumulation
account balances would therefore change over time as loans and monthly
deductions were taken out, and as interest accumulated.

2

The policies also contained an Optional Premium Payment Provision that allowed the policyholder to reduce or stop paying annual premiums after five years. *Id.* at 14 ¶ 58. This "vanishing premium" typically required large initial annual premiums. *Id.* ¶¶ 58–59. Each policy contained a "Guaranteed Cash Value" table that listed the minimum amount that Conseco Life promised to pay the policyholder upon surrender of the policy. *Id.* at 15 ¶ 67. The Guaranteed Cash Value depended on the number of years that the policy was in force. *Id.* To stop paying annual premiums under the Optional Premium Payment Provision, the policyholder's accumulation account value had to exceed the Guaranteed Cash Value plus the applicable surrender charge and any indebtedness. *Id.* at 15–16 ¶ 68. If a policy became "underfunded" under that formula, then Conseco Life could resume charging premiums. *Id.*

Upon the insured's death, a policyholder's beneficiary was entitled to the greater of (1) the "sum insured," as defined in a policy schedule, or (2) the amount in the accumulation account, multiplied by a factor that corresponded to the insured's age at death, less any indebtedness and unpaid premiums. *Id.* at 16 ¶ 70.

By 2008, LifeTrend policyholders "were dying in increasing numbers," so Conseco was paying increasing death benefits. *Id.* at 1 ¶ 3. At the same time, premium revenue was low because very few policyholders were still required to pay new premiums. *Id.*

### C.    The October 2008 Letters

In October 2008, Conseco Life sent a form letter to policyholders (the "October 2008 Letter") demanding retroactive premiums and announcing increased future premiums and cost-of-insurance charges.  *Id.* at 1, 18–19 ¶¶ 4, 83–86.  The October 2008 Letter was the result of a "shock lapse" strategy intended to "render the Policies uneconomical for thousands of Policyholders," forcing them to surrender their policies.  *Id.* at 23 ¶¶ 106–07.  Thousands of LifeTrend policyholders, including Plaintiffs, surrendered their Policies.  *Id.* at 23 ¶ 108.

### D.    The Regulatory Settlement Agreement

The October 2008 Letter prompted a joint investigation by state regulators.  *Id.* at 22 ¶¶ 100–01.  That investigation prompted Conseco Life to send a letter in November 2008 instructing policyholders to "temporarily disregard all previous notices" from Conseco Life about the LifeTrend policies. *Id.*

In May 2010, Conseco Life entered into a Regulatory Settlement Agreement ("RSA") with the state regulators.  *Id.* at 53 ¶ 225.  The RSA allowed Conseco Life to implement some, but not all, of the administrative changes announced in the October 2008 Letter.  *Id.* ¶ 226.  Conseco Life agreed not to demand retroactive premiums as shortfall payments but could increase cost-of-insurance and expense charges.  *Id.*  The RSA included a "Corrective Action Plan," which created a $10 million settlement pool for LifeTrend policyholders. *Id.* at 56–57 ¶¶ 242, 247.  To recover from that pool, policyholders were

4

required to release Conseco Life from all claims "arising out of or in any way related to any current and/or future litigation that Claimant could bring regarding the allegations in the [RSA]."  *Id.* at 57 ¶¶ 247–49.

### E.    Plaintiffs' Policies

Mr. Camp purchased a LifeTrend policy in 1993 and took advantage of the Optional Premium Payment Provision starting in 1998.  *Id.* at 2, 60 ¶¶ 30, 264.  He was not required to pay premiums or cost-of-insurance charges for several years leading up to 2008.  *Id.* at 63–64 ¶¶ 266, 268.  He received letters in October and November of 2008 demanding a $78,274.97 shortfall payment and informing him that cost-of-insurance deductions of $727.97 per month would be imposed.  *Id.* at 64 ¶¶ 267, 269.  Mr. Camp surrendered his policy. *Id.* ¶ 272.

Mr. Burnett purchased three LifeTrend Policies—two in 1990 and one in 1993.  *Id.* at 64–65 ¶¶ 273–75, 277.  He elected the Optional Premium Payment Provision for the first two policies in 1997, and for the third in 1999.  *Id.* ¶¶ 276, 278.  Mr. Burnett also received letters demanding additional payments, though he kept his policies during the regulatory investigation.  *Id.* at 65 ¶¶ 279–80.  In September 2010, Mr. Burnett signed the RSA release forms and eventually received a payment from the settlement pool.  *Id.* ¶ 283.  He later surrendered his policies.  *Id.* ¶ 284.

## F.   Procedural History

### a.   Defendants

In 2002, Conseco Inc. filed for Chapter 11 bankruptcy protection, emerging the next year as "CNO Financial."  *Id.* at 48–49 ¶¶ 183, 187.  CNO Financial is a Delaware corporation with its principal place of business in Indiana.  *Id.* at 11 ¶ 32.  During the time relevant to this lawsuit, CNO Financial or its predecessor owned the stock of Conseco Life's parent companies.  *Id.*

CNO Services is an Indiana limited liability company.  *Id.* at 12 ¶ 33.  CNO Financial owns 99% of CNO Services, and CNO Financials' wholly owned subsidiary CDOC[2] owns the remaining 1%.  *Id.*

Conseco Life is an Indiana corporation that sells and administers LifeTrend and other life insurance policies.  *Id.* at 11 ¶ 31.  On March 2, 2014, CNO Services sold Conseco Life to Wilton Reassurance Company for about $237 million.  *Id.*

### b.   The *Brady* Action

Current and former LifeTrend policyholders first sued Conseco Life in 2008.  *See Brady, et al. v. Conseco Life Ins. Co.*, No. 3:08-cv-5746 dkt. 1 (N.D. Cal. Dec. 24, 2008) (the "*Brady* Action").  The *Brady* Action was filed on behalf of a putative class of all current and former LifeTrend policyholders.  *Id.*   In February 2010, the *Brady* Action was consolidated with several other LifeTrend cases into a multidistrict litigation, *In re Conseco Life Ins. Co. LifeTrend Ins.*

---

[2] CDOC was named as a defendant in Plaintiffs' original complaint but not in the FAC. Dkt. 108-1 at 15, n.1.  The **clerk is directed** to remove CDOC from the docket.

*Sales & Mktg. Litig.*, No. 3:10-MD-02124 dkt. 1 (N.D. Cal.) (the "LifeTrend MDL").

In October 2010, the MDL Court certified a class of current and former LifeTrend policyholders.  *See* LifeTrend MDL, dkt. 111.  In December 2011, however, the MDL Court granted in part and denied in part Conseco Life's motion to decertify the Rule 23(b)(2) class.  *See* LifeTrend MDL, dkt. 253. Former policyholders were removed from the class, which continued on behalf of current policyholders.  *Id.*

### c.   The *Burnett* Action

On October 5, 2012, Plaintiffs filed their original complaint in the Central District of California as former policyholders removed from the LifeTrend MDL class.  Dkt. 1.  That case was transferred to the LifeTrend MDL, where—after the LifeTrend MDL Court granted in part a motion to dismiss from Conseco Life, dkt. 529—Plaintiffs filed their FAC.  *See* LifeTrend MDL, dkt. 636.

Plaintiffs raise two claims of relief in their FAC.  First, Plaintiffs allege that Defendants breached the terms of Plaintiffs' life insurance policies by announcing and later implementing rate increases and other administrative changes.  Dkt. 108-1 at 73–75 ¶¶ 327–35.  Second, Plaintiffs seek declarations that: (1) Defendants violated the terms of Plaintiffs' life insurance policies; (2) policyholders who signed RSA releases are not barred by asserting breach-of-contract claims here; and (3) "Conseco Life is the alter ego of CNO Services and/or CNO Financial, that CNO Services and Conseco Life are alter egos of

CNO Financial, and therefore all three Conseco Defendants are liable for the conduct of Conseco life." *Id.* at 73 ¶¶ 338–40.

In January 2018, the Central District of California transferred this case to this district under 28 U.S.C. § 1404(a).  Dkt. 69; dkt. 70.  The CNO Defendants and Conseco Life have moved to dismiss the FAC for failure to state a claim upon which relief can be granted.  Dkt. 107; dkt. 110.[3]

## II.
## Applicable Law

Defendants may move under Federal Rule of Civil Procedure 12(b)(6) to dismiss claims for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6).   To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A facially plausible claim is one that allows "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When ruling on a 12(b)(6) motion, the Court will "accept the well-pleaded facts in the complaint as true," but will not defer to "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley*, 671 F.3d at 616.

---

[3] In September 2019, Plaintiffs moved for class certification, dkt. 162, and on March 20, 2020, the Court granted Defendant Conseco Life's request to withdraw its motion to dismiss and Plaintiffs' motion for class certification, *see* dkt. 197.  The Court acknowledged that the CNO Defendants "joined" Conseco Life's motion to dismiss.  *Id.* On July 22, 2020, the Court granted Plaintiffs' motion for preliminary approval of a proposed settlement agreement and release with Defendant Conseco Life.  Dkt. 206.

## III.
## Analysis

**A.   *Alter Ego* Liability[4]**

**1. Governing Law**

The parties agree that Indiana choice-of-law rules govern.  *See* dkt. 111 at 11, n. 7; dkt. 129 at 15, n.4.[5]  Defendants argue that, under those rules, "[e]fforts to 'pierce the corporate veil' are governed by the [substantive] law of the state of incorporation," which is Delaware for CNO Financial and Indiana for CNO Services.  Dkt. 111 at 20 n.8.  Plaintiffs contend that they are seeking to pierce Conseco Life's—not CNO Financials'—corporate veil, so only Indiana law applies.  Dkt. 129 at 18 n.4.  However, all parties extensively rely on Delaware law and cite no inconsistencies between Indiana and Delaware law.

---

[4] In their brief in support, the CNO Defendants cursorily argue that they cannot be liable under an agency theory, dkt. 111 at 11–12, and in their reply brief they argue that their lack of agency liability for breach of contract prevents them from being liable under alter ego liability as well, dkt. 141 at 2–11.  The CNO Defendants recognize that Delaware or Indiana law governs attempts to pierce the corporate veil and that alter ego and agency are "two *distinct* tests" for piercing the corporate veil.  Dkt. 111 at 20 n.8, 21; *StrikeForce Tech. v. PhoneFactor, Inc.*, 2013 WL 6002850, at *3 (D. Del. Nov. 13, 2013) (emphasis added).  Indeed, in *StrikeForce*, the court allowed an agency claim to proceed but dismissed an *alter ego* claim.  *Id.*  Here, Plaintiffs' only theory of liability is alter ego.  *See* dkt. 129 at 30, dkt. 111 at 14 ("Plaintiffs' claims for relief make clear that Plaintiffs are seeking to pierce the CNO Defendants' corporate veil under an alter ego theory only.").  And even if the CNO Defendants' status as agents prevent direct liability for breach of contract, they cite no authority that alter ego liability cannot apply.  Indeed, piercing the corporate veil "disregard[s] the corporate entity," removing the "legal or independent significance" of the separate entities (and therefore their agency relationships).  *Wallace v. Wood*, 752 A.2d 1175, 1183–84 (Del. Ch. 1999).  For these reasons, the Court does not address agency liability.

[5] Courts "do not worry about conflict of laws unless the parties disagree on which state's law applies."  *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 n.1 (7th Cir. 2012).

*See* dkt. 111 at 13–24; dkt. 129 at 18, n.4.  Also finding no inconsistencies in the governing law, the Court does the same.

### 2.      The CNO Defendants' Alter Ego Liability

Alter ego claims require plaintiffs to show "(1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (applying Delaware law); *accord Continental Cas. Co. v. Symons*, 817 F.3d 979, 993 (7th Cir. 2016) ("Indiana courts hesitate to pierce the corporate veil but will do so to prevent fraud or injustice to a third party.").

The CNO Defendants argue that Plaintiffs cannot satisfy the second element[6] because they have not alleged that Conseco Life was undercapitalized, incapable of satisfying a large judgment, or used "*for the purpose* of engaging in inequitable conduct."  Dkt. 111 at 21–22, 25.  Plaintiffs argue that the FAC's allegations and the reasonable inferences from them show undercapitalization, an inability to satisfy a class judgment, and fraudulent use of the corporate form.  Dkt. 129 at 22–28.

The FAC alleges that:

- Conseco Life and the CNO Defendants operated as a single economic entity.

  - Dkt. 108-1 at ¶ 14 (CNO Financials' management made or directed Conseco Life's major decisions)

---

[6] The CNO Defendants do not explicitly contest the first element—that the parent and the subsidiary operated as a single economic entity—at this stage.  Dkt. 141 at 11.

- o ¶ 122 (CNO Financial created committees that controlled Conseco Life policy administration)

- o ¶ 125 (policyholders were required to deal with CNO Services on policy administration)

- o ¶ 130 ("Conseco Life had no employees, made no decisions for itself, and did not function as a stand-alone business.")

- o ¶ 131 ("CNO Financial had unfettered ability to designate the officers and directors of both Conseco Life and CNO Services.")

- o ¶ 132 (all of Conseco Life's officers held other roles at Conseco-related companies, including at CNO Financial and/or CNO Services)

- o ¶ 133 (all members of Conseco Life's board of directors held positions at CNO Financial and/or CNO Life)

- The CNO Defendants comingled their financial affairs with Conseco Life, siphoning funds from Conseco Life.

- o Dkt. 108-1 at ¶ 150 (CNO Financial required that Conseco Life work with CNO Financials' affiliates at rates set "without regard to the true market value")

- o ¶¶ 151–60 (listing services that CNO Services provided Conseco Life at a marked-up rate that "did not correlate" with the number or value of policies under management or with CNO Services' work performed)

    o ¶ 161 ("Through CNO Services, CNO Financial extracted hundreds of millions of dollars from Conseco Life.")

    o ¶¶ 177–78 ("Conseco Life's transfers to other CNO subsidiaries and affiliates totaled $954.7 million," which "did not reflect true market considerations")

   • The CNO Defendants damaged Conseco Life's financial standing.

    o Dkt. 108-1 at ¶ 178 ("CNO Financial directed and controlled" fund transfers from Conseco Life to other Conseco affiliates)

    o ¶ 157 (the amounts CNO Services charged Conseco Life "were actually caused substantially by CNO Services' assessment of how much cash Conseco Life happened to have on hand")

    o ¶¶ 144–46 (CNO Financial required Conseco Life to pay dividends that substantially exceeded its net income)

    o ¶ 216 (Conseco Life was left with "insufficient resources to perform its obligations under the LifeTrend Policies")

In sum, Plaintiffs have alleged that the CNO Defendants wholly controlled Conseco Life and drained its resources for their benefit. That included taking money from Conseco Life in amounts far greater than industry norms or market value, in relation only to how much cash Conseco Life had available.

The CNO Defendants argue that these allegations are not enough to plead fraud or inequity in the corporate form.  Dkt. 111 at 22.  But they recognize that the corporate veil may be pierced when "'an entity completely controls an undercapitalized subsidiary' and uses that complete control to 'cause[ ] the underfunded-controlled entity to engage in inequitable conduct.'"  *Id.* at 22 (quoting *In re Sunbeam Corp.*, 284 B.R. 355, 365 (S.D.N.Y. Bankr. 2002)* (Delaware law)).  Plaintiffs argue that the FAC alleges that the CNO Defendants completely controlled Conseco Life, leaving it undercapitalized and improperly shielding the CNO Defendants from liability.  Dkt. 129 at 19–23.

The FAC's substantial allegations about comingling of finances and the CNO Defendants' damaging Conseco Life's financial standing allow reasonable inferences that the CNO Defendants left Conseco Life undercapitalized and in danger of being unable to pay large judgments against it.  *See CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at *23 (Del. Ch. June 29, 2020)* (allowing an alter ego claim to proceed based on allegations showing a lack of regard for corporate formalities and transfer of "essentially all" assets); *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1145 (S.D.N.Y. 1996)* (Delaware law).[7]  That is enough.  *See* dkt. 111 at 22 (recognizing that complete control of an undercapitalized subsidiary, used as a liability shield, is a "typical situation" justifying piercing the corporate veil); *CLP Toxicology*, 2020 WL 3564622 at *23; *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D.

_____

[7] To the extent Indiana law differs from Delaware law, it requires fewer allegations.  *See Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship*, 768 N.E.2d 463, 469, 473 n.1 (Ind. Ct. App. 2002).

13

Del. 1989) ("[F]raud, strictly speaking, is not the only basis for finding an alter

ego relationship and piercing the corporate veil."); *Geyer v. Ingersoll*

*Publications Company*, 621 A.2d 784, 793 (Del. Ch. 1992).  Those allegations

also distinguish *Sunbeam*, which the CNO Defendants rely on.  There, the

complaint contained "no allegation[s]" about undercapitalization, intermingling

of finances, dividend payments, solvency, or siphoning of corporate funds.  284

B.R. at 367.  Here, as detailed above, the FAC alleges that the CNO Defendants

controlled each of those things to Conseco Life's detriment.

Nevertheless, the CNO Defendants argue that Conseco Life could not

have been undercapitalized because it sold in 2014 for $237 million.  Dkt. 111

at 24.  But the CNO Defendants do not cite authority or explain how a sale

price proves capitalization or the ability to pay a judgment, dkt. 111 at 24, and

regardless all reasonable inferences at this stage must be drawn in Plaintiffs'

favor, *Marshall–Mosby v. Corp. Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir.

2000).  Similarly, the CNO Defendants' argument that Conseco Life benefited

from its own decision to raise the LifeTrend Policies' cost-of-insurance charges

*id.* at 25, overlooks the allegations that the CNO Defendants completely

controlled Conseco Life and pulled its available cash away through

unaffordable dividends and above-market-value service charges.

Plaintiffs have therefore alleged that Conseco Life is a corporate fiction

that the CNO Defendants left undercapitalized and without the ability to pay a

large judgment.  *See Mobil Oil Corp.*, 718 F. Supp. at 268.  That is enough at

this stage, so Plaintiffs have stated a claim of alter ego liability against the CNO Defendants.

### 3. Chain of Liability

The CNO Defendants argue that Plaintiffs (1) do not specifically identify CNO Financials' and CNO Services' corporate relationship with Conseco Life, and (2) have not pleaded facts showing that the corporate veil of each intermediate entity between them should be pierced. Dkt. 111 at 28–29. Plaintiffs respond that piercing "every layer of the corporate structure" is not required when the relevant companies within the structure are alter egos of each other. Dkt. 129 at 26.

"[I]t is not necessary . . . to make allegations sufficient to pierce every layer of the corporate structure." *In re Moll Indus., Inc.*, 454 B.R. 574, 587 (D. Del. Bankr. 2011). As explained above, the alter ego test requires only "that the companies operate as 'a single economic entity,' tied together by 'an overall element of injustice.'" *Id.* (quoting *In re Broadstripe*, 444 B.R. 51, 101 (D. Del. Bankr. 2010). Holding otherwise would restrict alter ego liability "to a direct relationship such as a parent and subsidiary," *id.*, and the CNO Defendants cite no authority supporting that limitation, *see* dkt. 111 at 28–30.

Instead, the CNO Defendants rely on *In re Tronox Inc.*, 855 F.3d 84 (2d Cir. 2017). In *Tronox*, the Second Circuit said in a footnote that the plaintiffs in that case would have to meet the alter ego standard "[a]t each level of piercing" to reach a corporate parent several levels up in the corporate structure. *Id.* at 106 n.27. That statement is not controlling here because it is

15

*dicta* and regardless, Plaintiffs are not attempting to pierce the corporate veil of a distant parent through a "chain of liability."  Instead, they have alleged that the CNO Defendants and Conseco Life are direct alter egos of each other, which is enough to plead alter ego liability.  *See Moll*, 454 B.R. at 587.

### 4.   No Longer a Corporate Veil Between Conseco Life and the CNO Defendants

The CNO Defendants argue that when Conseco Life was sold, any corporate veil between it and the CNO Defendants ended, so there is no longer a veil to pierce.  Dkt. 111 at 30–31.  Plaintiffs contend that the sale "did not retroactively change the [corporate] relationships" and that the relevant time for piercing the corporate veil is "when the defendant entities are alleged to have harmed the plaintiff in the course of acting as alter egos."  Dkt. 129 at 30–31.

Alter ego liability is determined as of the time of the underlying conduct. *See VFB LLC v. Campbell Soup Co.*, 2005 WL 2234606, at *33 (D. Del. 2005) (looking to the allegations "at the time of the Spin-off"); *Smith v. McLeod Distr., Inc.*, 744 N.E.2d 459, 462, 464 (Ind. Ct. App. 2000) (looking to the allegations "at the time" the businesses were owned by the same person, though one company was later dissolved).  Conseco Life's sale therefore does not prevent Plaintiffs from seeking to pierce the corporate veil between it and the CNO Defendants.

The CNO Defendants cite only *Wells Fargo & Company v. Wells Fargo Express Company* to support their argument.  Dkt. 111 at 23 (citing 556 F.2d 406 (9th Cir. 1977)).  There, the Ninth Circuit evaluated personal jurisdiction,

16

explaining that establishing personal jurisdiction through an "'alter ego' theory as a means by which to reach the out-of-state parent," would reach only the current owner—not a prior out-of-state owner.  *Wells Fargo*, 556 F.3d at 421, 425.  *Wells Fargo*'s conclusion that the former parent "would not be . . . reached" by piercing the corporate veil therefore refers to the reach of personal jurisdiction.  *Id.* at 421.  It does not apply to this direct *alter ego* claim.

### B.    Liability for Regulator-Allowed Changes

The CNO Defendants argue that they cannot be liable for implementing cost and charge adjustments to the LifeTrend policies because those adjustments were allowed by state insurance regulators.  Dkt. 108 at 20–25.[8] They contend that because state regulators have applied their expertise in allowing the adjustments, this Court should not second-guess that decision by allowing this lawsuit to proceed.  *Id.*  Plaintiffs respond that the regulators' actions did not immunize Conseco Life from lawsuits.  Dkt. 128 at 27–28.

The CNO Defendants invoke two doctrines, citing only one case for each. First, the "filed rate" doctrine, which "prevent[s] parties from collaterally attacking rates duly adopted by a regulatory agency."  Dkt. 108 at 23 (citing *MacKay v. Superior Court*, 188 Cal. App. 4th 1427, 148 (2010).  Second, the *Burford* abstention doctrine, which involves abstaining from deciding a case out of "deference to state regulators."  *Id.* at 24 (citing *Hartford Cas. Ins. v. Borg Warner Corp.*, 913 F.2d 419, 427 (7th Cir. 1990).

---

[8] Conseco Life initially made this argument in its motion to dismiss, dkt. 108, which the CNO Defendants joined, dkt. 111 at 10 n.2.  The Court therefore refers to this as the CNO Defendants' argument.

The "procedural problem" with the CNO Defendants' argument is that they are not "challeng[ing] the complaint's sufficiency," but "advanc[ing] an affirmative defense." *Gunn v. Cont. Cas. Co.*, --- F.3d ----, 2020 WL 4499554, at *3 (7th Cir. Aug. 5, 2020). The Court therefore addresses this issue under Federal Rule of Civil Procedure 12(c) rather than Rule 12(b)(6), which places a heavier burden on the CNO Defendants—the "burden of pleading and proving" the defense. *Id.* ("[D]efenses have to come from somewhere. Proof of [them] in the air, so to speak, will not do." (citation omitted)).

The filed-rate doctrine expressed by the California Court of Appeal in *MacKay* does not support the CNO Defendants' argument. *MacKay* explained that under the California statutes governing insurance rates, challenges to rates must be raised through the administrative process, and judicial review is available only through that process. 188 Cal. App. 4th at 1432. The CNO Defendants do not explain why the filed-rate doctrine applies to the decisions that regulators made as part of the RSA before this case was filed, and do not argue that Plaintiffs could have administratively challenged those decisions. *See* dkt. 108 at 23–25; dkt. 142 at 10–12.

Similarly, the type of *Burford* abstention in *Hartford* cannot apply here. In *Hartford*, the Seventh Circuit held that federal courts should abstain because deciding that case could interfere with the ongoing rehabilitation of an insurer that was in default. 913 F.2d at 426. However, the Seventh Circuit explained that "a federal court would have to hear the case" if it "would not be disruptive of the rehabilitation process." *Id.* Here, the RSA was signed in

18

2010, dkt. 108-3 at 77–82, and the CNO Defendants point to no ongoing processes that this lawsuit could disrupt, *see* dkt. 108 at 23–25.  The CNO Defendants have not identified why abstention would be required here or when it would no longer be necessary, so *Hartford* does not apply.  *See* 913 F.2d at 427 ("[A]bstention is not forever.  By abstaining, we are only saying that at this time it is inappropriate for a federal court to hear this case.").

At bottom, the CNO Defendants' argument is that if an insurer breaches insurance contracts by making rate adjustments that fall within the bounds of a regulatory settlement, then the policyholders can have no judicial recourse for those breaches.  But they cite no authority for that broad rule and have not carried their Rule 12(c) burden.  *See Gunn*, 2020 WL at 4499554, at *3.  Judgment on the pleadings is therefore not warranted on this basis.[9]

## C.    The RSA's Release from Liability

The CNO Defendants argue that Mr. Burnett's[10] claims are barred by the RSA's release from liability.  *Id.* at 25–28.[11]  Mr. Burnett responds that the release covers only claims "regarding the allegations" in the RSA, and that those allegations are different than his breach of contract claim.  Dkt. 128 at

---

[9] Because the CNO Defendants have not cited authority supporting the merits of this argument, the Court does not address Plaintiffs' arguments that this argument is procedurally improper, that the Court cannot consider the RSA because its terms prevent it from being entered into evidence, and that the RSA expressly allows breach-of-contract suits like this one.  *See* dkt. 128 at 22–27, 20–30.

[10] Mr. Camp did not accept benefits under the RSA or sign an RSA release.  Dkt. 108 at 25 n.8.

[11] Conseco Life initially made this argument in its motion to dismiss, dkt. 108, which the CNO Defendants joined, dkt. 111 at 10 n.2.  The Court therefore refers to this as the CNO Defendants' argument.

31–33.  As with the allowed-by-regulators argument, the CNO Defendants are "advanc[ing] an affirmative defense" and therefore must satisfy Rule 12(c)'s heavier burden.  *Gunn*, 2020 WL 4499554 at *3.

The release applies to "any and all claims of any kind whatsoever, whether known or unknown, which Claimant now has or which may hereafter accrue, arising out of or in any way related to any current and/or future litigation that Claimant could bring *regarding the allegations in the Agreement*." Dkt. 108-3 at 103 (emphasis added).  The "allegations in the agreement" are unspecified but are at least "related to" rate and charge "adjustments announced in the October and November 2008 letters as well as the sales, administration and management of the Lifetrend policies."  *Id.* at 42–43.

The FAC—like the RSA—broadly relates to the October and November 2008 letters and the LifeTrend policies.  *See generally* dkt. 108-1.  But the RSA does not specify what its allegations are related to the letters and policies, and it does not say that it encompasses all potential allegations related to them. *See* dkt. 108-3 at 42–43.  Indeed, the FAC—which must be accepted as true at this stage, *McCauley*, 671 F.3d at 616—alleges that the RSA did not make allegations about many potential issues that are raised in the FAC:

- Dkt. 108-1 at ¶ 228 ("The Lead Regulators did not investigate Conseco Life's shock lapse strategy, nor did they allege that the strategy or its execution violated the Policies.")

- ¶ 229 ("[T]he Lead Regulators did not investigate whether Conseco was properly applying the OPP eligibility formula when determining whether Policyholders owed premiums.")

- ¶ 230 ("The Lead Regulators never alleged that Conseco improperly applied the OPP eligibility formula when announcing the new premium amounts.")

- ¶ 231 ("The Lead Regulators did not investigate whether Conseco improperly included factors other than mortality in cost-of-insurance deductions.")

- ¶ 232 ("The Lead Regulators never alleged that Conseco was calculating cost-of-insurance deductions improperly by including factors other than mortality in that calculation.")

- ¶ 233 ("The Lead Regulators did not investigate whether Conseco was fulfilling its interest payment allegations.")

- ¶ 234 ("The Lead Regulators never alleged that Conseco failed to pay Policyholders the guaranteed interest rate.")

- ¶ 235 ("The Lead Regulators did not investigate whether Conseco violated the Policies' Non-Participating Provision by attempting to make up for past and/or ongoing losses through increased premiums or increased cost-of-insurance deductions.")

- ¶ 236 ("The Lead Regulators never alleged that Conseco improperly attempted to recoup past and/or ongoing losses through increased

premiums, increased cost-of-insurance deductions or increased
expense charges.")

- ¶ 237 ("The Lead Regulators did not investigate Conseco's conduct
occurring after October 2008.")

- ¶ 238 ("The Lead Regulators never alleged that Conseco's conduct
after October 2008 violated the policies.").

The FAC therefore identifies many allegations that it claims were not in
the RSA, and the CNO Defendants point to nothing in the RSA contradicting
the FAC.  *See* dkt. 108 at 25–28; dkt. 142 at 12.  Instead, the CNO Defendants
argue that a release does not need to specify causes of action such as breach of
contract and that the FAC's claims "relate to" issues that the RSA states were
reviewed.  Dkt. 108 at 27–28.  Both statements are true.  *See RLI Ins. v.
Conseco, Inc.*, 543 F.3d 384, 391 (7th Cir. 2008); *Rodenbeck v. Marathon Petrol.
Co.*, 742 F. Supp. 1448, 1457 (N.D. Ind. 1990).  But that is not enough because
the RSA does not specify its "allegations," which therefore may be narrower
than the listed "issues" that the RSA says the Lead Regulators "review[ed]."
Dkt. 108-3 at 42; *see Deckard v. Gen. Motors Corp.*, 307 F.3d 556, 562 (7th Cir.
2002) ("The interpretation of a release is determined by the terms of the
particular instrument, in light of all facts and circumstances.").

In short, Mr. Burnett released claims "related to" the RSA's allegations,
but the RSA does not specify its allegations, and the FAC alleges that the RSA's
allegations do not include the FAC's claims.  At this Rule 12(c) stage, the
summary judgment standard applies "except that the court may consider only

22

the contends of the pleadings" and "view[s] the facts and inferences to be drawn from [the plaintiffs'] allegations in the light most favorable to the plaintiffs." *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993).  Under that standard—without evidence of what the RSA's allegations were—the FAC's allegations on that point must be taken as true, precluding judgment on the pleadings.[12]

### D.   Declaratory Relief

The CNO Defendants argue that Plaintiffs' claims for declaratory judgment should be dismissed as duplicative of Plaintiffs' breach of contract claim.  Dkt. 108 at 29.[13]  They contend that because Plaintiffs no longer own their policies, a declaratory judgment would have no effect.  *Id.*  Plaintiffs respond that declarations about specific policy provisions or RSA terms may be necessary as litigation proceeds.  Dkt. 128 at 35–36.

"When a party requests declaratory relief together with a substantially similar remedy, 'the court may exercise its discretion to dismiss the declaratory judgment claim.'"  *4310, LLC v. GES MegaOne, LLC*, No. 1:16-cv-01505-SEB-MPB, 2017 WL 1197293, at *5 (S.D. Ind. Mar. 31, 2017).  But the CNO Defendants offer no reason why the declaratory judgment claim should be dismissed except that it is duplicative.  *See* dkt. 108 at 29.  Because they have not alleged any legal deficiency in the claim or shown any burden to allowing it

---

[12] The Court therefore does not address Plaintiffs' arguments that this argument is procedurally improper.

[13] Conseco Life initially made this argument in its motion to dismiss, dkt. 108, which the CNO Defendants joined, dkt. 111 at 10 n.2.  The Court therefore refers to this as the CNO Defendants' argument.

to proceed, the Court will not exercise its discretion to dismiss the declaratory judgment claim at this point.

## IV.
## Conclusion

The CNO Defendants' motion to dismiss is **DENIED**.  Dkt. [110].  The **clerk is directed** to remove CDOC from the docket.

**SO ORDERED.**

Date: 8/17/2020

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

John M. Aerni
ALSTON AND BIRD LLP
john.aerni@alston.com

Kelly S Biggins
Locke Lord LLP
300 South Grand Avenue      Suite 2600
Los Angeles, CA 90071

James H Bilton
LOCKE LORD LLP
jbilton@lockelord.com

Taylor F. Brinkman
LOCKE LORD LLP
tbrinkman@lockelord.com

Shelli L. Calland
WEISBROD MATTEIS & COPLEY PLLC
scalland@wmclaw.com

Saul Cohen

WEISBROD MATTEIS & COPLEY PLLC
scohen@wmclaw.com

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Tamra B. Ferguson
WEISBROD MATTEIS & COPLEY PLLC
tferguson@wmclaw.com

Steven K. Huffer
S.K. HUFFER & ASSOCIATES, P.C.
steveh@hufferlaw.com

Adam J. Kaiser
ALSTON & BIRD LLP
adam.kaiser@alston.com

Barbara Louise Lyons
Law Office of Barbara L Llyons
80 El Camino Real  Apt D
Burlingame, CA 94010

Rachel Adi Naor
Alston and Bird LLP
rachel.naor@alston.com

Matthew B Nazareth
Locke Lord LLP
300 South Grand Avenue  Suite 2600
Los Angeles, CA 90071

Samuel J Park
Alston and Bird LLP
samuel.park@alston.com

Phillip Russell Perdew
LOCKE LORD LLP
pperdew@lockelord.com

Carl C Scherz
LOCKE LORD LLP
cscherz@lockelord.com

T. Esther Silberstein

WEISBROD MATTEIS & COPLEY PLLC
esilberstein@wmclaw.com

Derek Y. Sugimura
WEISBROD MATTEIS & COPLEY PLLC
dsugimura@wmclaw.com

Stephen A Weisbrod
WEISBROD MATTEIS & COPLEY PLLC
sweisbrod@wmclaw.com