# EXHIBIT 4

Page 3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

_____
                              )
IN RE CONSECO LIFE INSURANCE )CASE NO.: 3:10-md-2124 SI (EDL)
COMPANY LIFETREND INSURANCE  )
SALES AND MARKETING          )
LITIGATION,                  )Burnett v. Conseco Life
                             )    Insurance Co.
                             )
_____         )

VIDEOTAPED DEPOSITION
OF
JOE H. CAMP, D.D.S.

Taken at:

Winston & Strawn LLP
100 North Tryon Street - 29th Floor
Charlotte, North Carolina

On Thursday, June 26, 2014

REPORTER: JENNIFER J. ALBERT, RPR, CRR
Notary Public

DEFENDANT'S EXHIBITS MARKED:                    PAGE

Number 11 - Conseco Letter Dated December 18, 2008. .  115

Number 12 - Cash Surrender Dated February 10, 2009. .  118

Number 13 - Fax to Gerard Wathen with Attachments . .  120

Number 14 - Massachusetts General Life Policy With

      Handwritten Notations. . . . . . . . .   125

(Burnett Exhibit No. 41 was marked in a previous deposition,

but was referenced and will be attached with the other

exhibits.)

(Exhibits attached to transcript.)

Page 2

A P P E A R I N G
For the Plaintiffs William Jeff Burnett and Joe H. Camp:
        Stephen A. Weisbrod, Esq.
        Weisbrod Matteis & Copley PLLC
        1900 M Street, NW
        Suite 850
        Washington, DC  20036
        202.499.7900
        sweisbrod@wmclaw.com

For the Defendant Conseco Life Insurance Company:
        John M. Aerni, Esq.
        Winston & Strawn LLP
        200 Park Avenue
        New York, NY  10166
        212.294.4665
        jaerni@winston.com

ALSO PRESENT:  Scott Swing, Videographer

        * * * * * * * *

        I N D E X

                    PAGE

EXAMINATION BY MR. AERNI. . . . . . . . . . . . .    5
EXAMINATION BY MR. WEISBROD . . . . . . . . . . .  127
FURTHER EXAMINATION BY MR. AERNI. . . . . . . . .  131

DEFENDANT'S EXHIBITS MARKED:
Number 1 - Massachusetts General Life Insurance
        Policy. . . . . . . . . . . . . . . .  16
Number 2 - Statement of Policy Cost and Benefit
        Information . . . . . . . . . . . . . .  23
Number 3 - Conseco Life Annual Statements. . . . .  26
Number 4 - Policyholder Statement for May 15, 1994,
        to May 16, 1995 . . . . . . . . . . . .  29
Number 5 - Conseco Life Insurance Company Letter
        Dated October 7, 2008 . . . . . . . . .  30
Number 6 - Shortfall Notice Dated November 16, 2008.  34
Number 7 - Shortfall Notice Dated December 11, 2008.  34
Number 8 - Conseco Letter Dated December 19, 2008. .  35
Number 9 - Request to Surrender for Net Cash Value .  36
Number 10 - Conseco Letter Dated December 1, 2008 . .  103

Page 4

1           Pursuant to Notice in the aforementioned matter and
2      in accordance with the Federal Rules of Civil Procedure, this
3      deposition of JOE H. CAMP, D.D.S., was taken by Defendant
4      beginning at 9:11 a.m. on June 26, 2014, before JENNIFER J.
5      ALBERT, Registered Professional Reporter, Certified Realtime
6      Reporter and Notary Public.
7           THE VIDEOGRAPHER:  Starting of No. 1.  On the
8      record at 9:11 a.m.  This is the videotaped
9      deposition of Dr. Joe H. Camp.  This is in the
10     United States District Court for the Northern
11     District of California, San Francisco Division.
12     The case number is 3:10-md-2124 SI (EDL).
13          Today's date and time is indicated on the
14     video screen.  We are located today at 100 North
15     Tryon Street in Charlotte, North Carolina.  The
16     court reporter today is Jennifer Albert; she's here
17     on the behalf of Lowrance Court Reporting Services,
18     located in Charlotte, North Carolina.  My name is
19     Scott Swing, I'm with East Coast Legal Video
20     Productions; I'm the videographer, also from
21     Charlotte, North Carolina.
22          At this time counselors will verbally
23     introduce themselves and who they represent,
24     starting with the noticing attorney first, please.
25          MR. AERNI:  John Aerni from Winston & Strawn for

## Page 17

1     BY MR. AERNI:
2   Q. So the first document on your stack is a document that
3      I've premarked as Camp Exhibit 1. Do you see that?
4   A. Yes, I do.
5   Q. And I will just mention for the record's sake, so the
6      record is clear, there are some numbers in the bottom
7      right-hand corner of the document, Doctor, and does Camp
8      Exhibit 1 have the numbers in the bottom right BC-57 -- it
9      starts --
10   A. 0057.
11   Q. Right.
12   A. Yes.
13   Q. And I'm just going to make it simpler, I'm just going to
14      ignore those zeros.
15   A. Okay.
16   Q. So it starts with BC-57, and if you can just confirm with
17      me that it runs through until BC-76?
18   A. That's correct.
19   Q. And, Doctor, I will mention to you that the BC designation
20      in front of those numbers is an indication that your
21      counsel forwarded the documents to us. My understanding
22      is the B stands for Burnett and C stands for Camp, so
23      these are documents from Mr. Burnett and yourself.
24      Let me just ask you to confirm, if you would, that
25      Camp Exhibit 1 in front of you is a document that's in

## Page 18

1      your records?
2   A. Yes.
3   Q. Is it the policy, the life insurance policy, that brings
4      us here today?
5   A. It is.
6   Q. Have you --
7   A. Well, can I say something? This is Massachusetts General;
8      of course, this was taken over by Conseco. So I don't
9      know if that makes any difference or not, but --
10   Q. Okay.
11   A. This is the original policy that was issued to me.
12   Q. That's right. And this was a policy that you bought
13      around May 15th of 1993?
14   A. Yes.
15   Q. And was it Mr. Gamble's recommendation that you buy this
16      policy?
17   A. Yes.
18   Q. And this was the policy that you cashed in in around late
19      2008 or early 2009?
20   A. Well, the follow-up policy that Conseco had taken over was
21      the policy I cashed in, which originated from this.
22   Q. Is it your understanding that there was some policy that
23      was issued for this coverage in addition to the Camp
24      Exhibit 1 that's in front of you?
25   A. I don't remember anything, I just remember getting letters

## Page 19

1      saying it had been -- they had been taken over by Conseco
2      and so forth.
3   Q. And when you received Camp Exhibit 1 you were living here
4      in North Carolina?
5   A. Yes, I was here in Charlotte.
6   Q. And did Mr. Gamble deliver the policy to you here in
7      North Carolina?
8   A. Yes, he did. I went to his office and we went over the
9      policy.
10   Q. You mentioned that you went over the policy with
11      Mr. Gamble. That was around May of 1993 when you bought
12      it.
13   A. Yes. After that, shortly after that.
14   Q. So you've reviewed the policy at least once. Have you
15      reviewed it since approximately May of 1993?
16   A. No.
17   Q. Did you review it at all in connection with this lawsuit?
18   A. No.
19   Q. Did you review it at all in connection with coming here
20      today to give testimony?
21   A. No.
22   Q. Did you -- when there was various correspondence over the
23      years, be it with Massachusetts General Life or Conseco
24      Life Insurance Company, did you ever go back and look at
25      the life insurance policy?

## Page 20

1   A. No, I always called Mr. Gamble and asked for an
2      explanation, and I would meet with him if there was some
3      question, rather than me going back and digging out the
4      policy, because I don't understand half of what's written
5      in -- well, 90 percent of what's written in these
6      policies.
7   Q. You've been practicing as a dentist and endodontist for
8      many years. Do you also have professional liability
9      insurance?
10   A. Yes, I do.
11   Q. Is it fair to say you've had that most or all of your
12      career?
13   A. All of my career.
14   Q. Do you have familiarity with professional liability
15      insurance?
16   A. Yes.
17   Q. And do you have it covering you as of today even?
18   A. I have a limited policy. Since I'm not practicing
19      full-time, I was able to go to a limited policy, but, yes,
20      I have a limited policy.
21   Q. And how many different insurors or carriers have you had
22      over the years for your professional liability insurance?
23   A. Maybe three or four. The companies -- these companies buy
24      each other out and change names, and the one I have now,
25      you know, bought -- bought the one out before them and

Page 25

1  Q. And then where it says "for more information," under that
2     it says Date, May 15th, 1993.
3        Do you see that?
4  A. Yes.
5  Q. And then there's -- under that it says Policy Number, and
6     then there's a policy number there; right?
7  A. Correct.
8  Q. I don't know if you need to check or not, but would you
9     agree that that policy number is your policy, the one
10    that's Camp Exhibit 1?
11       You can check to confirm that if you -- if you want.
12    And that's the Complaint, Doctor. Okay. You can check
13    that as well.
14          MR. WEISBROD: Which one are you --
15          THE WITNESS: He's saying I should confirm that
16          number is this policy.
17    BY MR. AERNI:
18    Q. If you would take a look at Camp Exhibit 1.
19    A. I'm sorry, I was looking at the wrong thing.
20    Q. If you would look at Page 3 of Camp Exhibit 1, Doctor.
21       Page 3 of Camp Exhibit No. 1 is the one above you there.
22    A. Oh. Yes. Yes, that's correct.
23    Q. And is Camp Exhibit 2 a document that you received around
24       May of 1993 when you bought the policy?
25    A. Yes, it is.

Page 26

1          (Thereupon, Camp Exhibit No. 3 was marked for
2           identification.)
3     BY MR. AERNI:
4     Q. I'm going to move along here, Doctor. I will be moving
5        along fairly quickly through these documents. So let's
6        turn to your next document in the stack; it's a document
7        I've labeled Camp Exhibit No. 3.
8     A. Right.
9     Q. And while you're thumbing through that, I will just
10       mention for the court reporter that the -- Camp Exhibit 3
11       bears the following Bates numbers: BC-01 through -13, and
12       BC-25 to -26.
13    A. (Witness reviews document.)
14          Yeah, I received these kind of notices each year with
15       the policy report.
16    Q. And, Doctor, I will try to make it clear for the record.
17       Since there wasn't a question on the table, pardon me if I
18       back up and go through it again.
19    A. Sure.
20    Q. But am I correct that Camp Exhibit 3 are a number of what
21       are known as annual reports or annual statements that you
22       received from the insurance company, life insurance
23       company, for the policy that's Camp Exhibit 1?
24    A. Yes.
25    Q. And turning to the first two pages -- first three pages of

Page 27

1        Camp Exhibit 3, Doctor, the first three pages of Camp
2        Exhibit 3 reflect one of these annual reports that was for
3        the period May 15th, 2002, to May 15th, 2003?
4     A. Yes.
5     Q. And then the -- am I correct that the next -- as you go
6        through the document the next statements in order just go
7        year by year after that period until May of 2008?
8     A. That's correct.
9     Q. And is it -- am I correct that you did not receive an
10       annual statement for the year ending May of 2009, because
11       you had already surrendered your policy before May of
12       2009?
13    A. That's correct.
14    Q. And I'm going to turn now to the last -- the last four
15       pages of Camp Exhibit 3, Doctor. The pages at the
16       bottom are marked BC -- I will start with the pages marked
17       BC-12 and -13. And tell me when you're with me.
18    A. Okay. I have BC-12.
19    Q. BC-12 and -13 reflect one of these annual statements for
20       the period May 2007 to May 2008?
21    A. To May 16th, 2008.
22    Q. And that's what I'll call a clean copy of the report;
23       right? There's no handwriting on it?
24    A. That's correct.
25    Q. And the next two pages of Camp Exhibit 3, BC-25 and -26,

Page 28

1        is it correct that that's another copy of this annual
2        statement that we just saw as BC-12 and -13, but it has
3        markings and handwriting on it?
4     A. That's correct.
5     Q. Is the handwriting on pages BC-25 and -26 yours?
6     A. No.
7     Q. Whose is it?
8     A. I have no idea.
9     Q. Do you recognize Mr. Gamble's handwriting?
10    A. No, I wouldn't. Sorry.
11    Q. When you received these annual statements that are in
12       Camp Exhibit 3, did you on more than one occasion talk to
13       Mr. Gamble about them?
14    A. Yeah, I would call him each year about -- about the
15       statement. We'd traditionally do that with things that we
16       have together; when there's a yearly report and so forth,
17       we'd go over it; some things in more detail than others.
18    Q. And, Dr. Camp, I note that though we have the annual
19       statements starting with May -- starting from May 15th,
20       2002, forward, I note that we don't have annual statements
21       from 1993 until May of 2002. Do you know why that's the
22       case?
23    A. No, I do not.
24    Q. Have you searched for whether or not you have annual
25       statements from the period when you bought the policy

7

## Page 33

1    kind of a shortfall to it?
2    A. Yes.
3    Q. And you understood that to be in addition to these
4    increases for cost of insurance expenses and other
5    expenses?
6    A. Yes.
7    Q. And staying on that second page in the paragraph under
8    Administrative Changes, there's a reference to optional
9    premium payment provision.
10       Do you see that?
11   A. Which paragraph is that again?
12   Q. First paragraph under --
13   A. First paragraph under Administrative Changes?
14   Q. Yes. Correct.
15   A. And what am I looking for again?
16   Q. The phrase -- it's in the second line of that paragraph,
17   Doctor, optional --
18   A. Yes.
19   Q. -- premium payment provision.
20   A. Yes.
21   Q. Was it your understanding that your policy allowed you to
22   stop paying premium at some point?
23   A. When I originally bought the policy I was to pay five
24   premiums and that was it forever.
25   Q. So -- so you did understand there would be a time under

## Page 34

1    your policy when you would be allowed to stop paying
2    premium; is that correct?
3    A. Yes. Yes, after five years.
4    Q. I'm going to move along to the next document, Doctor.
5       (Thereupon, Camp Exhibit No. 6 was marked for
6       identification.)
7    BY MR. AERNI:
8    Q. The next document I've premarked as Camp Exhibit No. 6,
9    it's a one-page document, it has the identification number
10   BC-14.
11   A. Correct.
12   Q. And is Camp Exhibit 6 a document you received from
13   Conseco Life Insurance around November of 2008?
14   A. Yes, it is.
15   Q. And there is some boldface -- there is some bold type
16   about a third of the way down the page that the bottom
17   line of that boldface says "shortfall notice." Do you see
18   that?
19   A. I do.
20   Q. And it's your understanding that Camp Exhibit 6 was giving
21   you some kind of notice about a shortfall?
22   A. Yes.
23       (Thereupon, Camp Exhibit No. 7 was marked for
24       identification.)
25   BY MR. AERNI:

## Page 35

1    Q. Next I'll turn to Camp Exhibit 7, Doctor. And Camp
2    Exhibit -- I'll mention for the record that it has the
3    identification number of BC-27.
4    A. Correct.
5    Q. Is Camp Exhibit 7 also another document you received from
6    Conseco Life Insurance around December 11th, 2008?
7    A. It is.
8    Q. And is Camp Exhibit 7 another number -- excuse me, another
9    one of these shortfall notices?
10   A. Yes, it is.
11   Q. And, Doctor, if you could just for a moment bring back the
12   last two exhibits in your stack there, so numbers -- I'd
13   ask you to have it in front of you at the moment 5, 6 and
14   7.
15   A. Yes.
16   Q. Okay. And if you can sort of put them to your left side
17   perhaps while we turn to the next document.
18   A. Okay.
19       (Thereupon, Camp Exhibit No. 8 was marked for
20       identification.)
21   BY MR. AERNI:
22   Q. The next document I've marked as Camp Exhibit No. 8, it's
23   a one-page document that has the identification number
24   BC-55.
25   A. Correct.

## Page 36

1    Q. Is Camp Exhibit 8 a document you received from
2    Conseco Life Insurance Company around December 19th, 2008?
3    A. Yes, it -- yes, it was.
4    Q. And in the first paragraph of Camp Exhibit 8 it's -- the
5    letter states: We are writing to notify you that at this
6    time you may temporarily disregard all previous notices
7    sent to you from Conseco Life Insurance Company regarding
8    your Lifetrend policy.
9       Do you see that?
10   A. Yes.
11   Q. When you got Camp Exhibit 8, did you understand the
12   letter to be saying that you may temporarily disregard the
13   three notices we just went through, the ones that are Camp
14   Exhibits 5, 6 and 7?
15   A. I did, temporarily.
16       (Thereupon, Camp Exhibit No. 9 was marked for
17       identification.)
18   BY MR. AERNI:
19   Q. Moving along briefly to Camp Exhibit 9, Doctor. And it
20   might be helpful if we keep them in order. Thank you.
21   And I know I make this difficult the way I do this with
22   all the paper shuffling, Doctor, so bear with me.
23   A. No problem.
24   Q. The next document I have marked as Camp Exhibit 9, it's a
25   three-page document with the identification numbers BC-49

## Page 61

1  that's when I did it, in the retirement plan.
2      But I was just getting further insurance, you know.
3  I had debts at that time.  The building that we built, at
4  that point we still didn't have key man insurance on that
5  building, and so I had, you know, a home that I had bought
6  and other -- other things that were debts that I needed
7  coverage in the event of my death.
8  Q.  So at some point before May of 1993 or so you think
9  Mr. Gamble came to you about purchasing more
10  life insurance?
11  A.  Yes.
12  Q.  And do you recall, was this in a face-to-face meeting or a
13  telephone call or some of both?
14  A.  It would have been some of both.
15  Q.  Do you have any recollections of any conversations you had
16  with Mr. Gamble around this time in 1993 when you
17  purchased the policy?
18  A.  I remember us talking about putting it in a retirement
19  plan versus me taking it personally, and the only thing I
20  had against buying it in the retirement plan was in the
21  event of death and those other -- other individuals would
22  -- would share in the proceeds; but, you know, it was
23  using their money also to buy it, so they rightfully would
24  have had -- a portion of it would have belonged to them.
25  And so on down the road I made the -- had the plans to buy

## Page 62

1  it out personally.  That's -- that's all I remember at
2  this point.
3  Q.  And was it your idea or Mr. Gamble's idea to purchase the
4  plan initially and put it in the retirement plan?
5  A.  That probably came from him.
6  Q.  And did he come to you with any particular policy in mind?
7  A.  Just the companies he represented, one of those, and he
8  thought this was a good company.  So that would have been
9  his recommendation.
10      I know nothing about comparing one insurance company
11  to another.  I mean, I can look at a spreadsheet maybe and
12  get an idea of their assets and so forth, but that doesn't
13  tell me a whole lot.
14  Q.  And your policy has a death benefit or face amount of
15  $500,000; right?
16  A.  Correct.
17  Q.  How was it that that amount was arrived at?
18  A.  It was just a good number, I guess.  It would have covered
19  what I owed on -- on the building that, you know, the debt
20  we had on the building and possibly what I had on my home.
21  I don't remember exactly why we chose $500,000.
22  Q.  Did you have any -- before you purchased the policy, did
23  you have discussion with Mr. Gamble about what type of
24  policy you wanted to purchase?
25  A.  Well, the one thing that I didn't want to do was lock

## Page 63

1  myself into paying premiums the rest of my life.  I wanted
2  something that I could pay a higher fee up front and be
3  done with the premiums and the policy would then carry
4  itself so that I didn't have to be kicking in each year;
5  because in my profession, you know, if I'm disabled or
6  something happens and I can't practice, my income ceases.
7  So, you know, that's -- that's what I was always looking
8  at.
9      And there's a -- although you don't walk around
10  worrying about it all the time, there's always the
11  possibility, you know, you can get disabled.  Things
12  happen and you can't practice anymore.
13      You've got to be able to, you know, have the
14  dexterity in your hands and communicate from your brain
15  down to your hands.  So either one of those systems can --
16  can go awry or be injured to the point where you can't
17  practice, and if you're paying a big insurance premium
18  every year then that's money you've got to come up with.
19      So I did not -- that's the one thing I knew I didn't
20  want to do was lock myself into paying premiums the rest
21  of my life.
22  Q.  And the policy is a whole life insurance policy, your
23  policy?
24  A.  I don't -- I will be honest with you, I don't know.  I
25  don't remember.  I guess the policy states that somewhere

## Page 64

1  in it, but I honestly don't remember.
2  Q.  Turn, if you would, to the cover page of the policy,
3  Doctor.
4  A.  (Witness complies.)
5  Q.  Down toward the bottom of the cover page --
6  A.  Yeah, it says whole life insurance, so it was whole life.
7  Q.  And if you would refer to Page 3 of the policy, Doctor.
8  A.  Yes.
9  Q.  Over toward the right, about a third of the way down, do
10  you see a column that says Years Payable?
11  A.  Yes.
12  Q.  And what does it say as far as years payable?
13  A.  It says life, but this was sold to me that I would only
14  pay five payments and then I would be done with it and the
15  policy would carry itself.  Now, that may or may not be
16  true.
17      Obviously it -- in the end it didn't turn out to be
18  true, but that was what the policy was sold to me as.
19  That I would pay five years and that would get enough
20  value in the policy and then I would never have to pay any
21  premiums after that.
22  Q.  And who told you that?
23  A.  Mr. Gamble, I guess.
24  Q.  Did you talk to anybody else about the policy purchased
25  other than Mr. Gamble?

## Page 69

1  right?

2  A. Not that -- I don't -- I don't under- -- I don't follow

3  what you're saying.

4  Q. Well, let me try to help you out.

5  A. They're not -- they're not expenses that I paid. I was

6  only paying the premium, to my knowledge. I wasn't paying

7  any other expense.

8  Q. So let's stay with Camp Exhibit 2 that's in front of you,

9  and on the second page that you're already -- you're

10  already there --

11  A. Uh-huh.

12  Q. -- there is a line that starts out, it says: As described

13  in your policy.

14  A. Yeah.

15  Q. Do you see that?

16  A. Yes.

17  Q. And then it says: The following provisions apply, and

18  then it refers to three separate charges, it numbers them

19  1, 2, 3. Do you see that?

20  A. Yes, I do.

21  Q. Now, is it your understanding that for your policy those

22  three charges were deducted from --

23  Well, let's start it this way: Do you understand

24  with your policy once you paid premium that goes into

25  what's called the accumulation account of your policy?

## Page 70

1  A. I was -- I was not aware of that. What I thought, it paid

2  all the expenses and they got the interest on their

3  investment with the money, then they paid all expenses and

4  what was left over would be then my cash value increase.

5  So this was never, you know, told -- told to me or

6  anything. It probably was and I probably did not remember

7  it.

8  Q. So let -- I'll just address each of these expenses briefly

9  here, Doctor. It says --

10  A. Okay.

11  Q. For No. 1 it says: There is an expense charge of $2.50

12  per month, which may be increased after the fifth policy

13  year to a maximum $5 per month upon prior written

14  notification.

15  A. Right.

16  Q. Did anyone ever tell you about that expense?

17  A. I do not remember it. Maybe so, maybe not. I don't -- I

18  just -- sorry, I just do not remember.

19  Q. And then referring to the second one, it says: There is

20  an additional monthly expense charge of $1.88 per $1,000

21  of initial sum insured during the first two policy years

22  and 69 cents per $1,000 thereafter.

23  Do you see that?

24  A. Yes.

25  Q. Did anyone ever tell you about that?

## Page 71

1  A. Not that I remember.

2  Q. When you got your annual statements, did you ever look as

3  to whether or not you were being charged for those

4  expenses?

5  A. No. Basically what I looked at, you know, was this first

6  page, it would have had the cash value increases and so

7  forth.

8  Q. And turning to the third item there on Camp Exhibit 2,

9  Doctor, it says: There is a surrender charge as follows,

10  which is deducted from your accumulation account if the

11  policy is surrendered.

12  Do you see that?

13  A. Yeah, I was aware of that, and I did pay a surrender

14  charge when I cashed the policy in.

15  Q. So you're aware the policy had a 20-year surrender charge?

16  A. Yes, I was aware of that.

17  Q. And there is a table on that page of Camp Exhibit 2. You

18  were aware that the surrender charge ultimately went down

19  over the period of 20 years?

20  A. Yes.

21  Q. And were you aware of that when you -- around the time you

22  bought the policy?

23  A. Yeah, I was aware of that, that it had a surrender charge

24  on it. That's -- I remember that; I don't remember these

25  other things. If they were ever told to me, I don't -- I

## Page 72

1  don't know.

2  Q. And, for example, in that table on Camp Exhibit 2, do you

3  see there's a Year 16?

4  A. Yes.

5  Q. And there is a surrender charge for Year 16 of $9,420?

6  A. Yes.

7  Q. And to the best of your recollection was that the

8  surrender charge you -- that was deducted --

9  A. It was.

10  Q. -- when you --

11  A. It was 9,000-something. I don't remember the other

12  dollars --

13  Q. Okay.

14  A. -- but I know it was 9,000 and something.

15  Q. And your policy issue date was May 15th of 1993?

16  A. Yes.

17  Q. And so if you go 15 years from that, that would be

18  May 15th, 2008; right?

19  A. Yes.

20  Q. And you surrendered your policy after that date, but

21  before the next May 15th; right?

22  A. Right.

23  Q. So that would be your 16th policy year you understood?

24  A. Yes.

25  Q. Do you have any complaint about the surrender charge that

## Page 77

1 increased the amount of your cash value?
2 A. Yes.
3 Q. And turn, if you would, to page -- Paragraph 52 on the
4 next page of the Complaint, Doctor.
5 A. Okay.
6 Q. And I'll read it here, if you'll just read along, it says:
7 Generally speaking, the accumulation accounts grew when
8 policyholders paid premiums into them and when the Conseco
9 Defendants paid interest on amounts held in the accounts.
10 And that's what we just talked about a minute ago;
11 right?
12 A. Uh-huh.
13 Q. The inflows?
14 A. Right.
15 Q. And you understood that's sort of how the policy worked;
16 right?
17 A. Yes.
18 Q. And then it says: And the accumulation accounts shrank
19 when policyholders borrowed money from them or when the
20 Conseco Defendants took money out -- out of the accounts
21 in the form of cost of insurance deductions or expense
22 charges.
23 Do you see that?
24 A. I see it. Let me read this.
25 (Witness reviews document.)

## Page 78

1 Yes. Okay.
2 Q. And, again, so we talked about the premium pay- -- your
3 premium payments and any interest you received as being
4 inflows a minute ago; right?
5 A. Right.
6 Q. So you understand your policy essentially also had these
7 outflows in the form of expense deductions and cost of
8 insurance deductions?
9 A. I do, but I -- but I don't understand why they wait all
10 those years and then send me a bill for $78,000, and I
11 know nothing about that being done, and I'm assuming
12 during all that time that those amounts are being paid out
13 of the cash values that are building up and making the
14 cash value less.
15 And that's the only insurance I've ever had that has
16 anything similar to that. Maybe others have it and I just
17 don't know it, but I -- I've never seen that or
18 encountered that in any other insurance policy.
19 Q. And you understood that there -- at some period of time
20 you would be able to stop paying premiums --
21 A. Yes.
22 Q. -- for your policy; right?
23 A. Yes.
24 Q. At the same time we just talked a minute ago about these
25 outflows from your policy's cash value.

## Page 79

1 A. Correct.
2 Q. The expense charges and cost of insurance deductions;
3 right?
4 A. Yes.
5 Q. And did anyone ever promise you that the expense charges
6 would stop?
7 A. No.
8 Q. That --
9 A. No, I know those expense charges go on, but the policy is
10 building value as it goes -- as it goes on, and your cash
11 value might be less in one year than another year due to
12 expenses.
13 Q. And the same with the cost of insurance deductions, did
14 anyone ever promise you that those cost of insurance
15 deductions from your policy's cash value would at any
16 point stop?
17 A. No.
18 Q. And, Doctor, if you could turn back to the policy, which
19 is Camp Exhibit 1 in front of you.
20 A. Right.
21 Q. And it's on your left-hand side.
22 A. Oh.
23 Q. And turn, if you would, to the page that's BC-61.
24 A. 61?
25 Q. Right.

## Page 80

1 A. Okay.
2 Q. And I apologize for jumping around.
3 A. That's okay.
4 Q. I'm going to go back -- I'm going to go back to that
5 section labeled Expense Charges that we just went through
6 a few minutes ago.
7 A. Right.
8 Q. And in the first -- again, there are two paragraphs. In
9 the first paragraph, did you see where it says in the
10 second sentence: This charge may be increased by the
11 company at a policy anniversary after the policy has been
12 enforced for -- in force for at least five years, but not
13 to exceed $5 per month per policy and only upon the giving
14 of 90-day notice of an increase to the owner?
15 A. Yes.
16 Q. Okay. And then we went through the second paragraph a
17 minute ago, and it says that after the first two policy
18 years there is an additional monthly expense of 69 cents
19 per $1,000 of initial sum insured; right?
20 A. Yes.
21 Q. With your experience with life insurance over the years,
22 has it been your experience that essentially the policies
23 are priced based on units of $1,000 of coverage or more?
24 A. Yes.
25 Q. So you understood the idea of $1,000 of coverage being

## Page 109

1  would, Doctor. I'm making good on my promise to skip all
2  around and --
3  A. That's not a problem.
4  Q. -- make it really confusing for you.
5  A. No, that's not confusing. You've got it well organized.
6  Q. Just to put us back in the time frame, Camp Exhibit 7
7  is a letter you received from Conseco Life around
8  December 11th, 2008?
9  A. Yes.
10  Q. And it's the second one of these shortfall notices you
11  received?
12  A. I'm assuming. I don't see anywhere where it says it's the
13  second request. Oh, it was -- yeah, it's the second one.
14  Yeah.
15  Q. Okay. The first one was Camp Exhibit 6; right?
16  A. Yeah. Right. That was November -- yeah, so this -- yeah,
17  this would have been the second one.
18  Q. And down at the bottom of Camp Exhibit 7 there's a
19  reference to Pyramidal -- as in the word pyramid --
20  Pyramidal Funding Systems, Inc.
21  A. Right.
22  Q. Is that where -- is that where Mr. Gamble was affiliated
23  with around that time?
24  A. No.
25  Q. Do you know who Pyramidal Funding Systems, Inc., is?

## Page 110

1  A. I don't have the vaguest idea. I assume it's something to
2  do with the insurance company. It's nothing to do with
3  Mr. Gamble to my knowledge. I've never heard him being
4  associated with anybody with that name.
5  Q. When you received Camp Exhibit 7, did it change what your
6  plan was?
7  A. No, he just wanted me to expedite it and take care of it.
8  Q. So around mid-December when you received Camp Exhibit 7 it
9  was still your intention to cash out the policy?
10  A. Yes.
11  Q. In fact, is it fair to say it was your intention to cash
12  out the policy from the time you received the October 2008
13  letter until the policy was actually cashed out?
14  A. Yes.
15  Q. Was there ever any change in your intention during that
16  period?
17  A. No.
18  Q. Now let's turn back, if you would, to Camp Exhibit 8 --
19  A. Okay.
20  Q. -- Doctor.
21  Camp Exhibit 8, just to get us back in time, is
22  December -- a letter you received from Conseco Life around
23  December 19th, 2008?
24  A. Yes, it is.
25  Q. And this is the one that told you that at this time you

## Page 111

1  may temporarily disregard the notices we've seen as
2  Camp Exhibits 5, 6 and 7?
3  A. Yes, it is.
4  Q. Do you have an understanding that this period that you can
5  temporarily disregard those previous notices was referred
6  to as a moratorium or moratorium period?
7  A. Yes.
8  Q. That's what it was called?
9  A. I don't remember that specific term, but yes. To me it
10  meant that ultimately they're going to come back and want
11  the $78,000 and other charges, and all they're doing at
12  this point is temporarily suspending -- suspending all of
13  that.
14  Q. And to your knowledge was that temporary suspension ever
15  lifted or changed?
16  A. I don't know the answer to that.
17  Q. During the period --
18  A. It appeared -- it appeared to me, if you want to know the
19  honest truth, they're dragging their feet and they're
20  trying to get people on down the road until they get into
21  the payment sequence. I mean, that's what I thought.
22  You know, companies like this are great when it comes
23  to sending you premiums and they're not so great when it
24  comes to collecting from them it's been my experience.
25  They like to be paid, but they don't like to pay out.

## Page 112

1  Q. During the time that you continued to hold the policy,
2  were you ever told that this temporary suspension of any
3  of these notices was being lifted or changed?
4  A. No. No.
5  Q. And toward the second -- in the second paragraph of Camp
6  Exhibit 8, do you see that the second last -- or the last
7  sentence says: Conseco Life expects this review to be
8  completed on or before March 31st, 2009, and we'll provide
9  you with an update on the outcome of these discussions?
10  A. Yes.
11  Q. And did you ever get any update before you surrendered
12  your policy?
13  A. No, because I was -- I was out of it in early February.
14  So I would not have been receiving communications from
15  them past that point, since I was no longer one of their
16  clients.
17  Q. And was it also your understanding that as a result of
18  this temporary suspension of these other charges that you
19  would no -- they would no longer be asking for these until
20  the time that that temporary suspension was lifted?
21  A. Yeah.
22  Q. And you surrendered your policy before that --
23  A. I did.
24  Q. -- you were ever notified if that temporary suspension was
25  ever lifted?

28

## Page 117

1 -- him making the inquiry on my behalf. And I may have
2 signed a letter he wrote or something. I don't remember.
3 Q. Do you specifically remember going over with him figures
4 such as the accumulated value that appears in Camp
5 Exhibit 11?
6 A. Yes, I do.
7 Q. And did you go over with him the surrender charge of
8 $9,420 that appears in Camp Exhibit 11?
9 A. Yes, we did.
10 Q. And then you also would go over with him the net cash
11 value as of December 18th, 2008?
12 A. Yes.
13   We also went over the fact that, you know, this is
14 less than the money I had paid in, so I was really losing
15 some money on this policy. So, in other words, I did not
16 recover the premiums that I had paid in, that this was
17 less, because of the surrender charge.
18 Q. You had paid five premiums for this policy?
19 A. Yes, I paid five premiums.
20 Q. And each premium was $18,000 and change?
21 A. $18,750 or something like that.
22 Q. So --
23 A. So about $95,000 that I had paid in, roughly,
24 rounding it off.
25 Q. And the cash surrender value you ultimately received

## Page 118

1 around February of 2009 was a little bit greater than the
2 $89,000 figure reflected in Camp Exhibit 11?
3 A. I'm sorry, repeat the question.
4 Q. Let me try it this way. I'll make it easier for you.
5   MR. AERNI: Jennifer, I'd ask if you could mark
6 this document as Camp Exhibit -- 1 think it's 12.
7   THE WITNESS: Thank you.
8   (Thereupon, Camp Exhibit No. 12 was marked for
9 identification.)
10 BY MR. AERNI:
11 Q. Doctor, I've now handed you what I've marked as Camp
12 Exhibit 12. It's a single-page document with the
13 identification number BC-31.
14 A. Correct.
15 Q. And does Camp Exhibit 31 (sic) identify for you the amount
16 of actual cash surrender value you received from Conseco
17 life insurance policy -- or Conseco Life Insurance Company
18 when you cashed out your policy?
19 A. It is.
20 Q. And that was $89,920.44?
21 A. Correct.
22 Q. Which is, again, 3 to 4 hundred dollars more than is
23 reflected in Camp Exhibit 11?
24 A. Yeah. Yeah, it's $300 more.
25 Q. And is it your understanding that you received more from

## Page 119

1 -- from cashing out your policy in February 2009 than is
2 reflected in Camp Exhibit 11 because more cash value built
3 up?
4 A. Yeah, more cash value built up during that time.
5 Q. So going back to Camp Exhibit 11, do you know or do you
6 recall if you actually walked through those figures in
7 Camp Exhibit 11 when you met with Mr. Gamble on
8 December 22nd?
9 A. Yes, we did.
10 Q. And on that date was your decision to go ahead and cash
11 out the policy?
12 A. Yes.
13 Q. And did anything about the temporary suspension of any of
14 these changes or charges from the December 19th letter
15 influence your thinking about whether or not to cash out
16 the policy?
17 A. Yeah, I wanted to get out as quick as I could get out
18 because at that -- it seems to me it was all in limbo, you
19 know, and nobody knew exactly what was going to happen.
20 So I was trying to get out of it and avoid any further
21 charges.
22 Q. So this temporary suspension or moratorium, the fact that
23 it existed, made you more likely to want to surrender your
24 policy?
25 A. Yes.

## Page 120

1 Q. And you understood that had you kept -- kept the policy,
2 held on to the policy longer, at least while this
3 moratorium or temporary suspension was going on, your cash
4 value would still increase a bit; right?
5 A. Yes.
6   MR. AERNI: Jennifer, I'd ask we mark a new
7 document as Camp Exhibit 13.
8   (Thereupon, Camp Exhibit No. 13 was marked for
9 identification.)
10 BY MR. AERNI:
11 Q. Doctor, I've now handed you -- you now have in front of
12 you Camp Exhibit 13. It has the identification numbers
13 BC-78 to -80.
14 A. Yes.
15 Q. Is this a -- does Camp Exhibit 13 reflect a document you
16 sent to Conseco Life Insurance Company around February of
17 2009?
18 A. It does.
19 Q. And you sent it to Conseco Life by fax?
20 A. Yes.
21 Q. And you sent it to Mr. Wathen?
22 A. Yes.
23   MR. AERNI: And for Jennifer it's W-A-T-H-E-N,
24 Jennifer's benefit.
25 BY MR. AERNI:

## Page 137

STATE OF NORTH CAROLINA
COUNTY OF UNION

CERTIFICATE OF REPORTER

I, JENNIFER J. ALBERT, RPR, CRR, Notary Public and
Registered Professional Reporter, do hereby certify that
JOE H. CAMP, D.D.S., was duly sworn by me prior to the taking
of the foregoing deposition on June 26, 2014; that said
deposition was taken and transcribed under my supervision and
direction; that the parties were present as stated; and that I
am not of counsel for or in the employment of any of the
parties to this action, nor am I financially or otherwise
interested in the outcome of this action.

I do further certify that the foregoing ^ pages
constitute a true and accurate transcript of the testimony,
and that the witness is being given 30 days in which to affix
his notarized signature to the testimony.

This the 30th day of June, 2014.

_____
JENNIFER J. ALBERT, RPR, CRR
Notary Public #200817600029

## Page 138

WITNESS CERTIFICATION

I, JOE H. CAMP, D.D.S., hereby certify:

That I have read and examined the contents of the
foregoing testimony as given by me on June 26, 2014, and that
to the best of my knowledge and belief the foregoing pages are
a complete and accurate record of the testimony given by me,
except as noted on the attached Addendum A hereto.

I have ___ have not ___ made changes/corrections.

_____
JOE H. CAMP, D.D.S.

I,_____, Notary Public for the
County of _____, State of _____,
hereby certify that the herein above-named appeared before me
this the _____ day of _____, _____; and that I
personally witnessed the execution of this document for the
intents and purposes as herein above described.

_____

NOTARY PUBLIC

(SEAL)

My Notary Seal Expires: _____

## Page 139

ADDENDUM A

Upon reading and examining my testimony as herein
transcribed, I make the following additions, changes, and/or
corrections with the accompanying and corresponding reason(s)
for the same:

| Page | Line | Is Amended to Read |
|------|------|--------------------|
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |

_____
JOE H. CAMP, D.D.S.

35