UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM JEFFREY BURNETT, | ) | |
| JOE H CAMP, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-00200-JPH-DML |
| | ) | |
| CNO FINANCIAL GROUP, INC., | ) | |
| CNO SERVICES LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MOTION FOR CLASS CERTIFICATION**

Plaintiffs William Jeffrey Burnett and Joe H. Camp are former holders of

certain "LifeTrend" life insurance policies ("Policies"). They allege that

Defendants breached their Policies by announcing and implementing changes

in the calculation of Policy premiums and expense charges that caused

thousands of policyholders to surrender their Policies. The Court has approved

a class-action settlement and entered final judgment as to Defendant Conseco

Life Insurance Company. Dkt. 237; dkt. 251. Plaintiffs have filed a motion for

class certification for their claims against the remaining Defendants—CNO

Financial Group and CNO Services ("CNO Defendants"). Dkt. [232]. They later

filed a motion to modify their proposed class definition to shorten the time

during which Policy surrenders would qualify for the class. Dkt. [326]. For the

reasons below, those motions are **GRANTED** and the proposed class, as

modified, is certified.

# I.
## Facts and Background

Plaintiffs allege that the Policies allowed policyholders to stop paying premiums after five years if the policy had a high enough cash value.  Dkt. 108-1 at 13–17.  By 2008, few policyholders were still required to pay premiums.  *Id.* at 4.  In October 2008, Conseco Life sent a letter demanding premium payments and cost-of-insurance charges in an effort to force policyholders to surrender their policies.  *Id.* at 18–23.  Plaintiffs allege that this "shock lapse" strategy led thousands of policyholders to surrender their policies.  *Id.* at 23–26.

Current and former LifeTrend policyholders first sued Conseco Life in 2008.  *See Brady, et al. v. Conseco Life Ins. Co.*, No. 3:08-cv-5746, dkt. 1 (N.D. Cal. Dec. 24, 2008) (the "*Brady* Action").  The *Brady* Action was filed on behalf of a putative class of all current and former LifeTrend policyholders, *id.*, and in February 2010 was consolidated into a LifeTrend multidistrict litigation case, *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, No. 3:10-MD-02124 dkt. 1 (N.D. Cal.) (the "LifeTrend MDL").  The LifeTrend MDL Court initially certified a class of current and former LifeTrend policyholders, but in December 2011 limited the class to current policyholders.  *See* LifeTrend MDL, dkt. 253.

On October 5, 2012, Plaintiffs brought this case in the Central District of California on behalf of former policyholders removed from the LifeTrend MDL class.  Dkt. 1.  The case was transferred to the LifeTrend MDL, where Plaintiffs filed their amended complaint—the operative complaint.  *See* LifeTrend MDL, dkt. 636; dkt. 108-1.  Plaintiffs allege in the operative complaint that

2

Defendants breached the Policies by announcing and later implementing rate increases and other administrative changes.  Dkt. 108-1 at 73–75.  They also seek declarations that "Conseco Life is the alter ego of CNO Services and/or CNO Financial, that CNO Services and Conseco Life are alter egos of CNO Financial, and therefore that all three Conseco Defendants are liable for the conduct of Conseco Life."  *Id.* at 76.

In January 2018, after the MDL court removed former policyholders from the pending class action, this case was transferred to this district.  Dkt. 69; dkt. 70; *see* 28 U.S.C. § 1404(a).  The CNO Defendants and Conseco Life separately moved to dismiss the amended complaint for failure to state a claim. Dkt. 107; dkt. 110.  Conseco Life later withdrew its motion to dismiss after reaching a proposed class-action settlement.  *See* dkt. 172; dkt. 197; dkt. 200. On January 13, 2021, the Court granted final approval to the class and the class settlement agreement and entered partial final judgment as to the class's claims against Conseco Life.  Dkt. 237; dkt. 238; dkt. 251 (reformed partial final judgment).

The Court denied the CNO Defendants' motion to dismiss in August 2020.  Dkt. 208.  The Court rejected the CNO Defendants' arguments that (1) the operative compliant failed to state a claim for alter ego liability and (2) the complaint showed that Mr. Burnett's claims were barred by a release from liability included in a Regulatory Settlement Agreement that Conseco Life had negotiated with state regulators.  *Id.* at 14–17, 22–23.

Plaintiffs have moved for class certification of the claims against the CNO

Defendants.  Dkt. 232.  They initially proposed as a class:

> All Persons who owned a Class Policy, where Class
> Policy means each Conseco LifeTrend 3, LifeTrend 4 (87
> Series), or LifeTrend 4 (93 Series) policy for which (1) the
> policy owner invoked that policy's Optional Premium
> Payment prior to October 2008; (2) the policy owner
> received in or after October 2008 either of the following:
> (a) notice that an annual premium or shortfall payment
> was due on that policy, or (b) notice of increased cost-
> of-insurance deductions on that policy; and (3) the
> policy owner surrendered that policy between October
> 7, 2008 and June 30, 2013.  However, notwithstanding
> the above, a policy is not a Class Policy if the Estimated
> Initial Distribution for that policy in the Table of Initial
> Distribution Allocations attached as Exhibit 3 to
> Plaintiff's Settlement Agreement with Conseco Life
> Insurance Company (Dkt. 200-1 at 58) is $500.00.

*Id.* at 1–2.  They also proposed as a subclass:

> All persons who (1) meet the criteria for the Class; (2)
> accepted optional benefits made available by Conseco
> Life under the Regulatory Settlement Agreement; and
> (3) signed the standard release form accompanying the
> Regulatory Settlement Agreement.

*Id.* at 2.  In December 2021, Plaintiffs moved to modify the proposed class by

shortening the class period to include only policies for which "the policy owner

surrendered that policy between October 7, 2008 and September 1, 2011."

Dkt. 326 at 1–2.

The CNO Defendants oppose class certification and the modification to

the class definition.  Dkt. 254; dkt. 334.

4

## II.
## Applicable Law

Class actions were designed as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 155 (1982).  "Federal Rule of Civil Procedure 23 governs class actions."  *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021).  "Rule 23 gives the district courts broad discretion to determine whether certification of a class-action lawsuit is appropriate," *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008), and "provides a one-size-fits-all formula for deciding the class-action question," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399 (2010); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832 (1999) ("In drafting Rule 23(b), the Advisory Committee sought to catalogue in functional terms those recurrent life patterns which call for mass litigation through representative parties.").  "A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." *Santiago*, 19 F.4th at 1016.

## III.
## Analysis

### A. Modified Class Definition

Plaintiffs have filed a motion to modify the proposed class definition, seeking to change only the class period's end date from June 30, 2013 to September 1, 2011—shortening the eligible class period by about 22 months. Dkt. 326.  They argue that this will "streamline the evidence to be presented at

trial" and "facilitate class administration while having a minimal effect on the size of the class." Dkt. 329 at 2–3. The change would reduce the class from 2,124 policyholders to 1,993. *Id.* at 2. The CNO Defendants oppose the modification, contending that Plaintiffs' motion underscores the reasons why class certification is inappropriate. *See* dkt. 334 at 6–10. They also fault Plaintiffs for attempting to change the class definition after "eleven months of intense briefing" on the motion for class certification. *Id.* at 4.

The class-certification procedure is flexible, "enhanc[ing] the usefulness of the class-action device." *Gen. Telephone*, 457 U.S. at 160. So modifications can be freely made if necessary "in the light of subsequent developments in the litigation." *Id.*; *see Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023 (7th Cir. 2018). Indeed, because discovery frequently continues during and after certification, *see In re Allstate Corp. Securities Litig.*, 966 F.3d 595, 610, 610 n.3 (7th Cir. 2020), it's unsurprising that "judges and litigants regularly modify class definitions," which "courts have broad powers" to do, *In re Motorola Securities Litig.*, 644 F.3d 511, 518 (7th Cir. 2011); *see Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 826 (7th Cir. 2012) (explaining that district courts are "free to revisit" class definitions based on discovery and other developments).

Here, discovery has not yet closed. *See* dkt. 342. And Plaintiffs have explained that their motion to modify the class definition is based on a "comprehensive analysis" of "recently produced data and expert declarations." Dkt. 329 at 5. It's unsurprising that pieces of the class definition may change

6

as discovery continues even after a class is certified. *See In re Motorola*, 644 F.3d at 518. In fact, the CNO Defendants do not argue that the narrowed class would meaningfully affect whether certification is appropriate. *See* dkt. 334 at 3. Instead, they repeat their broader arguments on the merits of certification, including that causation necessarily involves individualized questions. *See id.* at 6–10. Those arguments overlook the broad discretion to modify class definitions, *Gen. Telephone*, 457 U.S. at 160, and are addressed below in the analysis of whether certification is appropriate under Rule 23.

Plaintiffs' motion to modify the proposed class definition is therefore **GRANTED**. Dkt. [326].

### B. Rule 23's Class-Certification Standard

"The party seeking certification bears the burden of demonstrating . . . by a preponderance of the evidence" that each of Rule 23's requirements is satisfied. *Santiago*, 19 F.4th at 1016. "Rule 23(a) enumerates four—and only four—requirements for class certification: numerosity, commonality, typicality, and adequacy of representation." *Simpson v. Dart*, 23 F.4th 706, 711 (7th Cir. 2022). In addition to those "prerequisites," the class must fit one of Rule 23(b)'s "particular types of classes, which have different criteria." *Santiago*, 19 F.4th at 1016. Here, Plaintiffs seek certification under Rule 23(b)(3), dkt. 234 at 23, so for certification to be appropriate "common questions of law or fact

must predominate over individual inquiries, and class treatment must be the superior method of resolving the controversy," *Santiago*, 19 F.4th at 1016.[1]

While the Court must find that all of the requirements in Rule 23(a) and (b)(3) are met before certifying a class, *id.*, the CNO Defendants challenge only Rule 23(b)(3)'s requirements that class issues predominate and that class treatment is superior to individual resolutions, *see* dkt. 254.

### C. Rule 23(a) Requirements

#### 1. Numerosity

To satisfy the numerosity requirement, the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the proposed class consists of 1,993 members. Dkt. 329 at 2; *see* dkt. 234 at 25. Courts in the Seventh Circuit have found that substantially smaller classes satisfy the numerosity requirement. *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 860 (7th Cir. 2017) ("While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement."). Because the proposed Class is so numerous that joinder of all members would be impracticable, Plaintiffs have satisfied the numerosity requirement.

---

[1] The parties dispute whether the Court's prior order certifying a settlement class, dkt. 237, supports Plaintiff's current motion for class certification. *See* dkt. 254 at 30; dkt. 284 at 11–12. Because the CNO Defendants were not involved in that issue, which involved a settlement class, the Court does not consider that order in ruling on this contested motion for class certification.

### 2. Commonality

To satisfy the commonality requirement, there must "be one or more common questions of law or fact that are capable of class-wide resolution and are central to the claims' validity." *Beaton*, 907 F.3d at 1026. Here, there are questions of law and fact common to the proposed Class. Plaintiffs outline several common questions, including:

- Did Conseco Life breach the Policies' optional premium payment provisions?
- Did Conseco Life breach the Policies' cost of insurance provisions?
- Did Conseco Life breach the Policies' reporting and disclosure provisions?
- Did Conseco Life breach the Policies' guaranteed interest rate provisions?
- Did Conseco Life breach the Policies' non-participating provisions?
- Did the CNO Defendants and Conseco operate as a single economic entity?

Dkt. 234 at 25. Plaintiffs also contend that central questions in this case can be answered using common evidence, including:

- The terms of the Policies;
- The October 2008 form letters that Conseco Life sent to all LifeTrend policyholders;
- The form letters that Conseco Life sent a month later telling policyholders to disregard "all" prior notices;
- Evidence that Conseco Life was required to pay inflated fees and dividends to the CNO Defendants.

*Id.* at 26.

These questions of law and fact are central to class members' claims and can be answered with common evidence. Because Plaintiffs' claims involve

common questions of law and fact, Plaintiffs have satisfied the commonality requirement.  *See Beaton*, 907 F.3d at 1026.

### 3.  Typicality

To satisfy the typicality requirement, "'the claims or defenses of the representative party [must] be typical of the claims or defenses of the class.'" *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009).  "A claim is typical if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . [the] claims are based on the same legal theory.'"  *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). "[T]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members," but the named plaintiffs' claims should "have the same essential characteristics as the claims of the class at large."  *Muro*, 580 F.3d at 492.

Here, Plaintiffs have satisfied the typicality requirement because they allege the same class-wide breach and because the class definition requires that all class members surrendered their Policies.  *See* dkt. 234; *Beaton*, 907 F.3d at 1027.

### 4.  Adequacy of Representation

To satisfy the adequacy of representation requirement, the representative parties must "fairly and adequately protect the interests of the class."  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  "This adequate representation inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their

10

differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).

Plaintiffs have satisfied the adequacy-of-representation requirement. Plaintiffs' claims are typical of those brought by other Class members, and their interests appear entirely consistent with those of the other Class members—so there is no indication that their claims are "idiosyncratic or possibly unique." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014). Plaintiffs have also actively participated in this litigation and their counsel represent that they will "continue to participate in this litigation and protect the interests" of the class and subclass. Dkt. 234 at 27.

Similarly, Plaintiffs' counsel will adequately represent the class. Plaintiffs are represented by Stephen A. Weisbrod, Shelli L. Calland, Derek Sugimura, Tamra B. Ferguson, and Saul Cohen from Weisbrod Matteis & Copley PLLC ("WMC"), and Kathleen DeLaney from DeLaney & DeLaney LLC. These attorneys have done substantial work identifying, investigating, and prosecuting Plaintiffs' claims, including in a settlement with Conseco Life that the Court has approved. *See* dkt. 206; dkt. 237.

WMC is a national litigation firm that specializes in representing insurance policyholders, including in the mass litigation context. Dkt. 200-2 at 1–2 (Weisbrod Decl.). WMC has dedicated thousands of attorney hours and spent hundreds of thousands of dollars representing Plaintiffs in this case since its filing in 2012. *Id.* at 2. WMC has devoted the human and financial

11

resources necessary to serve effectively as Class counsel, with the assistance of local counsel. *Id.* at 3.

Stephen Weisbrod, founding partner of WMC, graduated from Harvard Law School and is admitted to practice law in the District of Columbia, Florida, Illinois, and New York. *Id.* at 1. He was also admitted *pro hac vice* for this case. *Id.* Before entering private practice of law, Mr. Weisbrod served as law clerk to Justice Alan B. Handler of the New Jersey Supreme Court and Chief Judge James B. Moran of the United States District Court for the Northern District of Illinois. *Id.* He has tried more than 30 cases in seven states and the District of Columbia, representing clients in financial and commercial disputes, judgment enforcement and bankruptcy matters, and criminal cases. *Id.*

DeLaney & DeLaney is a civil litigation firm that handles various types of matters, including contract disputes, commercial disputes, and class action lawsuits. Dkt. 200-3 at 1 (DeLaney Decl.). DeLaney & DeLaney has served as local Class counsel and performed legal services on behalf of Plaintiffs since February 2, 2018. *Id.* at 3. DeLaney & DeLaney has devoted the human and financial services necessary to effectively serve as local Class counsel and the Court expects it will continue to do so. *Id.*

Kathleen DeLaney, DeLaney & DeLaney's managing partner, graduated from Indiana University Maurer School of Law, and is admitted to practice law in Indiana and Illinois. *Id.* at 1–2. Before entering private practice of law, Ms. DeLaney served as a law clerk for Judge David F. Hamilton, former United States District Judge for the Southern District of Indiana and current Judge for

the Seventh Circuit Court of Appeals.  *Id.* at 2.  Ms. DeLaney's courtroom

experience includes jury trials, bench trials, and appellate arguments in

Indiana's state and federal courts, including the Seventh Circuit Court of

Appeals.  *Id.*

Plaintiffs' counsel have invested substantial time and resources in this

case by investigating the underlying facts, researching the applicable law, and

exhaustively briefing their class-certification motion and accompanying legal

issues.  There is no indication that any counsel has interests that conflict with

those of the Class.

### D. Rule 23(b)(3) Predominance of Common Issues & Superiority of a Class Action

"[A] class action may only be maintained under Rule 23(b)(3) if 'the court

finds that the questions of law or fact common to class members predominate

over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and efficiently adjudicating the

controversy." *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021)

(quoting Fed. R. Civ. P. 23(b)(3)).  In assessing those requirements, courts

should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

13

Fed. R. Civ. P. 23(b)(3).

"There is no mathematical or mechanical test for evaluating predominance." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012).  The "predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Id.* at 815.  "Individual questions need not be absent"—Rule 23 "requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.*

"Analysis of predominance under Rule 23(b)(3) begins, of course, with the elements of the underlying cause of action." *Id.* at 815.  Plaintiffs allege breach-of-contract claims, and the CNO Defendants concede that "the elements of breach of contract in each state are similar." Dkt. 294 at 61.  Those elements are: (1) the existence of a contract, (2) that plaintiffs performed under the contract, (3) defendants' breach, and (4) damages from the breach. *See, e.g.*, *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. Ct. App. 1998); *St. Paul Fire & Marine Ins. v. Am. Dynasty Surplus Lines Ins.*, 101 Cal. App. 4th 1038, 1060 (2002).

Plaintiffs argue that Rule 23(b)(3) is satisfied because (1) common evidentiary issues predominate in the Policies at issue, the breaches of the Policies, and whether the CNO Defendants were alter egos of Conseco Life; (2) every element of their claims can be adjudicated for the class; and (3) a class action is manageable and the only realistic way for class members to have their

14

claims adjudicated.  Dkt. 234.  The CNO Defendants respond that class

certification is inappropriate because: (1) different policyholders surrendered

for different reasons, raising individualized causation issues; (2) damages are

individualized; and (3) different states' laws would apply to several legal issues

at trial.  Dkt. 254.

### 1. Causation of Policy Surrender

Plaintiffs argue that their claims allow "a class-wide inference of

causation," so this case will not require "individual trials on whether the

putative Class members surrendered their Policies in response to Conseco's

breaches of contract."  Dkt. 234 at 30–31; dkt. 284 at 13–14.  But they also

contend that even if "causation in this case is necessarily an individualized

inquiry, common questions would still predominate over that individualized

one" and class certification would still be appropriate.  Dkt. 284 at 25.  The

CNO Defendants respond that "proving causation would require highly

individualized factual inquiries."  Dkt. 254 at 35.  They rely on a survey by

market researcher and statistician Robert Klein, which they argue shows

"myriad and varied reasons why putative class members surrendered."  *Id.* at

36–39.

The parties have filed three motions to exclude expert testimony on

causation issues, which the Court addresses before determining whether

causation is an individualized inquiry here.  *See Messner*, 669 F.3d at 812–14

("When an expert's report or testimony is critical to class certification, . . . a

district court must make a conclusive ruling on any challenge to that expert's

qualifications or submissions before it may rule on a motion for class certification.").

### a. Standard for Expert Testimony

Federal Rule of Evidence 702 "confides to the district court a gatekeeping responsibility" to ensure that expert testimony is both relevant and reliable. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)). "In performing this role, the district court must engage in a three-step analysis, evaluating: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Id.* (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017)).

For the first step, a witness must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). General qualifications are not enough; a foundation for answering specific questions is required. *Hall*, 840 F.3d at 926. A witness qualified with respect to the specific question being asked may give opinion testimony if:

> a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b) The testimony is based on sufficient facts or data;
> c) The testimony is the product of reliable principles and methods; and
> d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Hall*, 840 F.3d at 926.

16

For the second step, the Court therefore must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Kirk*, 991 F.3d at 872 (quoting *Daubert*, 509 U.S. at 592–93). Relevant factors may include "whether the expert's theory has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Id.* "[T]his list is neither exhaustive nor mandatory." *Gopalratnam*, 877 F.3d at 780. Instead, the test is "flexible" because "the gatekeeping inquiry must be tied to the facts of a particular case" and "the precise sort of testimony at issue." *Id.*

If step two is satisfied, the Court must then assess whether "the expert testimony will assist the trier of fact." *Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019). For this step, the Court "evaluates whether the proposed scientific testimony fits the issue to which the expert is testifying." *Id.*

### b. The CNO Defendants' Expert Robert Klein

Plaintiffs have filed a motion to exclude the declaration of Robert Klein, a researcher who conducted a policyholder survey on the reasons for Policy cancellations. Dkt. 280 (motion to exclude); dkt. 254-2 (Klein declaration); dkt. 254-13 (Klein survey). While Plaintiffs argue that courts "repeatedly have criticized Mr. Klein for survey errors," dkt. 281 at 38 (collecting cases), they do not challenge his qualifications, *id.* Instead, they argue that Mr. Klein's survey is unreliable and irrelevant because it included policyholders who were not part of the class, asked questions "designed to lead straight to the CNO Defendants'

17

desired conclusion," and coded responses in a way that was inconsistent with their content.  *Id.* at 8–22.  The CNO Defendants respond that even if the survey is flawed, it's helpful in deciding whether a class can be certified because it shows "myriad and varied reasons why putative class members surrendered."  Dkt. 254 at 36–39; dkt. 294 at 35–38.

The CNO Defendants are not attempting to admit the Klein survey "into evidence to prove a fact at issue."  *Id.* at 36.  Instead, they offer it solely "to assist the court in determining whether the putative class is sufficiently homogenous to permit certification."  *Id.* at 36, 45 ("[The survey] is not being utilized in conjunction with a motion for summary judgment, or at trial.").  With that limitation, there is no reason to exclude the Klein survey in its entirety.  *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993).  As the Seventh Circuit has explained, it's "rare" for a survey to be "so flawed as to be completely unhelpful . . . and therefore inadmissible."  *Id.* (reversing the district court's exclusion of a survey).

Indeed, virtually all of Plaintiffs' arguments go to the survey's value, rather than its admissibility.  For example, they argue that Mr. Klein's survey questions were biased, suggestive, and confusing, and that he miscoded responses—but they admit that the survey reached several policyholders with questions that asked directly about the costs of maintaining Policies.  *See* dkt. 313 at 52–56.  Therefore, rather than excluding the survey entirely, the better path is to consider its weaknesses in evaluating the merits of class certification.  *See AHP Subsidiary*, 1 F.3d at 618 (concerns about a survey's

18

presentation to respondents generally go "to the weight to be accorded to the survey results rather than providing a reason to ignore the survey altogether").

The Court therefore **DENIES** Plaintiff's motion to exclude the Klein survey, dkt. [280], and considers both the survey and its limitations below. *See Messner*, 669 F.3d at 813.

### c. Plaintiffs' Expert Mark Browne's Causation Opinion

The CNO Defendants have filed a motion to exclude the causation opinions[2] of Dr. Mark Browne, an economist who evaluated Policy surrenders before and after the alleged breaches. Dkt. 258 (motion to exclude); dkt. 232-5 (Browne declaration). Dr. Browne found that "during the nine-month period prior to the October 2008 Notice," only .3% of Policies "were surrendered or allowed to lapse." Dkt. 232-5 at 13. He also found that in the next three years, 35% of the Policies were surrendered or allowed to lapse. *Id.* at 14. Based on these numbers and "because Conseco did not charge for cost of insurance after the eighth policy year" until the 2008 Notice, Dr. Browne opines "that the sharp increase in the number of policyholders who surrendered or let their policies lapse in the three years after the October 2008 Notice resulted from the" administrative changes to the policies announced in the 2008 Notice. *Id.* at 14–15.

The CNO Defendants do not challenge Dr. Browne's qualifications. *See* dkt. 259; dkt. 282 at 9 (listing Dr. Browne's qualifications). Instead, they argue

---

[2] The CNO Defendants also challenge Dr. Browne's damages opinion, *see* dkt. 259 at 3–4, which, as explained below, does not need to be resolved at this stage.

that his methodology "ignored obvious alternative explanations" for Policy surrenders, including the 2008 "Great Recession." *Id.* at 10.  Plaintiffs respond that Dr. Browne properly based his causation opinions "on policy lapse and surrender statistics, policyholder account data, features of the policies, Conseco's own analyses, and Dr. Browne's experience studying the behavior of life insurance policyholders."  Dkt. 282 at 11.

Dr. Browne's causation opinion relies on a base surrender rate from the first nine months of 2008.  Dkt. 232-5 at 13.  It therefore did not fail to account for the Great Recession because the base rate was from "the early months of the economic downturn."  Dkt. 277-3 at 21–25 (Browne supp. decl.).  Moreover, the timing of the surrenders or lapses overlaps with the economic downturn, *see id.* at 8, so expert testimony can help parse out the true cause, or one cause among several.  *See id.*  Because Dr. Browne's opinions address that overlap, his testimony should not be excluded for the sole reason that causation is uncertain.  *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 808–09 (7th Cir. 2012) (Expert testimony must "have a factual basis," but experts "may give an opinion . . . concerning the facts, subject to cross-examination on the work forming the basis of that opinion.").

For similar reasons, Dr. Browne's causation opinion is not inadmissible for failing to account for Mr. Klein's survey.  Even if policyholders had several reasons for surrendering Policies or allowing them to lapse, that would not exclude the alleged breaches as the cause.  *See id.*  And even accepting Mr. Klein's survey, Mr. Klein acknowledges that "cost of the policy" was the only

20

reason for Policy surrender for more than 40% of survey respondents, and one

of the reasons for at least an additional 40% of respondents.  Dkt. 294-4 at 6–

7.  Moreover, Dr. Browne has explained the reasons why he believes that Mr.

Klein's survey is unreliable.  Dkt. 277-3 at 3, 25–26, 31–34.  Instead of forcing

Dr. Browne to accept survey results that he doesn't believe are valid, the Court

will consider both experts' opinions and their limitations in evaluating whether

causation can be evaluated on a class-wide basis.  *See Gopalratnam*, 877 F.3d

771 at 781 ("The district court . . . abuses its discretion[ ] if it unduly

scrutinizes the quality of the expert's data and conclusions rather than the

reliability of the methodology the expert employed.").

Finally, even if Dr. Browne's opinion understates the surrender rate

before the 2008 notice, that does not make his causation opinions

inadmissible.  The CNO Defendants admit that the surrender rate increased

substantially during the class period after fluctuating "between 1.75% and

4.46%" "from 1999 through 2007."  Dkt. 294 at 11–12 ("[O]f the 4,638 Lifetrend

policyholders who surrendered from 2008–2013 . . . 1,656—approximately

36%—would have surrendered anyway.").  The CNO Defendants therefore do

not dispute the basis for Dr. Browne's opinion that there was an increase in

surrenders and lapses.  Dkt. 277-3 at 21–25.  So even if the CNO Defendants'

pre-notice surrender rate calculations are more accurate than the .3% that Dr.

Browne used in his opinion, the CNO Defendants do not explain why that

makes Dr. Browne's methodology so unreliable that his opinion must be

excluded.  *See id.* at 19–21.[3]  This issue can be addressed in the class-certification analysis, but it does not require the exclusion of Dr. Browne's causation opinions.  *See Gopalratnam*, 877 F.3d at 781.

The Court therefore **DENIES** the CNO Defendants' motion to exclude Dr. Browne's causation opinions at the class-certification stage.  Dkt. [258]; *see Messner*, 669 F.3d at 813.

### d. Plaintiffs' Expert Andre Liebenberg

In their reply in support of class certification, Plaintiffs cite a declaration from Dr. Liebenberg to bolster Dr. Browne's opinions that Policy surrenders were low before and did not rise during the financial crisis.  Dkt. 284 at 15–16.  The CNO Defendants have filed a motion to exclude Dr. Liebenberg's declaration, dkt. 293, arguing that it is unreliable and unhelpful, dkt. 294.

For the reasons explained below, causation in this case is necessarily individualized.  Without the possibility of a class-wide causation inference, identifying a pre-notice Policy-surrender rate is unnecessary and would not affect class certification.  So the relatively small portion of Dr. Browne's opinion that Dr. Liebenberg's opinion is relevant to—economic effects on surrender rates—need not be resolved for causation to be analyzed.  Far from being "critical to class certification," *Messner*, 669 F.3d at 813, Dr. Liebenberg's

---

[3] The Court similarly does not address Plaintiffs' arguments that the CNO Defendants' alleged surrender rates are too high because they include irrelevant policies and that the CNO Defendants are inappropriately relying on surrender data they withheld for more than a decade.  Dkt. 313 at 18–24.  Discovery has not closed, and Dr. Browne based his opinions on information from Conseco available at the time.  *See* dkt. 232-5 at 13–14.

opinion is therefore irrelevant at this stage, so the CNO Defendants' motion to exclude it is **DENIED as moot**, dkt. [293].

### e. Causation is Individualized

Plaintiffs argue that, with the class narrowed, they can prove class-wide causation in one stroke through common evidence related to the effects of the 2008 Notice on Policy surrenders.  Dkt. 284 at 14; *see* dkt. 329 at 21–22.  The CNO Defendants contend that causation is necessarily individualized because "proving causation would require highly individualized factual inquiries" about external forces and policyholders' motivations and delays in surrendering Policies.  Dkt. 254 at 35–40.

In a contract action like this one, "causation is an essential element of liability."  *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 744–45 (7th Cir. 2006).  So Plaintiffs must connect the contract breaches that they allege to the damages that each class member sustained.  *Id.*  Causation is therefore usually an individualized question because individual class members may have different reasons for their actions.  *See McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 875 (7th Cir. 2015); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394–95 (7th Cir. 2010).

Nevertheless, in a few special cases, causation may be proven on a class-wide basis.  For example, in securities fraud cases, a "fraud-on-the-market presumption allows plaintiffs to avoid proving individual reliance upon fraudulent misrepresentations and omissions."  *In re Allstate Corp. Sec. Litigation*, 966 F.3d 595, 600 (7th Cir. 2020).  But to invoke that presumption,

plaintiffs must "prove that the given securities traded in efficient markets in which prices reflect all publicly available information, including misrepresentations." *Id.* Put simply, if a fraudulent misrepresentation affected the price of a stock, and class members bought the stock in a public stock-market purchase at the affected price, then class-wide causation can be presumed. *Id.* at 605 ("As a result, if the securities in question trade on an efficient market, then the market itself provides the causal connection between a misrepresentation and the price of the stock.").

Similarly, antitrust causation can be resolved class-wide even in complex markets if the effects can be measured through a quantifiable analysis. *Messner*, 669 F.3d at 816–19. In *Messner*, the Seventh Circuit allowed causation to proceed on a class-wide basis when it could be analyzed by "compar[ing] prices at [the antitrust defendant's] hospitals with prices at a control group of comparable area hospitals not party to the [challenged] merger but otherwise presumably subject to the same market forces." *Id.*

But here, there is too much subjectivity in policyholders' decisions for this to be a case like *Messner*, in which causation could be addressed class-wide through an expert's formula applied to hard data. *See id.* Nor were the class members here all making detached, price-based decisions in a broad and efficient market when they decided to surrender their Policies or allow them to lapse. *See In re Allstate*, 966 F.3d at 600.[4] In short, policyholders' decisions

---

[4] Even then, the presumption of class-wide causation is rebuttable despite a showing "that the securities trade in efficient markets." *Allstate Litigation*, 966 F.3d at 605.

were not mechanical, so Plaintiffs get no presumption to aid them, and causation cannot be "established mechanically" in a way permitting class treatment of causation. *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010) ("Because each investor's loss usually can be established mechanically [when a company's stock trades in a large and efficient market], common questions predominate and class certification is routine.").

Instead, this case involves thousands of life-insurance policyholders, each in their own life situation both at the time of the alleged breach and at the time of Policy surrender or lapse, with different economic and personal influences. The Seventh Circuit has held that decisions like these are individual. *See McMahon*, 807 F.3d at 875; *Pella Corp.*, 606 F.3d at 394. And it's evidenced in the CNO Defendants' Klein survey. Of the relevant survey respondents—122 policyholders—only 43.4% said that cost was the only reason for surrendering the Policy, with the rest having at least one other reason and 13.1% saying that cost had no effect. Dkt. 294-4 at 5, 7. While that survey was imperfect, Plaintiffs' objection to these high-level results is that the survey "planted the idea that respondents were expected to give multiple reasons for surrendering their policies." Dkt. 281 at 12; dkt. 313 at 53. But even if that suggestion infected the survey, 13.1% of respondents still said that cost had no effect. Dkt. 294-4 at 7. That shows that causation is not uniform enough to be decided class-wide.

None of this is to say that there aren't some common issues within causation, as addressed below. But in this case, policyholders' individual

circumstances and decisionmaking processes cannot be overlooked and replaced with a class-wide "inference of causation." *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 936 (7th Cir. 2010). Indeed, Plaintiffs cite no case in which a court approved the aggregation of decisions like the ones policyholders made here, for causation to be proven class wide. *See* dkt. 284 at 16–20; dkt. 313 at 26–27.

Instead, they rely on *Tyson Foods, Inc. v. Bouaphakeo* and *Kleen Products LLC v. International Paper Company*. *See* dkt. 284 at 16–20. But in *Tyson Foods*, the Supreme Court held only that a jury could draw a class-wide inference that pork-processing-plant employees spent a comparable amount of time "donning and doffing" protective gear. 577 U.S. 442, 454–60 (2016). Such an inference on a replicable issue is not analogous to inferring that thousands of life-insurance policyholders cancelled their Policies for the same reason over nearly three years. *See id.* at 455 ("Whether and when statistical evidence can be used to establish classwide liability will depend on the purpose for which the evidence is being introduced and on the elements of the underlying cause of action."). And *Kleen Products* was an antitrust case in which the Seventh Circuit affirmed class certification after finding that the plaintiffs satisfied the "essential" step of identifying an "antitrust injury (in the form of cartel pricing here)." 831 F.3d 919, 927 (7th Cir. 2016). So, in *Kleen Products*, as in *Messner*, it was the mechanical action of prices that allowed a class-wide antitrust analysis. *See id.* at 928 ("No . . . chain of assumptions

26

taints the Purchasers' proof.  They have shown actual price increases [and] a mechanism for those increases.").

Plaintiffs also cite *Reyes v. Netdeposit, LLC*, an out-of-circuit case that said in dicta that "the causation element of . . . breach of contract can be satisfied through objective circumstantial evidence on a classwide basis."  802 F.3d 469, 481 (3d Cir. 2015).  But that was not a breach-of contract case and did not meaningfully address whether causation could be proven class-wide. *Id.* at 483–96.  *Torres v. S.G.E. Management, L.L.C.* is similarly too different to be helpful because it allowed a class-wide inference of causation against the purveyors of a pyramid scheme, reasoning that no one knowingly joins a pyramid scheme.  838 F.3d 629, 641–42, 46 (5th Cir. 2015) (en banc).

In sum, while causation may be proven class-wide in some cases, like public-company securities fraud (*Allstate Litigation*) and antitrust violations (*Messner*, *Kleen Products*), that's not the case here.  Because class members surrendered their policies at different times and in different situations, individualized factual inquiries will be necessary to determine the specific reason or reasons for each class member's surrender.  Class treatment of causation is therefore inappropriate.  *See McMahon*, 807 F.3d at 875; *Siegel*, 612 F.3d at 936.[5]

---

[5] The CNO Defendants also argue that their due process rights would be violated if causation were adjudicated class-wide because they would not be able to confront and cross-examine every adverse witness on these issues.  *See* dkt. 254 at 47–48; dkt. 294 at 56–57; dkt. 323-5 at 19.  Because causation is individualized here, any trial would involve individual follow-on proceedings on causation, which moots the CNO Defendants' due process arguments.

### f.  Damages is Individualized

Plaintiffs argue that damages can be calculated class-wide "using simple formulas that rely on common data."  Dkt. 234 at 20.  The CNO Defendants respond that Plaintiffs have not shown "that damages can be reliably measured on a class-wide basis."  Dkt. 254 at 48.

Causation and damages are closely related in contract cases.  *See, e.g.*, *Holloway*, 695 N.E.2d at 995 ("[T]he proper measure of damages for breach of contract is the loss actually suffered as a result of the breach."); *St. Paul Fire*, 101 Cal. App. 4th at 1060 ("An essential element of a of a claim for breach of contract are damages *resulting from the breach*.").  Since causation presents individualized issues, damages does too—otherwise, damages could be assessed from class members who have not proven the essential element of causation.  *See St. Paul Fire*, 101 Cal. App. 4th at 1061; *cf. McMahon*, 807 F.3d at 876 ("[A] plaintiff must prove causation to establish actual damages.").

### g.  Individualized Elements do not Make Certification Inappropriate

Even though causation and damages are individualized in this case, that does not end the Rule 23 analysis by necessarily defeating certification.  *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014).  As the Supreme Court and Seventh Circuit have repeated, "Rule 23(b)(3) . . . does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof."  *Bell v. PNC Bank*, 800 F.3d 360, 380–81 (7th Cir. 2015) (quoting *Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, 133 S. Ct. 1184, 1196 (2013)).

28

On causation, class certification can be appropriate for substantial common issues even when causation must be determined individually. *See Suchanek*, 764 F.3d at 759 (It is "an error of law" to rely "on a supposed rule that individual issues necessarily predominate in cases requiring individual subjective inquiries into causality."); *McMahon*, 807 F.3d at 875–76 (collecting cases). Indeed, Plaintiffs here have alleged breaches that are "*conduct* common to members of the class." *Suchanek*, 764 F.3d at 756. And they may be able to show, on an individual basis, that those breaches caused many or most of the Policy surrenders and lapses. *See Pella Corp*, 606 F.3d at 394 ("[T]he need for individual proof alone does not necessarily preclude class certification.").

Moreover, the CNO Defendants do not argue that a large number of policyholders "*could not* have been harmed," but that they *may not* have been harmed[6] because they might have surrendered their Policies for reasons other than the alleged breach of contract. *See* dkt. 254 at 38–40; *Messner*, 669 F.3d at 824–25. But with only that speculation, "there is no reason at this stage to believe that many" class members lack causation. *Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, 678 (7th Cir. 2009). In fact, Mr. Klein's survey indicates that more than 80% of relevant survey respondents surrendered their Policy or allowed it to lapse at least in part because of cost. Dkt. 294-4 at 6–7.

---

[6] "This distinction is critical for class certification purposes" because if "a great many" class members *could not* have been harmed, "the class is defined too broadly to permit certification." *Messner*, 669 F.3d at 824–25. The CNO Defendants do not make an overbreadth argument. *See* dkt. 254 at 35–37.

Similarly, the individualized nature of damages "is not an obstacle to a showing of predominance" of common issues. *Messner*, 669 F.3d at 815. Instead, causation and damages can be determined together in individualized proceedings, bifurcated from common questions. *See McMahon*, 807 F.3d at 876 ("It is well established that, if a case requires determinations of individual issues of causation and damages, a court may bifurcate the case."); *Suchanek*, 764 F.3d at 756 ("It is routine in class actions to have a final phase in which individualized proof [of damages] must be submitted."). That rule applies even when, as here, causation and damages are required to establish liability. *See Bell*, 800 F.3d at 380–81 ("PNC assumes that Rule 23 requires every class action to resolve all liability issues for every class member. Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof."). In fact, "only in rare, extreme cases would individual issues of damages be so complex as to defeat class certification." *Messner*, 669 F.3d at 815 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004)).[7]

More fundamentally, the CNO Defendants' argument goes to the merits of causation and therefore must be left for a later stage such as summary

---

[7] The Court does not address the CNO Defendants' challenge to Dr. Browne's expert opinions on class-wide methods for proving damages like it did for his opinions on causation. That's because, as explained above, causation provides the link between breach and damages in a contract claim, making it inappropriate and inefficient to attempt to resolve damages class-wide while resolving causation individually. *See McMahon*, 807 F.3d at 876 (tying together "individual issues of causation and damages"). So the damages portion of Dr. Browne's opinion is not "critical to class certification." *Messner*, 669 F.3d at 813.

judgment or trial. *Simpson*, 23 F.4th 706; *see Suchanek,* 764 F.3d at 757 ("If the court thought that no class can be certified until proof exists that every member has been harmed, it was wrong."). So it is "at best an argument that some class members' claims will fail on the merits," which is "generally irrelevant to the district court's decision on class certification." *Messner*, 669 F.3d at 823.

### 2. Governing Law

Plaintiffs argue that "there are no relevant differences in state law" that could preclude class certification. Dkt. 284 at 38. And the CNO Defendants concede that "the elements of breach of contract in each state are similar." Dkt. 294 at 61. Indeed, in cases arising under common law, the legal "principles are the same, or materially the same, in many or even all U.S. states." *See Thomas v. UBS AG*, 706 F.3d 846, 849 (7th Cir. 2013).

The CNO Defendants nevertheless argue that differing rules on extrinsic evidence, anticipatory breach, insurance-rate increases, and the Filed Rate doctrine make class certification inappropriate. Dkt. 254 at 61–69; *see In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules.").

### a. Extrinsic Evidence

Extrinsic evidence is unlikely to lead to conflicting laws because Plaintiffs "contend that the Policies are unambiguous" and "can be interpreted by considering only the language of the contracts." Dkt. 284 at 38–40 ("Plaintiffs are not asserting misrepresentation-based claims and will not be putting

31

forward any evidence of point-of-sale representations.").[8]  And with "a form contract, almost universally signed without negotiation or modification, there is no reason to think that the interpretation of the provision will vary from one signatory to another."  *Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1102 (7th Cir. 2019).

The CNO Defendants try to distinguish *Red Barn Motors* by arguing that it "did not involve the sale of insurance products through independent third-party salespeople" and had a contractual provision that resolved most choice-of-law issues.  Dkt. 254 at 64.  But those things are relevant only if the contracts are ambiguous and extrinsic evidence is admissible, both of which are unlikely for this type of form contract.  *See Red Barn Motors*, 915 F.3d at 1102.  The probability that an unambiguous interpretation will "generate common *answers* apt to drive the resolution of the litigation" therefore supports certification.  *Id.*[9]

---

[8] The CNO Defendants also argue that certification is inappropriate here because Judge Illston's 2010 order declining to certify a class in the Northern District of California noted Conseco's argument that "plaintiffs' 'vanishing premium' theory is not appropriate for certification because it rested on individualized oral representations made by the insurance agents."  Dkt. 254 at 31 (quoting *In re Conseco Life Ins. Co. Litig.*, 270 F.R.D. 521 (N.D. Cal. 2010)).  Here, Plaintiffs have disclaimed the use of that evidence.  Because of that critical difference, Judge Illston's order does not show that class certification is inappropriate in this case.

[9] If the contracts are found ambiguous and Plaintiffs attempt to resolve the ambiguity with extrinsic evidence, the Court can consider whether any differences in substantive law require decertification—though Plaintiffs anticipate that any extrinsic evidence would be common to the class.  *See* dkt. 284 at 39; *Red Barn Motors*, 915 F.3d at 1101 ("Neither the categorization of the contract as ambiguous, nor the prospect of extrinsic evidence, necessarily imperils class status.").

### b. Anticipatory Breach

Anticipatory breach issues also do not make class certification inappropriate.  The CNO Defendants argue that any breach was anticipatory because no rate increases were implemented until 2010.  Dkt. 254 at 64–65.  But Plaintiffs have expressly waived an anticipatory breach theory, arguing instead that "Conseco breached all of the Policies in October 2008 by providing incorrect, incomplete, or no information to policyholders."  Dkt. 284 at 40–41 ("Plaintiffs are not suing on an anticipatory breach."); *see Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718–20 (7th Cir. 2012).  Any differing substantive law on anticipatory breach therefore will not affect this case, and the CNO Defendants have not argued that there are variations in substantive law as to any breach that occurred in October 2008.  *See* dkt. 254 at 64–65.  Instead, they argue that there was no breach in October 2008, *id.*, but that is a merits argument that they have not connected to the class-certification standard, so it is left for a later stage.  *See Messner*, 669 F.3d at 823.

### c. Cost-of-Insurance Rate Increase

The CNO Defendants argue that "differences in state law may also drive the outcome of Plaintiffs' [cost-of-insurance] rate increase claims."  Dkt. 254 at 66.  Plaintiffs argue that cost-of-insurance issues turn on policy language, not differences in state substantive law.  Dkt. 284 at 41–42.

The cases that the CNO Defendants cite analyze cost-of-insurance claims based on policy language without noting differences in state substantive law.  In *Norem v. Lincoln Benefit Life Company*, the plaintiff alleged that the

33

defendant breached the terms of his insurance policy through "its method of calculating . . . the cost of insurance rate."  737 F.3d 1145, 1146–47 (7th Cir. 2013).  The Seventh Circuit applied Illinois law but cited only standard common-law principles for interpreting insurance policies without mentioning any Illinois-law doctrines specific to cost-of-insurance rates.  *Id.* at 1148–49, 1155 (following the "common understanding" and "most reasonable way to construe" policy language).  When the Seventh Circuit applied Wisconsin law to a similar issue, it took the same approach.  *Mai Nhia Thao v. Midland Nat. Life Ins. Co.*, 549 Fed. App'x 534, 536 (7th Cir. 2013) (reciting only standard contract-interpretation principles before interpreting the policy language).  And this district recently did the same when applying Alabama law.  *Couch v. Wilco Life Ins. Co.*, 363 F. Supp. 3d 886, 894 (S.D. Ind. 2019).

Indeed, these cases show that cost-of-insurance rate issues are resolved nationwide under the same standards regardless of which state's substantive law applies.  In *Norem*, the Seventh Circuit considered cases from California (applying California law), Wisconsin (applying Wisconsin law), Illinois (applying Illinois law), New Jersey (applying Missouri law), and Iowa (applying Iowa law) without noting any differences in substantive law.  737 F.3d at 1149–55. When *Norem* distinguished cases, it did so based on "different procedural postures" and "obvious" factual differences, rather than differing legal standards.  *Id.* at 1153–54 (distinguishing *In re Conseco Life Ins. Co.*, 920 F. Supp. 2d 1050 (N.D. Cal. 2013); *Yue v. Conseco Life Ins. Co.*, No. CV 08-1506 AHM, 2011 WL 210943 (C.D. Cal. Jan. 19, 2011); *Yue v. Conseco Life Ins. Co.*,

34

282 F.R.D. 469 (C.D. Cal. 2012)).  Then, when the Seventh Circuit decided *Mai Nhia Thao* the same day under Wisconsin—instead of Illinois—law, it explained that *Norem* alone "resolves this [cost-of-insurance rate] issue."  549 Fed. App'x at 537.  Finally, in *Couch*, this district resolved a cost-of-insurance issue under Alabama law by relying on cases from across the nation, but none from Alabama state court.  363 F. Supp. at 899.[10]

In short, the Seventh Circuit and this district recognize that cost-of-insurance rate issues are resolved under the policy's language by applying common-law principles that "are the same, or materially the same, in many or even all U.S. states."  *Thomas*, 706 F.3d at 849.

### d.  The Filed Rate Doctrine

The filed rate doctrine "prevent[s] parties from collaterally attacking rates duly adopted by a regulatory agency."  Dkt. 208 at 17 (citing *MacKay v. Superior Court*, 188 Cal. App. 4th 1427, 1428 (2010)); *see Gunn v. Continental Cas. Co.*, 968 F.3d 802, 805 (7th Cir. 2020) ("The federal version of [the filed rate doctrine] in general forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.").  The CNO Defendants have raised a defense under this doctrine,

---

[10] The CNO Defendants also cite a Southern District of New York case that they argue acknowledged a difference between New York and Wisconsin law.  *U.S. Bank N.A. v. PHL Variable Ins. Co.*, No. 2014 WL 2199428 at *11 (S.D.N.Y. May 23, 2014).  But that order merely noted in a footnote that it would defer to *Norem* "[t]o the extent that Wisconsin insurance law, rather than New York or California contract law, controls this question" as to eight policies issued in Wisconsin.  *Id.* at *11 n.4.  That case therefore did not identify—much less analyze or apply—any differences in state substantive law.

arguing that the cost increases that Plaintiffs challenge "were scrutinized and ultimately authorized by the insurance regulators of at least 45 states." Dkt. 254 at 67.

Plaintiffs do not dispute that the filed rate doctrine varies across states, *see* dkt. 284 at 34–36, and the Seventh Circuit recently recognized that "[s]tates have adopted versions of this doctrine of varying breadth and force, some in statutes and some through case law." *Gunn*, 968 F.3d at 805. But Plaintiffs argue that the filed-rate-doctrine defense relies on the Regulatory Settlement Agreement that Conseco Life negotiated with state regulators, which "states that it is governed by Indiana law for issues that span multiple jurisdictions." Dkt. 284 at 43. They also argue that the RSA did not establish a filed rate at all. *Id.* at 44. The CNO Defendants argue generally that this Court would have to guess at each state's version of the filed-rate doctrine, but they do not address those RSA provisions. Dkt. 254 at 67–68; dkt. 323-5. Nor do they explain why the alleged filing "of detailed nonforfeiture calculations . . . with state insurance regulators" make the cost-of-insurance adjustments imposed as a filed rate in at least some jurisdictions. Dkt. 254 at 67–68; dkt. 323-5.

While "[n]o class action is proper unless all litigants are governed by the same legal rules," *In re Bridgestone/Firestone*, 288 F.3d at 1015, each side has provided less than two pages of analysis on this issue. Dkt. 254 at 67–68; dkt. 284 at 42–44. That is far too little to decide the merits of this argument. *See Gunn*, 968 F.3d at 807–08 (explaining that the court could not decide the filed-

rate-doctrine issue because the parties "asserted their choice-of-law positions, and they clearly signaled that the choice of law could be decisive," but did not adequately analyze the question).[11]

The Court therefore cannot yet address the merits of the filed-rate doctrine in order to determine whether it may apply here and which states' laws may govern.  The lack of briefing also prevents the Court from analyzing whether any variations may be addressed through the certification of subclasses.  *See Thomas*, 706 F.3d at 849 ("The problem of choice of law created by a nationwide class action governed by laws of different states . . . is usually solved by the district court's certifying a different subclass for class members in each jurisdiction whose law differs in some relevant respect from that of the other jurisdictions.").  This issue is therefore best left for further proceedings, such as "a motion for summary judgment on a more complete record."  *Gunn*, 968 F.3d at 813 (identifying the order of addressing the merits and class status on issues such as this one as "case management issues best left to the district court's discretion").

                    *       *       *

In short, Plaintiffs' class claims do not, at least at this stage, appear to involve substantive legal principles that would vary in a material way from claimant to claimant, depending on the applicable law.  *See Thomas*, 706 F.3d

---

[11] Moreover, a court ordinarily should not evaluate the merits at the class-certification stage.  *See Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).  While "a peek at the merits" is appropriate when necessary to evaluate class certification, *id.*, such a "peek" is impossible when the parties have not meaningfully addressed the legal question.

at 849 ("Many common law principles are the same, or materially the same, in many or even all U.S. states.").  Because choice-of-law issues do not make class certification inappropriate, the Court does not further address at this time which law applies and whether subclasses will be necessary.  *See Simpson*, 23 F.4th at 706; *Messner*, 669 F.3d at 823.

### 3. Predominance of Common Questions

Plaintiffs argue that even if causation is individualized, common questions predominate because the core contested issues are common ones. Dkt. 234 at 27.  The CNO Defendants respond that all of the elements of Plaintiffs' claims are individualized, preventing common questions from predominating.  *See* dkt. 254 at 31–57.

Again, a Rule 23(b)(3) class may be certified even if some elements of the claim are not "susceptible to classwide proof."  *Bell v. PNC Bank*, 800 F.3d 360, 380–81 (7th Cir. 2015) (quoting *Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, 133 S. Ct. 1184, 1196 (2013)).  The Court therefore considers whether the common issues in this case predominate over the individualized elements of causation and damages.

### a. Contract Formation

Plaintiffs argue that common questions predominate on the existence of the contract because "Conseco followed standard procedures for all [c]lass members, each of whom had a standard form contract and received form communications."  Dkt. 324 at 29.  The CNO Defendants contend that any commonality in the contractual provisions is defeated by the individualized

nature of the Policy sales.  Dkt. 254 at 31 ("An adjudication of the class claim would require inquiries into individualized point of sale representations to each of the . . . putative class members.").  Plaintiffs have clarified, however, that they "are not relying on point-of-sale representations," but "on the plain meaning of their Policies."  Dkt. 284 at 12.  Plaintiffs also explain that the operative complaint's references to those statements were merely "offered for context."  *Id.* at 12–13 n.4 (citing dkt. 108-1 at 73–76).  With those things excluded based on Plaintiffs' representations, the nature and contents of the Policies present a common question.  *See Red Barn Motors, Inc. v. NextGear Capital, Inc.*, 915 F.3d 1098, 1102 (7th Cir. 2019) (reversing the denial of class certification because any extrinsic evidence needed to resolve ambiguity would be common to the class).

That leaves class members' annual statements as the only extrinsic evidence that the CNO Defendants have identified as perhaps relevant to contract formation.  Dkt. 254 at 34.  But even assuming that those statements are ultimately relevant and admissible, they would not cause individual questions to predominate over class questions.  *Red Barn Motors*, 915 F.3d at 1102 ("[T]he mere need for extrinsic evidence does not in itself render a case an improper vehicle for class litigation.  We have considered numerous cases in which the testimony of individuals would be necessary to establish the meaning or existence of a policy, and the prospect of such individual testimony did not render class status improper.").  Indeed, the annual statements said either that the Policies' Guaranteed Cash Value went to zero after an OPP

39

election or omitted such a statement.  *See* dkt. 254 at 34.  With only two options, there cannot be myriad individualized assessments that would make class treatment inappropriate.  Therefore, the interpretation of the Policies is an issue of law that will be decided under common issues of fact, supporting a predominance finding.  *See Red Barn Motors*, 915 F.3d at 1102 ("With such a form contract, almost universally signed without negotiation or modification, there is no reason to think that the interpretation of the provision will vary from one signatory to another, and therefore the issue is one that is capable of a common answer and for which that common question predominates.").

### b. Breach

Plaintiffs argue that breach also presents common questions because Conseco sent the same form communications to each class member.  Dkt. 234 at 29.  Except for their argument addressed above about alleged variations in state law, the CNO Defendants do not argue that breach presents individualized questions.  *See* dkt. 254 at 31–36.

This element presents common questions at least as much as contract formation does—and probably more so.  In fact, Plaintiffs do not allege a breach of just one Policy provision, but several—they argue breaches related to vanishing premium eligibility, cost-of-insurance rate increases, guaranteed interest rates, the Policies' non-participating provisions, and disclosure/reporting requirements.  *See* dkt. 234 at 14–18.  Those alleged breaches are all contained in form communications common to the class that were sent as part of the alleged shock-lapse strategy.  *See* dkt. 108-1 at 13–16.

40

So there are no individualized questions regarding breach, making it an element for which class certification "will generate common answers apt to drive the resolution of the litigation." *Red Barn Motors*, 915 F.3d at 1102 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011)). And that can be done efficiently, by aligning those communications with the Policy interpretations in one proceeding to reach common answers. *See id.* To the extent there were individual responses to those notices, that goes to causation instead of to breach.

For these reasons, on the elements of contract formation and breach, "common questions clearly predominate." *Messner*, 669 F.3d at 815–16.

### c. Alter Ego

Plaintiffs are also pursuing an alter ego claim, seeking a declaration that "Conseco Life is the alter ego of CNO Services and/or CNO Financial, that CNO Services and Conseco Life are alter egos of CNO Financial, and therefore that all three Conseco Defendants are liable for the conduct of Conseco Life." Dkt. 108-1 at 73. This too is a major common claim that will be decided under common evidence and that—if Plaintiffs cannot prevail on it—should resolve this case at summary judgment or trial. *See* dkt. 208 at 9–17 (order denying motion to dismiss alter ego claim after recounting extensive factual allegations). Indeed, the CNO Defendants do not argue that Plaintiffs' alter ego claim involves any individual issues or that it would be challenging to resolve in class proceedings. *See* dkt. 254.

On this issue too, class certification is therefore likely to "generate common answers apt to drive the resolution of the litigation." *Red Barn Motors*, 915 F.3d at 1102.

### d. Causation and Damages

While—as explained above—causation and damages are individualized here, that does not make class certification inappropriate.  Instead, a long line of Seventh Circuit cases shows that class certification is often warranted when many substantial issues are common, but causation and damages are individual.  *See, e.g.*, *McMahon*, 807 F.3d at 875–76 (vacating the denial of certification because the district court "suggest[ed] that the existence of individual issues of causation automatically bars class certification"); *Bell v. PNC Bank*, 800 F.3d 360, 381 (7th Cir. 2015) (affirming class certification); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) (affirming class certification); *Suchanek*, 764 F.3d at 759 (vacating the denial of class certification);  *Pella Corp.*, 606 F.3d at 394 (affirming class certification).

*Pella*, for example, involved a class action alleging that a line of Pella-manufactured windows "suffered from an inherent defect when they left the factory, whether and when Pella knew of this defect, the scope of Pella's warranty, and the nature of the [follow-on customer response program] and whether it amended the warranty."  606 F.3d at 394.  So, like this case, *Pella* involved several major issues that were virtually identical for all class members for which generate common answers are apt to drive the resolution of the litigation.  *See id.* at 393 (affirming the district court's finding of "common

predominant issue[s]").  In fact, the common issues here predominate more
than in *Pella*, which involved subclasses for consumers who had replaced their
windows and for those who had not.  *Id.* at 395.  Plaintiffs' proposed class
involves only policyholders who surrendered their Policies, which simplifies the
common questions.

   *Pella* also, like this case, involved individual issues of causation and
damages.  *See id.* at 394–95.  But the Seventh Circuit emphasized that those
individual issues "do[ ] not necessarily preclude class certification."  *Id.*
Instead, "[a] district court has the discretion to split a case . . . by certifying a
class for liability alone where damages or causation may require individualized
assessments."  *Id.*  And in fact, such a split is appropriate when there are
"individual elements of reliance or causation" that are nonetheless
predominated by common ones.  *Suchanek*, 764 F.3d at 759.  Holding
otherwise would apply "too stringent a standard," *Messner*, 669 F.3d at 818,
and undermine the "importance of the class action device in vindicating the
rights of consumers," *Suchanek*, 764 F.3d at 760 (quoting *Amchem Prods., Inc.
v. Windsor*, 521 U.S. 591, 625 (1997)).

   While *Pella* involved consumer-fraud and this case alleges breach of
contract, the CNO Defendants have not explained why that distinction matters
for class certification, *see* dkt. 254 at 43–44, and the Seventh Circuit has
considered both types of cases together, *see Beaton v. SpeedyPC Software*, 907
F.3d 1018, 1029–31 (7th Cir. 2018) (affirming class certification after analyzing
predominance on implied warranty and fraud claims).  Indeed, as explained

43

above, the class-certification issues presented here are like those presented in fraud cases because the claims arise from common actions by the defendant, leading to common legal issues on liability. *See Suchanek*, 764 F.3d at 756 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.").[12] It therefore "makes good sense . . . to resolve [common] issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings." *Pella*, 606 F.3d at 394; *see Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("When one or more of the central issues in the action are common to the class and can be said to predominate, [certification] may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages.").

### e.  Common Questions Predominate

In sum, the formation and common nature of the Policies as form contracts, whether Conseco breached the Policies, and whether the CNO Defendants acted as alter egos of Conseco all present common issues that "represent a significant aspect of [the] case and . . . can be resolved for all

---

[12] For similar reasons, causation and damages here are not like reliance issues in securities-fraud cases, when the requirement that "individual investors . . . prove reliance on the alleged misrepresentation" is "often an insuperable barrier to class certification." *Dukes*, 564 U.S. at 351 n.6.  That general rule exists in securities fraud cases involving inefficient markets or alleged misrepresentations that were not aired publicly, causing individualized issues to permeate the entire analysis and thus predominate. *See Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 473 (2013).  Here, by contrast—as explained above—the issues of contract formation and interpretation, breach, and alter ego liability are all common even though causation and damages are individual.

members of [the] class in a single adjudication." *Costello v. BeavEx, Inc.*, 810
F.3d 1045, 1059 (7th Cir. 2016) (vacating the denial of class certification); *see*
*Chi. Teachers Union, Local No. 1 v. Bd. of Ed. of Chi.*, 797 F.3d 426, 436 (7th
Cir. 2015) (finding it "certainly [ ] more efficient" to answer a single common
question "just one time rather than over and over again in multiple separate
lawsuits"). And those issues are, unlike the causation and damages issues,
complex and require extensive evidence to resolve. *See Beaton v. SpeedyPC*
*Software*, 907 F.3d 1018, 1029 (7th Cir. 2018); *Butler v. Sears, Roebuck & Co.*,
727 F.3d 796, 801 (7th Cir. 2013) ("[P]redominance requires a qualitative
assessment too; it is not bean counting."). The contract-interpretation and
alter ego issues here are factually common across class members yet are legally
complex and rest on mountains of relevant facts. *See* dkt. 108-1 at 15–55
(operative complaint alleging forty pages of detailed factual allegations about
the Policies' provisions, the alleged breaches, and the relationships between
Conseco Life and the CNO Defendants); dkt. 208 at 9–17 (order denying the
CNO Defendants' Rule 12(b)(6) motion to dismiss because Plaintiffs had alleged
enough facts to plausibly plead alter ego liability). Finding common answers to
those common questions in class proceedings is substantially more important
and efficient, even if relatively straightforward hearings on causation and
damages are required afterward. *See Butler*, 727 F.3d at 801–02. So
"[p]redominance is satisfied." *Costello*, 801 F.3d at 1059.

   None of this is to say that Plaintiffs will prevail on these common issues
at any later stage. *See Beaton*, 907 F.3d at 1031 ("[C]ertification is largely

independent of the merits . . . and a certified class can go down in flames on the merits.").  Instead, the common issues predominate regardless of whether those issues are ultimately resolved in Plaintiffs' favor or in the CNO Defendants' favor.  *See id.* at 1060.  If Plaintiffs prevail on common issues, they may proceed to individual proceedings on causation and damages—a "hybrid procedure" that the Seventh Circuit has "looked favorably upon."  *Id.*  And if the CNO Defendants prevail, this case will be resolved in their favor and they will not have to litigate causation and damages "against every individual plaintiff, promoting efficiency."  *Id.*  Either way, resolution of these classwide issues would substantially advance the case, and that is enough to show that common issues predominate.  *See id.*; *Messner*, 669 F.3d at 815, 819 (vacating the denial of class certification).  So the "only answer" the Court provides "today is that it will certainly be efficient and fair to answer the [common questions] once for all plaintiffs rather than in piecemeal litigation."  *Chi. Teachers Union*, 797 F.3d at 444.

Moreover, a finding that common issues don't predominate in this case would undermine the purpose of class actions.  "Rule 23(b)(3) class actions are designed to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Suchanek*, 764 F.3d at 759 (quoting *Amchem*, 521 U.S. at 615).  That is the case here because common issues predominate, and because without class certification, "the amount of damages to which each

46

plaintiff would be entitled is so small that no one would bring this suit without the option of a class." *Beaton*, 907 F.3d at 1030; *see Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 744 (7th Cir. 2008); dkt. 313 at 22–23, 23 n.6. In short, class certification is superior to wholly individual proceedings, and "would substantially advance the case." *Suchanek*, 764 F.3d at 761.

### 4. Manageability

Plaintiffs argue that a class action is manageable here even if there are individual issues because follow-on individual proceedings are far more manageable than thousands of individual cases. Dkt. 234 at 38–39; *see Mullins v. Direct Digital*, 795 F.3d 654, 664 (7th Cir. 2015) ("[T]he [district] court must assess efficiency with an eye toward other available methods."). The CNO Defendants respond that resolving causation "would require individual trials that would obliterate the efficiencies that the class action device is intended to achieve." Dkt. 254 at 40–41.

This case will be manageable as a class action with some individual proceedings occurring, if necessary, after the resolution of common issues. Indeed, that's typical—"a class action has to be unwieldy indeed before it can be pronounced an inferior alternative." *Carnegie v. Household Intern'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *see Mullins*, 795 F.3d at 664 ("[R]efusing to certify on manageability grounds alone should be the last resort."). This case is no less manageable than *Pella*, for example, in which the Seventh Circuit dismissed "minor concerns" about manageability. 606 F.3d at 395–96. In fact, individualized causation in this case is less complicated than in *Pella* because

here the class includes only policyholders who surrendered their policies, while *Pella* required subclasses based on which action consumers took after they discovered the defect. *See id.* at 395. In short, "[a]t the back end, if the class prevails on the common issue[s], it would be a straightforward matter for each purchaser to present her evidence on reliance and causation." *Suchanek*, 764 F.3d at 760; *see McMahon*, 807 F.3d at 876 ("It is well established that, if a case requires determinations of individual issues of causation and damages, a court may bifurcate the case.").

Moreover, it may be that not every class member would need to have an individual hearing or trial on causation. *See Pella*, 606 F.3d at 395. As explained above, the CNO Defendants' Klein survey showed that at least 40% of relevant respondents surrendered their policies because of cost alone, so it's likely that causation would not be disputed for every class member at follow-on proceedings. *See id.* at 395 (Individual proceedings are required "only if there is a dispute."). It's also possible that causation and damages could be resolved in "homogeneous groups of class members." *Butler*, 727 F.3d at 800. Or, this entire case—or at least some common and individual issues—may be resolved at later stages, perhaps by summary judgment, stipulation, or settlement. *See Pella*, 606 F.3d at 395; *Beaton*, 907 F.3d at 1031; *Carnegie*, 376 F.3d at 661 (noting the likelihood of settlement if liability is resolved in favor of the class, but that even "if there is no settlement, that [wouldn't] be the end of the world").

Finally, even if this case and its individual issues proceed to trial, and many individual hearings are required, that's "often . . . the sensible way to proceed." *Butler*, 727 F.3d 796.  If that comes to pass, the Court will explore with the parties a more detailed trial plan and options for minimizing and managing the hearings and trials that will be required.

### D. Appointment of Class Representatives & Class Counsel

After a court certifies a Rule 23 class, the court is required to appoint class counsel to represent the class members.  *See* Fed. R. Civ. P. 23(g)(1).  In appointing class counsel, the court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

Fed R. Civ. P. 23(g)(1)(A).

For the reasons explained above and based on the Court's finding of the adequacy of class representatives and class counsel, the Court appoints William Burnett and Joe Camp as class representatives and Stephen Weisbrod, Shelli Calland, Tamra Ferguson, Saul Cohen, and Kathleen DeLaney as Class counsel.

**IV.**
**Conclusion**

Plaintiffs' motion to modify the class definition is **GRANTED**, dkt. [326],

and their motion for class certification is **GRANTED** as modified, dkt. [232].

The CNO Defendants' motions for oral argument are **DENIED** because they

have not shown that oral argument may assist the Court in deciding these

issues.  Dkt. [256]; dkt. [260].  The parties have submitted "hundreds of pages

of legal briefing, as well as hundreds of pages of documents, deposition

transcripts, and expert reports," *Pella*, 606 F.3d at 396; in light of those

submissions, the CNO Defendants have not shown why brief argument would

aid a ruling on the motion for class certification, *see* dkt. 256; dkt. 260.  The

CNO Defendants' motion to exclude Dr. Browne's opinions at the class-

certification stage is **DENIED**.  Dkt. [258].  Plaintiff's motion to exclude Mr.

Klein's opinions is **DENIED**.  Dkt. [280].  The CNO Defendants' motion to

exclude Dr. Liebenberg's opinions is **DENIED as moot**.  Dkt. [293].

The Court designates Plaintiffs William Jeffrey Burnett and Joe H. Camp

as class representatives and appoints the following attorneys as Class Counsel:

> Stephen Weisbrod
> Shelli Calland
> Tamra Ferguson
> Saul Cohen
> WEISBROD MATTEIS & COPLEY PLLC
>
> Kathleen A. DeLaney
> DELANEY & DELANEY LLC

Plaintiffs shall have through **April 25, 2022** to propose the form, content, and means of distribution of a class notice and to file a motion for its approval.  *See* Fed. R. Civ. P. 23(c)(2)(B).

Magistrate Judge Lynch is asked to hold a status conference to discuss potential settlement and to ensure firm deadlines for the remainder of this litigation.

**SO ORDERED.**

Date: 3/25/2022

James Patrick Hanlon
United States District Judge
Southern District of Indiana


Distribution:

John M. Aerni
ALSTON AND BIRD LLP
john.aerni@alston.com

Kelly S Biggins
Locke Lord LLP
300 South Grand Avenue      Suite 2600
Los Angeles, CA 90071

James H Bilton
LOCKE LORD LLP
jbilton@lockelord.com

Taylor F. Brinkman
LOCKE LORD LLP
tbrinkman@lockelord.com

Shelli L. Calland
WEISBROD MATTEIS & COPLEY PLLC
scalland@wmclaw.com

Gillian H. Clow
ALSTON & BIRD LLP
gillian.clow@alston.com

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Tamra B. Ferguson
WEISBROD MATTEIS & COPLEY PLLC
tferguson@wmclaw.com

Steven K. Huffer
S.K. HUFFER & ASSOCIATES, P.C.
steveh@hufferlaw.com

Adam J. Kaiser
ALSTON & BIRD LLP
adam.kaiser@alston.com

Jonathan J. Kim
ALSTON & BIRD LLP
jonathan.kim@alston.com

Barbara Louise Lyons
Law Office of Barbara L Llyons
80 El Camino Real  Apt D
Burlingame, CA 94010

Rachel Adi Naor
Alston and Bird LLP
rachel.naor@alston.com

Matthew B Nazareth
Locke Lord LLP
300 South Grand Avenue  Suite 2600
Los Angeles, CA 90071

Samuel J. Park
ALSTON AND BIRD, LLP
samuel.park@alston.com

Phillip Russell Perdew
LOCKE LORD LLP
pperdew@lockelord.com

Carl C. Scherz
LOCKE LORD LLP
cscherz@lockelord.com

Thomas J. Scrivo
ALSTON & BIRD LLP
tj.scrivo@alston.com

Kristin Shepard
ALSTON & BIRD LLP
kristin.shepard@alston.com

T. Esther Silberstein
WEISBROD MATTEIS & COPLEY PLLC
esilberstein@wmclaw.com

Derek Y. Sugimura
WEISBROD MATTEIS & COPLEY PLLC
dsugimura@wmclaw.com

Michael A. Valerio
ALSTON & BIRD LLP
michael.valerio@alston.com

Stephen A Weisbrod
WEISBROD MATTEIS & COPLEY PLLC
sweisbrod@wmclaw.com