UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM JEFFREY BURNETT,<br>JOE H CAMP,<br><br>Plaintiffs,<br><br>v.<br><br>CNO FINANCIAL GROUP, INC.,<br>CNO SERVICES LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:18-cv-00200-JPH-KMB |

**POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs brought this case on behalf of a class of life insurance policyholders who surrendered their policies after Conseco Life Insurance Company ("CLIC") announced major policy administration changes. CLIC reached a classwide settlement on the breach of contract claims against it. The Court then held a bench trial on alter ego liability for the breach of contract claims against CLIC's former parent company CNO Financial Group, Inc. and its former affiliate CNO Services LLC ("CNO Defendants"). As explained below, the class is not entitled to the extraordinary equitable remedy of alter ego liability, so the CNO Defendants are entitled to judgment on the class claims against them.

## I.
## Procedural Background

Plaintiffs brought this case in the Central District of California in 2012 as a putative class action alleging that CLIC breached their LifeTrend life insurance policies. Dkt. 1; dkt. 108-1 (operative amended complaint). They

also sought to hold the CNO Defendants liable for CLIC's breaches under an alter ego theory of liability. Dkt. 108-1 at 11. The Central District of California transferred the case to this district in 2018. Dkt. 69. Plaintiffs then reached a class-wide settlement with CLIC, which the Court approved, resolving the claims against CLIC. Dkt. 237; dkt. 251 (partial final judgment).

For the CNO Defendants, the Court certified a class and subclass of policyholders seeking to recover from the CNO Defendants under an alter ego theory of liability for CLIC's breaches. Dkt. 343. After denying the CNO Defendants' motion for summary judgment, dkt. 506, the Court bifurcated trial with a jury trial on breach-of-contract liability and a subsequent bench trial on alter ego liability. Dkt. 514. In May 2025, the CNO Defendants conceded "on a class-wide basis" that CLIC breached the LifeTrend insurance policies. Dkt. 561. The next month, the Court held a jury trial on causation and damages related to CLIC's breaches for named plaintiffs Dr. Camp and Mr. Burnett, *see* dkt. 632–634, and the jury returned verdicts in favor of Plaintiffs, dkt. 626.

From August 26 through September 2, 2025, the Court held a bench trial on the issue of the CNO Defendants' alter ego liability for CLIC's breaches. Dkts. 681–685. The parties' joint motion to admit exhibits is **GRANTED** and the stipulated exhibits on the joint exhibit list, dkt. 673-1, are accepted into evidence. Dkt. [691]. The parties have filed proposed findings of fact and conclusions of law. Dkt. 692; dkt. 693; *see* dkt. 695; dkt. 696.

The Court now issues its findings of fact and conclusions of law. Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately.").

## II. Findings of Fact[1]

### A. Conseco, Inc.; CNO Financial; CNO Services; and CLIC

1. CNO Financial is a publicly traded company and parent of several subsidiaries, including insurance companies and non-insurance service-provider company CNO Services.
2. CNO Services provides administrative services to CNO Financial's insurance-company subsidiaries.
3. Conseco Life Insurance Company ("CLIC") was CNO Financial's wholly owned subsidiary until CLIC's sale in July 2014 to Wilton Re. CNO Services provided administrative services to CLIC before its sale.
4. CLIC administered and provided coverage under various insurance policies, including the LifeTrend 3, LifeTrend 4 (87 Series), and LifeTrend 4 (93 Series) policies that are at issue in this case.
5. CLIC was domiciled in Indiana from 1997 at least through its sale to Wilton Re, and its lead regulator was the Indiana Department of Insurance ("IDOI").
6. Before CNO Financial, CLIC was a subsidiary of Conseco, Inc. After Conseco, Inc.'s bankruptcy proceedings in 2003, a new Conseco

[1] Any finding of fact that more properly states a conclusion of law is adopted as a conclusion of law.

corporation—renamed CNO Financial in 2010—was formed and became CLIC's parent company.

7. CNO Financial sold CLIC to Wilton Re for about $237 million on July 1, 2014. Dkt. 669 at 4.

**B. CLIC's Corporate Formalities**

8. CLIC was one of several insurance companies within CNO. Tr. Vol. 2 at 457. At times, CLIC was identified as part of CNO Financial's business segment "Conseco Insurance Group" (sometimes referred to as "CIG"). *See* Tr. Vol. 3 at 877, 891, 903–04. CIG was not a legal entity, but a reference to the insurance subsidiaries collectively. Ex. 468A at 21–22 (81–83).

9. The evidence does not support a finding that CIG or CIG committees controlled CLIC or handled most of CLIC's management.

10. CLIC was a distinct legal entity with its own bylaws and articles of incorporation. Tr. Vol. 3 at 856.

11. CLIC had its own investments, assets, liabilities, and reserves. Tr. Vol. 2 at 457. CLIC's reserves were separate from CNO's and from other subsidiaries' reserves. *Id.*

12. CLIC maintained separate books and records from its parent company and all affiliated entities. *See* Tr. Vol. 1 at 203; Exs. 767, 977, 978, 982.

13. CLIC filed its own corporate documents. *See* Exs. 468A at 35 (135), 767, 977, 978, 982; Tr. Vol. 1 at 232.

14. CLIC had its own board of directors, separate from CNO Financial's board of directors and separate from the boards of directors of other subsidiaries. Ex. 468A at 35 (134); Tr. Vol. 3 at 856–57.

15. CLIC's board was chosen by CNO Financial's CEO and executive management. Tr. Vol. 3 at 857. Board members were officers and employees of CNO. *See* Ex. 469A at 44. From a regulatory perspective, it is neither unusual nor improper for CLIC's board members to be CNO officers and employees. *See* Tr. Vol. 1 at 150–51; dkt. 693 at 18.

16. The board was chosen based on potential board members' qualifications, including experts such as an accountant, an actuary, a legal expert, and an operational specialist. *Id.*; Ex. 469A at 28–29. The role of CLIC's board was to oversee CLIC's affairs, including its fiduciary role and ensuring that regulatory affairs were handled appropriately. Tr. Vol. 3 at 857.

17. Board selections for CLIC were subject to vote by the board of directors and were reported to regulators. Ex. 469A at 29.

18. CLIC's board members took an oath that they would faithfully, honestly, and diligently administer CLIC's affairs. *See* Ex. 1030 at 42.

19. The evidence does not support a finding that CLIC's board members did not understand the obligation to act in CLIC's best interest. *See* Tr. Vol. 3 at 857–58; Ex. 459A at 14 (53–54).

20. The evidence does not support a finding of an event when a CLIC board member favored CNO Financial at CLIC's expense. *See* Tr. Vol. 3 at 857–58; Ex. 459A at 14 (53–54).

21. CLIC's board met at least quarterly between November 2003 and November 2013, with meetings lasting from twenty minutes to two hours. *See* Tr. Vol. 3 at 854; Ex. 469A at 32.

22. CLIC's board meetings were separate from its parents' and other subsidiaries' board meetings. Ex. 468A at 35 (134); Tr. Vol. 3 at 854. Board meetings frequently, but not always, occurred on the same days as other insurance subsidiaries' board meetings. Ex. 469A at 30. But the meetings were not scheduled at the same time, had different agendas and minutes, and led to separate resolutions. Ex. 468A at 35 (134); Tr. Vol. 3 at 854.

23. CLIC's board meetings focused on its own business, not the business of its parents or other subsidiaries. *See* Ex. 459A at 14 (54).

24. CLIC's board approved dividend payments to parent companies. *See* Ex. 459A at 10 (38). The evidence does not support a reasonable inference that CNO Financial required CLIC to pay a dividend that it could not afford. *See* Ex. 459A at 14–15 (54–57).

25. The evidence does not support a finding that CLIC's board was a mere formality that failed to make its own decisions regarding CLIC. Tr. Vol. 3 at 875; *cf.* Tr. Vol. 1 at 49, 56–57.

26. CLIC had its own officers, which were elected by its board of directors. Tr. Vol. 3 at 866; Ex. 468A at 17 (63). For example, CLIC had its own president and treasurer, different from the president and treasurer of any other insurance subsidiary. Tr. Vol. 3 at 866–68.[2]

27. There is no evidence that CLIC commingled funds with CNO Financial or any affiliate. *See* Tr. Vol. 1 at 232; Tr. Vol. 2 at 454; Tr. Vol. 3 at 868.

28. CLIC's financial statements were prepared on a statutory accounting basis, while CNO Financial's SEC filings followed Generally Accepted Accounting Principles ("GAAP"). Statutory accounting is similar to but more conservative than GAAP accounting. Tr. Vol. 1 at 33; Tr. Vol. 4 at 1152.

29. PricewaterhouseCoopers independently and thoroughly audited CLIC's annual financial statements. Tr. Vol. 2 at 459–60; *see* Tr. Vol. 5 at 1276. PwC reviewed documents and conducted interviews as part of its audits. Tr. Vol. 2 at 459–60; *see* Tr. Vol. 5 at 1276. PwC found that CLIC's statements fairly stated CLIC's condition, and reported those findings to CLIC's board. Tr. Vol. 4 at 986–988.

[2] In deposition excerpts admitted into evidence, Michael Dubes testified that, as of January 31, 2006, he was president of CLIC and other "companies that comprised Conseco Insurance Group." Ex. 466A at 23–24. He then testified, however, that he was not sure whether he was president of insurance companies other than CLIC. *Id.* The Court credits Mr. Bonach's trial testimony that each insurance-company subsidiary had a different president. Tr. Vol. 3 at 866

30. As an insurance holding company, CNO Financial has an interest in and was involved in some of CLIC's decisions, but CLIC's decisions were not dictated by CNO Financial. Tr. Vol. 3 at 866–67.

**C. CLIC's Regulatory Oversight**

31. Life insurance companies like CLIC are highly regulated by state insurance departments. *See, e.g.*, Tr. Vol. 4 at 949, 1009–10.

32. The National Association of Insurance Commissioners ("NAIC") provides manuals, handbooks, and analysts to assist regulators. Tr. Vol. 4 at 942. Every state has enacted NAIC's Insurance Holding Company Model Act, which requires disclosure of information about an insurance company's relationship with parents and other subsidiaries. Tr. Vol. 1 at 184; Tr. Vol. 4 at 947.

33. CLIC disclosed CNO Financial's management of and relationship to CLIC under the Holding Company Act. Tr. Vol. 4. At 957–58; *see e.g.*, Ex. 1031.

34. CLIC filed annual statements disclosing to IDOI assets, liabilities, cash flow, reserves, dividends, and known risks to the company. Tr. Vol. 4 at 953–54.

35. CLIC also filed annual actuarial opinions about the adequacy of its reserves for anticipated claims. Tr. Vol. 4 at 955–56. Those filings address policies' non-guaranteed elements ("NGEs"), including current practice and any anticipated changes. *Id.*

36. IDOI conducted four "full scope" financial examinations of CLIC between the late 1990s and 2014, in accordance with the NAIC Financial Examiners' Handbook. Tr. Vol. 4 at 959. IDOI hired outside regulatory, accounting, and actuarial consultants to assist with those examinations. Tr. Vol. 4 at 990–92.

37. The "full scope" examinations discussed CLIC's corporate governance and intercompany payments, and did not identify concerns that CLIC lacked proper governance. Tr. Vol. 4 at 988–89; Exs. 767, 977, 978, 982.

38. Regulators also required CLIC to maintain minimum reserves to cover future policy claims and obligations. Tr. Vol. 2 at 404–05; Ex. 460A at 36. If an insurance company fails to show sufficient statutory reserves, regulators can require it to increase reserves. Tr. Vol. 2 at 407; Ex. 460A at 60.

39. Using capital to increase reserves decreases available capital, which lowers the risk-based capital ("RBC") ratio that regulators use to evaluate an insurance company's financial position. Tr. Vol. 2 at 407. An RBC ratio below 200% requires the insurance company to take action, a ratio below 150% requires regulatory action, and a ratio below 100% authorizes regulatory takeover of the company. Tr. Vol. 5 at 1258–59.

40. A regulatory takeover of CLIC would have hurt CNO Financial and CLIC's affiliated insurance subsidiaries. All of CLIC's policyholders

would have suffered, including from lowered benefits, raised costs, and decreasing service quality. Tr. Vol. 2 at 408–09; Tr. Vol. 3 at 886.

**D. CLIC's Insurance Policies and Financial Distress**

41. Conseco, Inc.'s bankruptcy, while precipitated by a non-insurance company acquisition, damaged CLIC through a loss of market confidence and increased regulatory scrutiny. Tr. Vol. 2 at 392, 409–10.

42. CLIC's rating was downgraded, leading to a decline in policy sales, increased commissions, and increased policy lapses. Tr. Vol. 2 at 410–12.

43. Through mergers with other insurance companies, CLIC inherited blocks of interest-sensitive life insurance policies that had been sold in the late 1980s and early 1990s. Tr. Vol. 2 at 397–98. These policy blocks included the LifeTrend policies at issue in this case, as well as other, larger, blocks. Tr. Vol. 2 at 397–98, 438.

44. Those interest-sensitive policy blocks were troublesome for CLIC largely because they were priced with the actuarial assumption that high interest rates would continue. Tr. Vol. 2 at 399–400. When rates instead went down, policyholders' account values grew slower and CLIC had to pay more to cover death benefits. Tr. Vol. 3 at 806–07.

45. The policy blocks also underperformed for CLIC because lapse rates—the rate at which policies were cancelled—were lower than anticipated. Tr. Vol. 2 at 400–03.

46. In the early 2000s, CLIC projected losses of $800 million on the interest sensitive policy blocks. Tr. Vol. 2 at 417–18. Neither CLIC nor CNO Financial had $800 million available to cover those losses. *Id.*

47. CLIC's regulators were aware of the troubled policy blocks and routinely discussed the concerns with CLIC. Tr. Vol. 2 at 415, 443.

**E. CNO Financial's and CLIC's Response**

48. CNO Financial and CLIC discussed with regulators ways to strengthen CLIC's financial position, and hired outside professionals including actuarial firms and law firms. Tr. Vol. 2 at 443. It was very important to CNO Financial to keep CLIC solvent. Tr. Vol. 3 at 886–87.

49. To help offset the troubled blocks of policies, CLIC merged with another insurance company in 2001, entered a reinsurance agreement with an affiliate, and received profitable business from another insurance company in 2008. Tr. Vol. 2 at 414–15; Tr. Vol. 5 at 1380–82. Regulators knew of those actions and approved the reinsurance agreements. Tr. Vol. 2 at 415.

50. CLIC also received a $40 million benefit from a tax sharing agreement implemented as part of the CNO holding structure. Tr.

Vol. 5 at 1357. That agreement could instead have been set up to benefit CNO Financial. Ex. 459A at 16 (63).

51. CLIC further received a $19 million benefit in dividends from an affiliate's preferred stock between 2003 and CLIC's 2014 sale. Tr. Vol. 5 at 1358.

52. CLIC periodically paid dividends to its parent company, as was common for an insurance company in a holding company structure. Tr. Vol. 1 at 184; Tr. Vol. 2 at 444, 453.

53. The evidence does not support a finding that CLIC's dividend payments lacked a reasonable business purpose. *See* Tr. Vol. 1 at 194; Tr. Vol. 5 at 1372–74.

54. The $10 million dividend paid in 2006 was to take advantage of a tax holiday. Tr. Vol. 1 at 194. This dividend was proper from a regulatory perspective. *Id.*

55. CLIC notified regulators of all dividends and received all required regulatory approvals. Tr. Vol. 1 at 101.

56. Between 2003 and its 2014 sale, CLIC received $132 million more in surplus contributions than it paid in dividends. Tr. Vol. 5 at 1355–56.

57. CLIC also made NGE changes on troubled policy blocks. CLIC reduced anticipated losses on "R-Factor" and "ValueLife/ValueTerm" policies by increasing cost-of-insurance ("COI") charges to policyholders. Tr. Vol. 2 at 421–22; Tr. Vol. 3 at

815–19. IDOI knew about and did not oppose CLIC's actions. Tr. Vol. 2 at 422–24. CLIC settled a lawsuit about those changes at a cost of about $200 million; the changes and settlement allowed CLIC to remain solvent and for the policies to continue. Tr. Vol. 2 at 425–26. CNO provided about $65 million to CLIC to help fund the settlement. Tr. Vol. 2 at 426; Ex. 791 at 300.

58. CLIC similarly decided to make NGE changes to the LifeTrend Policies, attempting to break even on the policies. Tr. Vol. 3 at 790. A LifeTrend Steering Committee and LifeTrend Working Group were formed to provide input on the changes. Ex. 168A at 8–9 (29–33). Christopher Nickele was on the LifeTrend Steering Committee and was the chief decisionmaker for the LifeTrend changes. *Id.* Mr. Nickele was a CNO Financial vice-president, CLIC board member, and president of CLIC. Ex. 173A at 6–7 (20–23).

59. CLIC anticipated that about 35% of policyholders would give up their policies under the LifeTrend changes. Tr. Vol. 3 at 802. In late 2008, CLIC sent letters to policyholders announcing the changes. *E.g.* Ex. 6.

60. Regulators began a multistate market conduct examination of the LifeTrend NGE changes in December 2008, placing a moratorium on the changes. Tr. Vol. 3 at 822–25.

61. The market conduct examination ended in May 2010 with a Regulatory Settlement Agreement ("RSA"). Ex. 64. The RSA did not

allow CLIC to collect shortfall payments, but it allowed COI adjustments. *Id.*; Tr. Vol. 2 at 515–16. Those changes did not allow CLIC to make a profit on those policies. Tr. Vol. 2 at 515–16.

62. Ultimately, with support from CNO Financial, CLIC remained solvent and did not require regulatory intervention. Tr. Vol. 2 at 430–31.

**F. CLIC's Shared Services and Expenses**

63. CLIC received all of its administrative services—including accounting, underwriting, claims handling, and marketing—from CNO Services. Tr. Vol. 2 at 457. CLIC had no employees of its own; CNO Services employed the people who performed services for CLIC. Ex. 472 at 6.

64. This shared services model is common in holding company structures and provides economies of scale. Tr. Vol. 2 at 458. Under CLIC's Insurance Services Agreement with CNO Services, CLIC paid for its services plus a 10% margin. Ex. 1028 at 5.

65. If services payments to affiliated companies do "not reflect the value of those services," that can mask an insurance company's financial situation or cause "an economic loss at the benefit of a related party." Ex. 1206 at 47 (NAIC handbook at 39). Here, however, CLIC provided regulators with information about what it was paying for services, and no regulator raised a concern. Tr. Vol. 2 at 458–59.

Regulators also approved similar 10% margins in insurance company services agreements. Tr. Vol. 1 at 223–25.

66. Under a 2002 amendment to the Insurance Services Agreement, the 10% margin would be removed if CLIC experienced losses under statutory accounting principles for the most recent quarter. Ex. 339. CLIC informed IDOI of that amendment, and IDOI did "not disapprove." Ex. 1022.

67. PwC audited CLIC's shared-service payments to CNO Services and raised no concerns. Tr. Vol. 2 at 459–60.

68. From 2006 to 2010, the amount of indirect overhead allocated to CLIC was reduced, saving CLIC about $44 million. Tr. Vol 5 at 1359–60. The reduction was calculated under a formula that lowered overhead expenses for insurance subsidiaries that were not making a profit, Ex. 462 at 9–10; Ex. 469A at 47–48. This formula was approved by auditors and state regulators. Ex. 462 at 10.

69. An appraisal conducted in preparation for CLIC's sale found that reasonable expenses for CLIC's life insurance business included in the sale could be estimated at $19 million annually. Ex. 132 at 13. That estimate did not include all of the policies that CLIC had been insuring. *Id.* at 4. The estimate was also based on industry assumptions, not CLIC's actual or necessary expenses. Tr. Vol. 5 at 1528. CLIC's actual expenses were increased by maintaining and using more than five different administrative systems for policies,

which resulted from prior acquisitions of other insurance companies. Tr. Vol. 3 at 880.

70. While the indirect overhead was reduced, CLIC paid CNO Services for its direct expenses. Tr. Vol. 3 at 919.

**G. CLIC's Sale**

71. By 2013, CLIC was in runoff, meaning it was not selling new policies. Tr. Vol. 2 at 461.

72. CNO Financial and CLIC made the decision to sell CLIC. Tr. Vol. 2 at 360–61.

73. IDOI approved CLIC's sale. *Id.*; Ex. 991.

74. CLIC could not administer its policies separate from CNO Services, so price negotiations for CLIC's sale included the overall price and price for transition services from CNO Services. Ex. 1060 at 2–3; Tr. Vol. 2 at 465–66.

75. The post-sale services from CNO Services to CLIC were not, and were not intended to be, the same services CNO Services provided pre-sale. Tr. Vol. 2 at 471. Under the Stock Purchase Agreement, CNO Services had "no obligation to provide" legal services, investment management, actuarial opinions, and other "Excluded Services." Ex. 435 at 187–88, 221.

76. CLIC sold for about $237 million. Tr. Vol. 3 at 921–22. Wilton Re agreed to purchase two years of transition services from CNO Services at $30 million for the first year and $20 million for the

second year. Tr. Vol. 2 at 378–79. CNO Services provided the transition services at a loss. Tr. Vol. 2 at 472.

## III.
## Admissibility of Expert Testimony

### A. Background

At the bench trial, Plaintiffs called as experts Frederick Heese, Mark Browne, and Robert Muriel. Defendants called as experts Mary Jo Hudson[3], Ed Buttner, and Jack Gibson. Before the Court granted in part the CNO Defendants' motion to bifurcate trial, *see* dkt. 514, the parties filed motions to exclude portions of Ms. Hudson's, Dr. Browne's, and Mr. Muriel's testimony, dkt. 467; dkt. 468; dkt. 475. The Court denied those motions without prejudice as to the issues relevant only to the bench trial. Dkt. 529; *see Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016) (When "a trial judge conducts a bench trial, the judge need not conduct a Daubert (or Rule 702) analysis before presentation of the evidence, even though he must determine admissibility at some point."). Now that the parties' designated experts have testified, those arguments are ripe. *See id.* The CNO Defendants have also moved to strike portions of Mr. Heese's testimony as outside his disclosed expert opinions. Dkt. 671.

---

[3] Before trial, Plaintiffs filed a motion to exclude Ms. Hudson's opinions about the proper legal interpretation of the LifeTrend policies and whether regulatory review should prevent policyholders from bringing legal actions. Dkt. 475; dkt. 479. The Court granted that motion before the jury trial, dkt. 529, Ms. Hudson did not offer those opinions at the bench trial, and Plaintiffs do not otherwise challenge Ms. Hudson's qualifications or the admissibility of her opinions. *See* dkt. 693; dkt. 696.

**B. Applicable Law**

To testify as an expert, a witness must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). General qualifications are not enough; a foundation for answering specific questions is required. *Hall*, 840 F.3d at 926. A witness qualified with respect to the specific question being asked may give opinion testimony "if the proponent demonstrates to the court that it is more likely than not that":

> a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b) The testimony is based on sufficient facts or data;
> c) The testimony is the product of reliable principles and methods; and
> d) The expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Hillman v. Toro Co.*, 164 F.4th 971, 978–79 (7th Cir. 2026). In short, proponents of expert evidence must "demonstrate by a preponderance of the evidence that their [experts'] opinions are reliable." Fed. R. Evid. 702 comm. note to 2023 am.

These requirements are evaluated under the two-step *Daubert* framework. *Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)). For the first step, the proponent must "establish that the proposed witness would testify to valid scientific, technical, or other specialized knowledge." *Id.* If step one is satisfied, the proponent "must then show that the expert testimony will assist

the trier of fact." *Id.* For this step, the Court "evaluates whether the proposed . . . testimony fits the issue to which the expert is testifying." *Id.*

Federal Rule of Civil Procedure 26(a)(2) governs disclosure requirements for expert witnesses. Under this rule, witnesses must provide an expert report if they are "retained or specially employed to provide expert testimony in the case" or if their "duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). "Failure to comply with the disclosure requirements of Rule 26(a) results in automatic and mandatory exclusion" of the undisclosed opinions "unless the failure was substantially justified or harmless.'" *Novak v. Board of Tr. of S. Ill. Univ.*, 777 F.3d 966, 972 (7th Cir. 2015); Fed. R. Civ. P. 37(c)(1).

**B. Mr. Heese's Disclosure**

The CNO Defendants have filed a motion to exclude Mr. Heese's opinion that CLIC's accounting had "irregularities," which he based in part on the CNO Defendants' concession that CLIC breached the LifeTrend policies at issue. Dkt. 671. The CNO Defendants contend that Mr. Heese's failure to update his report with the breach concession means that the opinion must be excluded. *Id.* at 4–5. Plaintiffs respond that Mr. Heese's report disclosed his opinion that CLIC did not properly report "its policyholder obligations" including the "NGE change to LifeTrend." Dkt. 693 at 73 (quoting dkt. 665-1).

Mr. Heese's report disclosed his opinion that CLIC did not properly report its policyholder obligations. Dkt. 665-1 at 5, 34. The CNO Defendants do not dispute that this allows Mr. Heese to opine that CLIC's obligations to

policyholders stemming from any breach were not properly reported. *See* dkt. 671. Instead, they seek to exclude his opinion only "to the extent it addresses the concession of breach." *Id.* at 5. The breach concession, however, does not fundamentally change Mr. Heese's opinion about CLIC's financial reporting of its obligations. *See* Tr. Vol. 1 at 42–44. Mr. Heese permissibly used the concession as corroboration of his opinion that CLIC was "aware of contingencies that should have been revealed in the financial statements that weren't," rather than to offer a new opinion. *Id.*

Mr. Heese's testimony was therefore permissible elaboration on his disclosed opinions. *See Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 762 (7th Cir. 2010) ("The purpose of these expert reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion."). The CNO Defendants' motion to exclude is denied. Dkt. [671].

**C. Dr. Browne**[4]

Dr. Browne's opinions addressed CLIC's services payments to CNO Services and whether they were consistent with reasonable expenses in an arm's-length relationship. Tr. Vol. 1 at 257. To form his opinions, Dr. Browne developed expense ratios to evaluate CLIC's expenses and then compared those ratios to CLIC's peer companies. *Id.* at 258–59. The peer companies were

[4] Before the jury trial, the Court granted in part and denied in part the CNO Defendants' motion to exclude Dr. Browne's actuarial opinions, deferring only whether Dr. Browne's opinions about inflated expenses and service payments were admissible at the bench trial. Dkt. 529 at 7–10, 13 n.3.

identified by Ward, a company that develops peer groups for business analyses. *Id.* at 257–58. His ratios used either affiliate payments or general expenses in the numerator and either assets, capital and surplus, or premiums and considerations in the denominator. *Id.* at 267–69. This created six ratios—each numerator over each denominator—which Dr. Browne calculated from CLIC's financial records. *Id.*

The CNO Defendants argue that these opinions should be excluded under Rule 702 because his peer companies are not reliably selected and because his ratios are unreliable. Dkt. 473 at 7–21. Plaintiffs respond that Dr. Browne's methods are based on reliable metrics in the insurance industry, passing Rule 702 gatekeeping. Dkt. 493 at 5–13.

For his peer analysis, Dr. Browne used Ward data to form CLIC's peer groups, explaining that Ward is an industry leader in developing peer groups for analyses. Tr. Vol. 1 at 257. Ward in turn segmented life-insurance companies by ownership structure, asset size, and product mix. Tr. Vol. 2 at 540. That is enough to show, by a preponderance of the evidence, that the peer-group selections are reliable enough to be admissible. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) (explaining that experts can rely on other experts' data and opinions, though the testimony "should, of course, be rejected if . . . the underlying basis is faulty"). The CNO Defendants allege shortcomings in Ward's classifications, but not that they are inherently or fundamentally flawed, so those concerns go to weight rather than

admissibility. *See id.* (If an expert "might have relied on faulty information, the matter certainly [can] be explored on cross-examination.").

The CNO Defendants also challenge Dr. Browne's three ratios that use affiliate payments as the numerator, arguing that this methodology didn't account for the amount of services each peer company outsourced to affiliates. Dkt. 473 at 17–18. CLIC, for example, paid CNO Services to perform all its services, including legal, actuarial, and policy-management work. But Dr. Browne compared CLIC to Ward peer companies that reported *any* amount of affiliate payments, however small. Tr. Vol. 2 at 558–59.

Dr. Browne did not determine whether the companies in the analysis "outsourced essentially all of its operational activities to affiliates," or outsourced "a much smaller portion." *Id.* at 560–61, 568–69. Nor did he assess CLIC's affiliate payments "on a more granular level" to evaluate their reasonableness, or to support comparing those payments to those of CLIC's peers. Tr. Vol. 1 at 289–90. Dr. Browne did not explain how his ratios could reliably evaluate whether the affiliate payments were typical for "an arm's length transaction" between the insurer and affiliate when they do not account for the extent of outsourcing. *See* Tr. Vol. 1 at 270; *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 876–77 (7th Cir. 2021) (explaining that a failure to consider alternative explanations supports exclusion of opinions because an expert "must substantiate his opinion, rather than assume it to be true"). Put simply, comparing the cost of outsourcing *all* services with the cost of outsourcing *an*

*unknown portion* of services is not reliable enough to be admissible under Rule 702. Dr. Browne's opinions based on affiliate-payment ratios are excluded.

Dr. Browne's comparisons of CLIC to Wilco (as CLIC was renamed after its sale) suffer the same shortcoming. Dr. Browne did not consider the extent of Wilco's use of affiliates for services or evaluate whether it was similar to CLIC's. Tr. Vol. 2 at 571–72 (Dr. Browne's admission that he had "no idea what the nature or level of Wilco's affiliated service provider utilization was"). Instead, he used Wilco's reported affiliate service payments, with no context or evaluation, and used them to compare ratios with CLIC. *Id.* ("These are the numbers I got, and I reported them."). Dr. Browne's opinions based on comparing CLIC to Wilco therefore are not admissible. *See Kirk*, 991 F.3d at 876–77; *Timm v. Goodyear Dunlap Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) ("To satisfy the requirements of Rule 702 and *Daubert*, Woehrle needed to show that his conclusions were the fruit of a rigorous, objectively-verifiable approach—something more than mere speculation.").

For Dr. Browne's remaining three ratios—with general expenses in the numerator—the CNO Defendants' arguments go to weight rather than admissibility. *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 817 (7th Cir. 2012) (explaining that expert opinions may "be tested . . . with the familiar tools of vigorous cross-examination [and] presentation of contrary evidence"). While the CNO Defendants challenge Dr. Browne's use of median companies to identify whether expenses may be "unusually high," that addresses the weight of Dr. Browne's conclusions rather than his methodology. *See* dkt. 473 at 13–

14 (arguing that Dr. Browne's opinions are meaningless because "half of the companies will always exceed the median"). Similarly, Dr. Browne's use of a company's general expenses (which can fluctuate for any number of reasons), capital and surplus (which can vary due to operational strategy), and net premiums and considerations (which can vary with reinsurance practices) are issues for weight and cross-examination. *See Lapsley*, 689 F.3d at 817. At least at a high level, Dr. Browne's general-expense ratios compare total expense levels against the size of the underlying business across insurance companies to inform whether CLIC's expenses may be too high. *See* Tr. Vol. 1 at 269. That is enough for those three ratios to pass Rule 702 gatekeeping. *See Anderson v. Raymond Corp.*, 61 F.4th 505, 509–10 (7th Cir. 2023).

**D. Mr. Muriel**

Mr. Muriel is an attorney and former director of the Illinois Department of Insurance. Tr. Vol 2 at 590–93. Plaintiffs called Mr. Muriel as an expert on the regulation of insurers and insurance holding companies. *Id.* at 601. The Court exercised its discretion to hear Mr. Muriel's opinion testimony before determining whether he was qualified as an expert under Rule 702. *See Sny Island Levee Drainage Dist.*, 831 F.3d 892 at 900 (When "a trial judge conducts a bench trial, the judge need not conduct a Daubert (or Rule 702) analysis before presentation of the evidence, even though he must determine admissibility at some point."); Tr. Vol. 2 at 601–02.

The CNO Defendants argue that Mr. Muriel is not qualified as an expert, so his opinions should be excluded under Rule 702. Dkt. 474 at 2. Plaintiffs

respond that Mr. Muriel is qualified by his experience as director of the Illinois Department of Insurance and past work as a CPA. Dkt. 489 at 1–2.

Mr. Muriel offered opinions that (1) CLIC's board was not appropriately involved and lacked substantive decisionmaking, (2) CNO dictated CLIC's operations, that the "ability to pay" expense allocations were not fair and reasonable, (3) CLIC's services agreement was too vague, (4) CLIC's expenses were improperly buried in its sale price, and (5) regulators can miss issues. Tr. Vols. 2, 3 at 606–18, 624–34, 637–38, 644–46, 779. He did not explain, however, how his experience qualified him to offer any of those opinions. *See* Tr. Vol. 2 at 590–602.

Mr. Muriel never worked for an insurance company. Tr. Vol. 3 at 655. He never served on an insurance company's board. *Id.* He never served on the board of a financial-services holding company. *Id.* Mr. Muriel could not remember having advised the board of a life insurance company. *Id.* at 658. He has never published an article or taught a class about corporate governance. *Id.* at 661. He had never, before this case, testified as an expert or prepared an expert report on issues of corporate governance or financial holding companies. *Id.* at 680–81. Mr. Muriel did no independent analysis of CLIC's expenses. Tr. Vol. 2 at 611. And he spent very limited time reviewing voluminous corporate records and expert reports in preparing his opinions. Tr. Vol. 3 at 681–87.

The closest Mr. Muriel comes to showing qualifications that support his opinions is his experience during a twenty-month stint as director of the

Illinois Department of Insurance. *See id.* at 689–90; *United States v. Andrews*, 172 F.4th 960, 968 (7th Cir. 2026) ("An expert's experience can suffice to satisfy Rule 702(c)'s threshold."). But for experience to support admissibility, it must be relevant to the opinions and reliably applied. *Brown v. Burlington N. Santa Fe Ry.*, 765 F.3d 765, 776 (7th Cir. 2014).

From his time as director of the Illinois Department of Insurance, Mr. Muriel has not identified any relevant NAIC meetings that he attended. Tr. Vol. 3 at 691–92, 736–38. He could not remember being involved in any analysis of the reasonableness of shared services payments. *Id.* at 703–04. He also admitted that he did not read or review in full the documents he signed as director. *Id.* at 698–99. He instead considered concerns that were brought to him by staff—though he did not explain what those concerns were or what they focused on. *Id.*; *see Brown*, 765 F.3d at 776 ("Dr. Fletcher's application of his own experience is itself suspect."). Most importantly, Mr. Muriel never explained how his experience informed or underpinned his opinions about CLIC. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (What matters is not the title or specialty, but whether the expert "has the adequate education, skill, and training."); *Kirk*, 991 F.3d at 876–77 ("An expert . . . must substantiate his opinion, rather than assume it to be true.").

That lack of connection between experience and expert testimony led to opinions such as Mr. Muriel's admittedly incorrect opinion that one of CLIC's capital infusions and dividends was "inexplicable," when it was instead a carefully crafted transaction related to a tax holiday. Tr. Vol. 3 at 701–03. Mr.

Muriel similarly opined that a 10% services markup was "especially high and offensive," despite a 10% markup rate having been approved by the Illinois Department of Insurance, including with Mr. Muriel's signature during his time as director. *Id.* at 705–31. And he offered an opinion that he retracted at trial that financial issues from LifeTrend policies were never discussed at CLIC board meetings. *Id.* at 760–68.

For his remaining opinions, Mr. Muriel did not draw connections between his limited regulatory experience and his opinions, but offered conclusions that CLIC's actions were, for example, "utterly unfair," "very offensive to me," or something regulators "would not be thrilled to hear." *E.g.* Tr. Vol. 2 at 611–18, 705–06. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. American Int'l Grp.*, 521 F.3d 790, 791 (7th Cir. 2008); *see United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017) (experts may not "merely tell the [factfinder] what result to reach"); *Burns v. Sherwin–Williams Co.*, 78 F.4th 364, 374 (7th Cir. 2023) (affirming the exclusion of "a bare conclusion"). Mr. Muriel's trial testimony therefore demonstrates that he lacks the qualifications to offer the opinions he reached, so those opinions are excluded. *See Downing v. Abbot Labs.*, 48 F.4th 793, 809–10 (7th Cir. 2022) ("For expert testimony to be admissible, the expert must have had something useful to say about the particular circumstances at issue.").

## IV.
## Conclusions of Law[5]

The alter ego issues in this case are governed by Delaware law, though Indiana law is substantially the same. Dkt. 667 at 5–6; dkt. 692 at 83 n.103; *see* dkt. 693 at 57–58.

Imposing alter ego liability by piercing the corporate veil is disfavored and reserved for "exceptional cases." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. Ct. 2021); *accord Escobedo v. BHM Health Assocs., Inc.*, 818 N.E.2d 930, 933 (Ind. 2004) ("Because of the bedrock nature of the principle of limited shareholder liability, the burden on a party seeking to 'pierce the corporate veil' is severe."). Indeed, Delaware "corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control." *Allied Cap. Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. Ct. 2006).

Several factors are relevant to "whether to disregard the corporate form and pierce the corporate veil, including (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder." *Manichaean Cap., LLC*, 251 A.3d at 706. No single factor is determinative. *Id.*

[5] Any conclusion of law that more properly states a finding of fact is adopted as a finding of fact.

at 707. "An ultimate decision regarding veil-piercing is largely based on some combination of these factors, in addition to an overall element of injustice or unfairness." *Id.*

**A. Corporate structure and formalities**

CLIC was an insurance subsidiary within the CNO Defendants' holding-company structure. That structure is common in the insurance industry and is contemplated by NAIC and its model holding-company law that every state has adopted. Placing an insurance company in a holding company also maintains the separate legal status of the companies involved; in fact here CLIC was its own legal entity with its own articles of incorporation and bylaws. *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. Ct. 2012) ("[T]he separate legal existence of juridical entities is fundamental to Delaware law."). The holding-company structure therefore does not make CLIC a "sham entity" to support alter ego liability against the CNO Defendants. *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. Sup. Ct. 2003). Instead, the Delaware-law "policy [that] disfavor[s] disregarding the separate legal existence of business entities" continues to apply. *Manichaean Cap., LLC*, 251 A.3d at 706 (addressing piercing the veil of a holding-company structure); *accord Principal Growth Strategies, LLC v. AGH Parent LLC*, 288 A.3d 1138, 1162 (Del. Ch. Ct. 2023) ("Delaware courts have upheld the legal significance of corporate form, in a corporate-subsidiary complex, despite the fact of substantial overlap in the management and control of the two entities.").

Within that structure, CLIC did not function only as a "façade for the dominant shareholder." *Manichaean Cap., LLC*, 251 A.3d at 706. The "degree of control required to pierce the veil is exclusive domination and control to the point that the [subsidiary] no longer has legal or independent significance of its own." *Wallace ex rel. Cencom Cable Income Partners II v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. Ct. 1999) ("Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."). Here, CLIC had its own investments, assets, liabilities, and reserves. It also had its own insurance policies, including financially problematic blocks of insurance that came with substantial challenges, independent of other insurance subsidiaries in the holding structure. While CLIC's challenges were also a substantial concern for CNO Financial, that is insufficient to support alter ego liability. *See Principal Growth Strategies, LLC*, 288 A.3d at 1162. Through those challenges, CLIC did not commingle funds with CNO Financial, maintained its own financial reporting, and had its financial statements independently and thoroughly audited by PwC.

In line with that independence, CLIC maintained its own board of directors that met and focused on CLIC's business—not CNO Financial's. While CLIC's board members were CNO Financial officers and employees, that does not support piercing the corporate veil because it is common and appropriate for highly regulated insurance companies. *See Crosse*, 836 A.2d at 497 (a veil-piercing claim requires that the subsidiary be "a sham entity"); *Nieves v. Insight Building Co.*, No. 2020 WL 4463425 at *8 (Del. Ch. Ct. Aug. 4,

2020) ("Similarities between entities, such as overlap of personnel, do not negate this basic principle [that a subsidiary is separate and distinct from its parent]: This rule applies . . . even though the entities have identical officers and directors.").[6] Similarly, it was not inappropriate for CNO Financial to be involved in some of CLIC's decisions as its corporate parent in a holding-company structure. *See Principal Growth Strategies, LLC*, 288 A.3d at 1162 ("Mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity.").

What matters is that the board members took and honored their oath to faithfully administer CLIC and act in its best interests. *See Crosse*, 836 A.2d at 497. The evidence from trial does not show that they failed to do so here. Instead, board members were chosen for their qualifications to run CLIC appropriately and they did so through a tumultuous and uncertain time for the company. During that process, CLIC's and the CNO Defendants' interests frequently "were aligned in running responsible, profitable insurance operations." Tr. Vol. 3 at 857–58. As Mr. Bonach credibly testified, CLIC's board took its fiduciary role seriously in managing CLIC's affairs, without

---

[6] Plaintiffs rely on *Continental Casualty Co. v. Symons*, 817 F.3d 979 (7th Cir. 2016), to argue that piercing the corporate veil would not be "unprecedented" and is permissible in regulated industries. Dkt. 693 at 5–6; dkt. 696 at 5. But *Symons* involved "deferential . . . clear error" review of alter ego liability when "fraud was present and the corporation was operated as a mere instrumentality of the alter-ego liable parties." 817 F.3d at 993–94. In addition to those factual distinctions—that go to the core of alter ego liability—the Court does not base its conclusion that alter ego liability is not appropriate here on the regulated nature of the insurance industry.

placing the interest of the holding company above CLIC's interests. Tr. Vol. 3 at 857–58.

Under the factual findings established at trial regarding CLIC's corporate structure, business transactions, board functions, and separation of assets, CLIC and the CNO Defendants did not "operate as a single business entity" as Plaintiffs allege. Dkt. 696 at 5, 30. These factors therefore do not support piercing the corporate veil. *See Crosse*, 836 A.2d at 497.

**B. Capitalization, solvency, and siphoning funds**

There's no dispute that CLIC faced severe financial headwinds from the troubled policies it owned. Those concerns occupied CLIC's attention, and a substantial portion of CNO Financial's attention, for years. They had the potential to "kill" CLIC, and potentially CNO Financial as well. Ex. 112 at 2–3. As Mr. Bischof credibly and precisely explained at trial, CLIC was concerned about its solvency, outlook, and RBC ratio for more than a decade, but it weathered the storm through careful work focused on CLIC's success. Tr. Vol. 2 at 407–446. Ultimately, with CNO Financial's support—including about $65 million to help fund a settlement—CLIC remained solvent, evidenced by its eventual sale. CLIC's financial concerns therefore are not the type of solvency issues that support piercing the corporate veil. *See Manichean Cap.*, 251 A.3d at 707 (Insolvency means "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof" or "an inability to meet maturing obligations as they fall due in the ordinary course of business.").

Instead, a lack of solvency supports alter ego liability when it reveals that the parent company and subsidiary are not treating the subsidiary as its own company, but instead as a mere formality to avoid liabilities or obligations. *PXP Producing Co. v. MitEnergy Upstream LLC*, 342 A.3d 402, 417–18 (Del. Ch. Ct. 2025). The evidence from the bench trial largely reveals the opposite. Instead of having all its resources stripped away, CLIC benefitted from mergers, reinsurance agreements, and receipt of profitable business between 2001 and 2008. CLIC paid dividends to CNO Financial, including to take advantage of a tax holiday, which the parties agree was a legitimate dividend. But CLIC received millions of dollars more in contributions than it paid in dividends. That leaves no evidence that CLIC improperly "funneled monies" up to CNO Financial, much less "in an effort to avoid payment on a possible future judgment." *Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*, No. 2020-0194-KSJM, 2022 WL 611274 at *3 (Del. Ch. Ct. Mar. 2, 2022).

At bottom, CLIC received more financial benefit from CNO Financial than it paid in dividends and remained solvent during the relevant time. So this is not a case when a parent stripped the assets from a subsidiary, leaving plaintiffs with no ability to recover damages from the subsidiary's actions. *See Crosse*, 836 A.2d at 497 ("A veil-piercing claim is usually invoked when the shell corporate entity is insolvent and the plaintiff wishes to reach the personal assets of the corporation's . . . alter egos."). CLIC's solvency and capitalization therefore do not support piercing the corporate veil.

Plaintiffs nevertheless argue that the CNO Defendants siphoned funds from CLIC through inflated and unreasonable service payments. Dkt. 693 at 64–66. At the outset, Plaintiffs do not explain why this argument supports holding CNO Financial liable for CLIC's actions when those service payments were made to CNO Services rather than CNO Financial. *See* dkt. 693 at 64–66. Even setting that aside, there are too many evidentiary gaps in Plaintiffs' theory for this to support alter ego liability. For example, while CLIC's expenses were substantially higher than the $19 million that the consulting firm Milliman identified as a reasonable annual expense amount, Plaintiffs do not address whether Milliman's figure considered CLIC's specific situation, including its outdated and cumbersome administrative systems. The Milliman estimate also expressly relied on expense assumptions "based on industry target allowables" without attempting to calculate or question "the current fully allocated expenses of CLIC." Ex. 132 at 13 (Milliman Report at 10). Similarly, the fact that CLIC's expenses decreased after its sale is insufficient because it does not account for CLIC's ongoing efforts to streamline policy administration, the decreasing number of policies under administration, or the portion of CLIC's business not included in its sale. *See* Tr. Vol. 2 at 461; Tr. Vol. 3 at 827–30; Ex. 132 at 4 (Milliman Report at 1).

Even if the evidence did show that CLIC paid excessive expenses to CNO Services, that alone would be insufficient to pierce the corporate veil. CNO Services provided the services that CLIC needed and paid it for—at a markup that was approved by regulators, consistent with the industry, and externally

audited—so at most CNO Services overcharged CLIC. But such overcharging here, even if proven, does not show abuse of the corporate form as required for alter ego liability. *See Wallace*, 752 A.2d at 1184 (The corporation "must be a sham and exist for no other purpose than as a vehicle for fraud."). The same is true for Mr. Heese's and Dr. Browne's opinions that expense ratios show that CLIC's expenses were too high. For example, Mr. Heese's opinion that a 20% expense ratio would have been appropriate recognizes that CLIC had legitimate obligations that it paid CNO Services for. *See* Tr. Vol. 1 at 207. Dr. Browne's ratio-focused analysis similarly does not opine that CLIC was a sham entity without legitimate policy-administration expenses. *See id.* at 275–78.

Considering the other alter ego factors, including CLIC's corporate structure, solvency, and relationship with CNO Financial, the services payments that CLIC made are insufficient to pierce the corporate veil. *See Manichaean Cap., LLC*, 251 A.3d at 706.

**C. Vehicle for fraud and injustice**

For many of the same reasons relevant to the other factors, the evidence does not support a finding that CLIC was "designed to defraud investors and creditors" to support alter ego liability. *Crosse*, 836 A.2d at 497. Plaintiffs rely heavily on the CNO Defendants' concession that CLIC breached the policies at issue in this case. *See* dkt. 696 at 8–17. But even if that concession could be relevant to piercing the corporate veil—when CLIC itself never made such an admission—a concession in litigation more than a decade later does not show the required "deliberate intent to improperly avoid the Company's liabilities or

obligations." *PXP Producing Co.*, 342 A.3d at 417–18. And while CLIC's actions came at a cost to at least some policyholders, a regulatory takeover for insolvency would have been worse for CLIC's policyholders as a whole. CLIC's actions were those of an insurance company in precarious financial position, rather than that of a company that "exist[ed] for no other purpose than as a vehicle for fraud." *Id.* In fact, Plaintiffs admit that CLIC's actions "saved" it from "significant adverse financial consequences," dkt. 693 at 9, which is inconsistent with the insolvency and fraud required for alter ego liability. *PXP Producing Co.*, 342 A.3d at 417–18.

In the end, even after its sale, CLIC retained enough value to pay the class here $27 million, dkt. 237, demonstrating that CNO Financial worked to maintain its solvency rather than treat it as a sham corporation. *See id.* at 417–19. That agreed settlement does not provide evidence that CLIC was too undercapitalized or insolvent from CNO Financial's actions that it could not have paid whatever damages may have resulted if the case had been litigated to conclusion. *See Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) ("Delaware courts have held that the possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil."); *Nieves v. Insight Building Co.*, 2020 WL 4463425 at *8 ("Judicial disregard for the corporate form is not a remedy available to plaintiffs who merely wish to hold another entity liable in addition to the one with whom they contracted.").

Plaintiffs similarly rely on the jury's verdict in this case that Dr. Camp and Mr. Burnett suffered significant damages from CLIC's actions. Dkt. 693 at 64. "But Delaware courts have rejected that sort of circular reasoning that treats the underlying liability in the present litigation as proof of the injustice justifying veil piercing." *PXP Producing*, 342 A.3d 419. Even more, injustice to the plaintiffs is not enough for alter ego liability—the injustice must also "flow[ ] from misuse of the corporate form." *Id.*; *accord CBR Event Decorators, Inc. v. Gates*, 962 N.E.2d 1276, 1282–83 (Ind. Ct. App. 2012) ("[T]he fraud or injustice alleged by a party seeking to pierce the corporate veil must be caused by, or result from, misuse of the corporate form."). Plaintiffs have not made that required connection here.

* * *

Under the relevant factors, considered in combination along with whether Plaintiffs have shown "an overall element of injustice or unfairness," the extraordinary equitable remedy of piercing the corporate veil is not appropriate here. *Manichaean Cap., LLC*, 251 A.3d at 706. The CNO Defendants are therefore entitled to judgment as a matter of law.

## IV. Conclusion

The parties' joint motion to admit exhibits is **GRANTED**. Dkt. [691]. The CNO Defendants' motion to exclude Mr. Heese's opinion based on the CNO Defendants' concession of breach is **DENIED**. Dkt. [671].

The CNO Defendants are entitled to judgment as a matter of law because Plaintiffs have not shown that they are entitled to equitable alter ego liability. Final judgment will issue by separate entry.

**SO ORDERED.**

Date: 9/30/2026

James Patrick Hanlon

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel